**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

NOV 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IVAN FICKEN, individually, and as father and
best friend of and on behalf of CIPRIAN IVANOF,
his adopted son, as well as on behalf of ISAIA IVANOF,
Ciprian Ivanof's birth father, at the address of
2020-1/2 Second St.
Eau Claire, WI. 54703
Home Telephone: 715-855-1172
E-Mail Address: altruistic10@yahoo.com

        Plaintiffs,

vs.

AMR Corporation,
AMERICAN AIRLINES, INC.
AMR EAGLE HOLDING Corporation,
acting through its President of AAdvantage Marketing
Programs, KURT STACHE, and through its employees
or agents, BARRY ROBERTSON and LISA NORRIS
all of whom have an address of
4333 Amon Carter Blvd.
Ft. Worth, Texas 76155

        Defendants.

Case: 1:07-cv-02166
Assigned To : Urbina, Ricardo M.
Assign. Date : 11/30/2007
Description: Pro Se General Civil

JURY ACTION

**JURY TRIAL DEMANDED**

**COMPLAINT**

    Plaintiffs Ivan Ficken, Ciprian Ivanof and Isaia Ivanof hereby allege and state the following

Complaint against Defendants.

**PARTIES**

1. Plaintiff Ivan Ficken is an individual who is the adoptive father of Ciprian Ivanof.

2. Plaintiff Ciprian Ivanof is an individual who is the adoptive son of Ivan Ficken.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECEIVED
JAN 1 9 2006
NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

IVAN FICKEN, individually, and as father and
best friend of and on behalf of CIPRIAN IVANOF,
his adopted son, as well as on behalf of ISAIA IVANOF,
Ciprian Ivanof's birth father, at the address of
Calea Grivitei, nr. 212
Bloc J, Sc. G, Ap. 9,
Sector 1, COD 783121
Bucharest, ROMANIA
Home Telephone: 40-21-665-6139
E-Mail Address: altruistic10@yahoo.com

        Plaintiffs,

vs.

AMR Corporation,
AMERICAN AIRLINES, INC.
AMR EAGLE HOLDING Corporation,
acting through its President of AAdvantage Marketing
Programs, KURT STACHE, and through its employees
or agents, BARRY ROBERTSON, and LISA NORRIS,
all of whom have an address of
4333 Amon Carter Blvd.
Ft. Worth, Texas 76155

        Defendants.

**CIVIL ACTION NO.**

---

## PLAINTIFFS' MOTION REQUESTING ASSIGNMENT OF COUNSEL
## FROM THE PRO BONO PANEL FOR ABOVE CAPTIONED CASE

In accordance with the criteria listed on the DC Federal District Court's website by which a

Judge decides whether to appoint counsel, the following reasons are offered in support of this

request.

1A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RECEIVED

SEP 2 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IVAN FICKEN, individually, and as father and
best friend of and on behalf of CIPRIAN IVANOF,
etal

        Plaintiffs,

vs.

AMR Corporation,
AMERICAN AIRLINES, INC.
AMR EAGLE HOLDING Corporation,
etal

**CIVIL ACTION NO.** MC06-0083(RMU)

**NOTICE OF CHANGE OF ADDRESS**

Notice is hereby given that effective immediately, Plaintiffs' address should be changed to

        2020½ Second St.
        Eau Claire, WI. 54703

The Court and any Defendants are requested to send copies of any filings or notices to Plaintiffs at the

above address. Plaintiffs phone no. is (715) 855-1172.

_____
Plaintiff Ivan Ficken, individually

_____
Plaintiff Ivan Ficken, for and on behalf of his
adoptive son, Plaintiff Ciprian Ivanof

1B

3.  Plaintiff Isaia Ivanof is an individual who is the birth father of Ciprian Ivanof. While Isaia Ivanof
    maintains a residence at 7 Pescarilor Str., Jurilovca, Tulcea Judet, Romania, he is not fluent in
    English, does not understand the complex intricacies of the issues under consideration here, and for
    purposes of this litigation is deemed not competent to act on his own behalf, for which he is
    depending upon Plaintiffs Ficken and Ciprian Ivanof to look out for his best interests in this
    litigation, and for whom all communications should be addressed to Plaintiffs at the address listed in
    the heading of this Complaint.

4.  Defendant AMR Corporation is a corporation which acts as the parent company for American
    Airlines, Inc.which is the trade name through which AMR Corporation operates and does
    commercial business supplying aviation transportation services to the public, both of which are
    corporately affiliated with AMR EAGLE HOLDING Corporation.

5.  The AAdvantage® Program is an organizational subdivision of AMR Corporation and American
    Airlines, Inc., known as AA's travel awards program whose purpose is to track and maintain records
    of members of the public who fly on American Airlines and earn and accumulate frequent flyer
    miles in the AAdvantage Program, which enables them to redeem those accumulated air miles for
    flights on American Airlines as well as other partner airlines, and other participating commercial
    ventures which allow accumulation and redemption of AAdvantage miles for other goods and
    services, with Kurt Stache holding the title of President of AAdvantage Marketing Programs, which
    concerns the subject of this Complaint.

6.  Barry Robertson and Lisa Norris are (or were) agents or employees of AMR Corporation and
    American Airlines, working in its AAdvantage Program or Customer Relations Department at the
    time that most of the events described in this Complaint occurred, and for whose actions, AMR
    Corporation and American Airlines hold legal liability through the doctrine of *Respondeat Superior.*

## JURISDICTION AND VENUE

7. This action is brought under the federal Racketeer Influenced and Corrupt Organizations ("RICO")

    Act, 18 U.S.C. Sec. 1961 et seq., any other federal or state statutory provisions relating to recovery

    of property or assets wrongfully taken, as well as any statutory provisions relating to plaintiffs'

    entitlements for both intentional and negligent infliction of emotional distress and other

    psychological harm, as well as other common law doctrines providing for the recover of loss relating

    to the above.

8. Jurisdiction is also claimed under Diversity of Citizenship, 28 U.S.C. Sec. 1332(a). Plaintiffs Ficken

    and C. Ivanof are American citizens of the State of Wisconsin, with a temporary residence in

    Bucharest, Romania and Plaintiff Isaia Ivanof is a Romanian citizen with the amount in controversy

    being in excess of the statutory requirement of $75,000. In all of the above, jurisdiction is vested in

    this Court by virtue of 28 U.S.C. Sec. 1331.

9. While Defendant AMR Corporation (hereinafter "AMR") is incorporated in the state of Delaware,

    and maintains much of its organizational headquarters at, or in the vicinity of, the Dallas-Ft. Worth

    Airport it maintains agency ticket offices in Washington, DC and does business in terms of

    maintaining regular commercial flights into Washington, DC as well as cities throughout the U.S.

    and world. All of the above provide sufficient regular and remunerative contacts with this judicial

    district to confer jurisdiction in this Court. Venue is proper in this District pursuant to 28 U.S.C.

    Sec. 1391 and to 18 U.S.C. Sec. 1965(a) and (b).

## STATEMENT OF FACTS AND ALLEGATIONS

10. While American Airlines (hereinafter "AA") debuted the concept of awarding "air miles" with the

    announcement of their AAdvantage® Program, as a means of cultivating and sustaining brand

    loyalty among their customers and the flying public, within weeks following that announcement,

    virtually all major airlines in the U.S. followed suit to remain competitive and to develop their own

3

following of customers who would hold brand loyalty to any or several airlines which they would prefer to fly to enable passengers to accumulate air miles, which could later be redeemed for free flights on that particular airline, thereby ensuring that each airline having such a program would have an established and reliable customer base whose first or second preference would be to fly on one or another particular air carrier to enhance their accumulation of air miles, which they would later hope to redeem for free flights in the future. The success and proliferation of such air miles programs has been so profound during the last several decades that partner and tie in programs which enable the public to accumulate air miles from such diverse sources as buying boxes of cereal and opening and using brokerage and credit card accounts have now become such a part of not only the culture in America, but the world, as the practice spread world wide, and particularly in joint partnership agreements, that Plaintiffs need provide no further descriptive impact of this phenomenon and ask the Court to take judicial notice of the profound manner in which "air miles" have now become embedded in the psyche of the public throughout the world, in the manner in which air miles are now awarded and redeemed in the same manner as cash and credit transactions to the point where air miles have now attained the status of a shadow world currency, as middleman brokerage firms have been spawned dealing in purchase and sale of air miles awards and many of the airlines themselves now offer increments of air miles for sale in what has become essentially a world currency market in airline miles. (The importance of this phenomenon, whether in accordance with and to the liking of the airlines themselves or not, is that airline miles and their being deposited and held in and withdrawn from airline mileage accounts have become an intangible form of property, in the same manner as is money or cash deposited, held in and withdrawn from a bank account, and they need to be looked at and treated in the same manner as cash deposited in a bank).

11. Shortly after AA announced its AAdvantage Program, which Ficken joined and received an AA frequent flyer number of H632802, he also joined Trans World Airlines (hereinafter "TWA")

4

frequent flyer program and received a TWA frequent flyer number of 49619695. While not

previously in the habit of flying an excessive number of trips, Ficken's affiliation with the Naval

Reserve and the difficulty of finding a pay billet locally in the DFW area during the mid-1980s when

Ficken was employed with the SBA in Grand Prairie, TX (until he lost his employment due to a

Machiavellian office director illegally retaliating against Ficken for having filed an EEO complaint,

which led to escalating acts of retaliation that culminated in Ficken's loss of his employment in

March, 1987 and causing the EEO case to become backlogged in EEO administrative process and

then the Federal Court system in Washington, DC for the next 12 years), necessitated finding a

Naval Reserve billet in other parts of the country, for which Ficken had to pay his own transportation

expense to attend, and for which, particularly after his job loss in1987, when the expenditure of time

both on airplanes in flight and awaiting connecting flights became less important (due to Ficken not

having any remunerative employment, beyond his Naval Reserve pay, that would be impaired by

taking time consuming circuitous routes) than was the accumulation of as many air miles as what he

could obtain, almost any flying which Ficken did was scheduled in such a manner as to obtain the

maximum number of air miles, generally by taking as many short haul flights between as many cities

as possible, and making the cheapest advance purchase reservations as far in advance as possible to

obtain the least expensive fares, which, although the total was generally more expensive than an

advance purchase direct flight, the additional air miles which were awarded, generally had a value

which more than made up for the cost differential between direct and circuitous flights, and during

the period when excessive and cutthroat competition raged in the airline industry and during which

time as much as triple mileage awards were being given, the value of air miles obtained was close to

or exceeded the cost of the advance purchase tickets that were bought. E.g. For an approximately

three year period, between 1987 and 1990 Ficken had held a pay billet as Officer in Charge of a

Naval Reserve unit in Cleveland, Ohio. He commuted to his once per month weekend reserve drill

by flying from DFW to Little Rock, AR, changing flights from Little Rock to St. Louis, MO.,

changing flights from St. Louis to Chicago, and changing flights from Chicago to either Cleveland

directly, or sometimes even an additional stopover in between, depending upon what fares and

schedules existed in that market. Since TWA awarded a minimum mileage level of 750 miles,

regardless of the actual mileage flown, while AA awarded only 500 miles as a minimum, and

additionally, TWA maintained a consistent policy from the outset that their miles would never

expire, whereas AA and other airlines, had variable on and off mileage expiration dates, whenever

possible, Ficken flew TWA to both obtain and preserve the maximum number of miles in his

mileage account, with TWA being the airline in which he had accumulated the most mileage. In

short, due to having the available time to expend in taking many and multiple circuitous connecting

flights, Ficken had both contributed a substantial amount of money to TWA's much needed

earnings, since, for years, they had been hanging on the cusp of and being in and out of bankruptcy

proceedings, and, Ficken had expended the time "earning" those miles, by expending sometimes

several days additional time solely for the purpose of receiving airline miles in exchange for

purchasing airline tickets and making the necessary trips, coming and going to his Naval Reserve

meetings (scheduling difficulties often prevented making all the circuitous flights between DFW and

Cleveland or between Cleveland and DFW in one day, thus on the Thursday prior to a drill weekend,

Ficken would get as far as Chicago, where he could take the EL directly from O'Hare Airport to

downtown Chicago and spend the remainder of the day there, returning to O'Hare Airport in the

evening to sleep at the airport awaiting an early flight to Cleveland on Friday AM, and/or

conversely, the same thing upon returning from Cleveland on Sunday night, not getting into DFW

until Monday or Tuesday night. Although some airlines had previously completely discontinued

operations after entering bankruptcy or being bought out by other airlines (e.g. Frontier Airlines

previously having been bought by AA and the frequent flyer mileage had been assumed by AA, and

Pan American and Eastern Airlines having gone bankrupt), in each and every case, it had been advertised throughout the airline industry that no previous frequent flyer member of the public had lost their air miles because of it (similar to a financially solvent bank buying out an insolvent bank and honoring the deposits that had been in place there, and providing further analogous proof that airline miles held in ones mileage account hold the same status and deserve the same property protection as does cash held in ones bank account), something which Ficken was depending upon, in having no fears that his TWA mileage would be in jeopardy of loss, regardless of TWA's corporate fortunes. Particularly in view of no longer having any remunerative employment after 1987 and being forced to live off an ever declining balance of savings he had accumulated while he had been working for the SBA (except for his meager monthly Naval Reserve pay, which was nearly totally consumed in paying airline fares simply to attend the monthly weekend reserve meetings), Ficken viewed his airline mileage with various airlines as one of his major financial assets, and it deserves to be treated as such, on par with actual cash deposits in a bank account.

12.  By early 1990, Ficken had accumulated so many air miles with TWA that when he read about the discovery of the "gulag" of orphanages in Romania that had been discovered by the Western press in the wake of the downfall of the Ceaucescu communist regime in Romania, even in spite of not having a job and not wishing to expend more of his savings on airfares, he was able to redeem a TWA mileage award, dating from mileage first accumulated under a different and more advantageous redemption regime, that enabled him to fly from DFW to TWA's nearest destination to Romania, i.e. Istanbul, Turkey, first class, for little or no additional mileage expenditure than he would have had to make by flying coach, followed by taking train connections to Romania, he was among the first Americans to come to Romania to find a child to adopt, where he found Plaintiff Ciprian Ivanof in a small orphanage near the Black Sea. Being the first American to have visited all the orphanages he did outside of Bucharest, Ficken later wrote a series of reports that he circulated

7

free to anyone who asked, as did the adoption agency writing Ficken's home study, thereby enabling many other people in the U.S. to receive the first reliable information about how to do a Romanian adoption and give them the courage and confidence to go to Romania to find a child to adopt. Upon returning to the U.S. in April, 1990 to get all the lengthy INS and state homestudy paperwork completed, he returned twice during the fall of 1990 (a return to the U.S. between the two trips necessitated by Naval Reserve duty obligations) to complete Ivanof's adoption, with another of the trips also using TWA mileage to fly into and return from Istanbul again. Thus, due to the highly uncertain and speculative nature of the first trip to Romania being done solely to see whether Ficken was able to find a child to adopt, and being easily facilitated by the volume of the TWA mileage he had accumulated, which necessitated minimal actual cost in making the trip, it is probable that had it not been for that volume of TWA airline mileage, the initial trip might never have even been made and Plaintiff Ciprian Ivanof might never have even obtained American citizenship. (While many Romanians had previously tried to adopt C. Ivanof from the orphanage he was in, his birth parents had never given their consent, and for whom the sheer fact of one of their children being able to go to America was, at the time, such an unimaginable dream, that it was probably instrumental in convincing them that they should permit his adoption to be able to go to the U.S. C. Ivanof's birth parents were living in such destitute circumstances at the time of his adoption that they didn't even have electricity, most of their house had only a dirt floor, with only one room having any heat and that from the stove used to cook food, and no indoor plumbing, with three of C. Ivanof's siblings having died in infancy undoubtedly due to the primitive circumstances into which they had been born, and during the time period between Ficken finding Ivanof in the orphanage and completing his adoption, a recently born daughter from the same family had been adopted by a family from Greece, with two older siblings of C. Ivanof still alive and living at home with such severe malnutrition that their growth was obviously stunted).

8

13. Upon bringing C. Ivanof to America in Nov. 1990, Ficken was still living in Grand Prairie, TX, but after three years, had to rotate out of his Naval Reserve billet in Cleveland, finding a different one with a newly established unit at the Naval Historical Center in Washington, DC, where he had two weeks of reserve duty in mid-December, 1990. Ficken brought C. Ivanof along for the two weeks, finding day care at a nearby military base, but enabling him to participate in the Naval Historical Center's Christmas celebrations at the Navy Museum there, as well as C. Ivanof being the first Romanian adoptee to be able to visit the Romanian Embassy in Washington, DC, where the staff arranged a photo op with the Romanian Ambassador to the U.S. and spending Christmas in the home of a family in Richmond, VA whom Ficken had met in Bucharest who had also just completed the adoption of a Romanian child. During the following two years, Ficken generally brought Ivanof along on his once per month weekend Naval Reserve drills in Washington, DC, following the same circuitous flight itinerary of making the shortest distance hops between cities between DFW and Washington, DC to maximize the airline mileage for both Ficken and C. Ivanof, the total airfare for both of them now substantially exceeding Ficken's monthly Naval Reserve pay, but worth it, due to both accumulating retirement point credit for the reserve drills attended, which increases ones ultimate military retirement pension after age 60, as well as, now both Ficken and C. Ivanof were now accumulating valuable airline mileage, which, whenever possible, was TWA mileage.

14. In 1992, Ficken and C. Ivanof moved to Washington, DC both to cut down on the monthly expense of airline trips as well as to enroll C. Ivanof in a bi-lingual French-English school there, the tuition of which was extremely burdensome of being between about $6500 to $8500 per year during the three years Ivanof attended. Shortly thereafter, TWA ran a particularly lucrative mileage promotion whereby if a person flew a certain number of segments of TWA flights over a set time period and which had to include two transatlantic round trip flights, not only would the passenger receive all appropriate flight credit (perhaps with a double or triple premium to boot), but, at the end of the

9

promotion, would receive bonus airline miles somewhere between 100,000 and 200,000 miles per account holder. While Ficken held a strong commitment to raise C. Ivanof with the experience of making at least annual trips back to Romania to visit and stay in touch with his birth family, to whom Plaintiffs had already brought several trips worth of the maximum weight and volume of checked baggage allowable, plus several airlines had been kind enough to give Plaintiffs several additional pieces of free checked baggage upon explaining the humanitarian relief purpose of the trip to bring clothing, food and tools to C. Ivanof's birth family as well as toys and clothing to the orphanage in Romania which had cared for Ivanof during his first couple years of life, TWA's mileage promotion was another opportunity to do so and gain a lot of extra valuable mileage on top of that. So Ficken and C. Ivanof made an additional trip to C. Ivanof's birth family under that promotion (flying into Germany and manhandling all the excess baggage and luggage between airport and train station as well as switching trains several times to get to Romania, while trying to keep track of a young child who was incapable of helping) as well as one additional transatlantic trip a few weeks later, in which Plaintiffs merely made the required Saturday night layover at the Frankfort Airport, which has a special room inside the airport for travelers with children, where C. Ivanof could sleep even on a mattress for free while Ficken slept on the floor, awaiting the expenditure of time for their return flight a day or two later solely to get in their second required TWA transatlantic flight. Both Ficken and C. Ivanof additionally took a number of other domestic TWA flights during the promotion period, solely to receive the required minimum number of segments of travel required by the promotion to receive TWA's maximum bonus mileage award in excess of 100,000 miles apiece. Again, Ficken expended thousands of dollars for which TWA received the financial benefits from (and, as explained, *infra,* AA ultimately received the financial benefits from when buying out TWA some years later, when TWA was in bankruptcy again), and for which the expenditure of those funds was extremely financially burdensome to Ficken, since he

10

didn't have any remunerative employment (shortly after Plaintiffs were committed to moving to Washington, DC in the fall of 1992, Ficken even lost his pay billet with the Naval Historical Unit, due to a required rotation after two years, but where he continued to drill in their voluntary unpaid training unit to accumulate further retirement point credit, as well as possibly being able to obtain some paid two week training duty in the future). To a far greater extent than even in the past, as Ficken's financial savings began to dwindle, and the subjective value of what little money he had left became ever more valuable, his expenditure of thousands of dollars for TWA airline fares on two transatlantic flights for both Ficken and C. Ivanof, was carefully calculated to simply convert that several thousand dollars in cash to more than the same equivalent value of airline miles, which could be used and redeemed for both Ficken and Ivanof in the future to make future flights to visit C. Ivanof's birth family and continue to help support them and enable them to be pulled out of the destitute circumstances they were in.

15. Up through 1996, Ficken and C. Ivanof made at least annual and sometimes twice per year trips to Romania to bring humanitarian relief shipments to C. Ivanof's birth family and to his orphanage, sometimes through redeeming some of the TWA mileage that Ficken had accumulated in his TWA mileage account (none of C. Ivanof's TWA mileage was ever redeemed, under the rationale of his being about 45 years younger than Ficken and thus his probable life expectancy being much longer, during which he could independently redeem the mileage for trips to visit his birth family in Romania in the distant future, as well as being able to utilize it in enabling him to travel to get to college and back in the nearer future) and other times making an outright purchase of TWA airline tickets, depending upon the fare and perception of the comparative value of the additional mileage to be gained in doing so. It is Plaintiffs' best estimate that their last issued TWA mileage statements credited Ficken with approximately or more than 150,000 miles, C. Ivanof with approximately 350,000 miles and I. Ivanof with approximately not more than 10,000 miles, bringing the total

11

mileage value under this Complaint to about or more than half a million airline miles. In 1997 and 1998 Ficken and C. Ivanof were unable to make a visit to C. Ivanof's birth family, due to both financial constraints as well as Ficken's EEO employment discrimination/retaliation case against SBA in the DC Federal District Court having reached a critical and time consuming stage with an interlocutory appeal having been made to the DC Federal Court of Appeals over the issue of the District Court's failure to assign counsel, an appeal which the DC Federal Court of Appeals declined to take, without addressing the appeal's merits in *Ficken v. Alvarez,* 146 F.3d 978 (1998), with Ficken fearing that an absence from the U.S. for several weeks during this time period, when court appearances and filings might unexpectedly arise, could seriously prejudice the progress of the case.

16. In November, 1998, Washington DC government social workers intruded into Ficken and C. Ivanof's life, deeming the apartment in which they were living "unsafe" (in reality there were no safety issues involved, with C. Ivanof never having experienced any illness or injury from having lived there during the previous six years, and with Ficken and C. Ivanof living in luxury in comparison with C. Ivanof's birth family in Romania, and the whole issue being one of aesthetics that the poorly maintained apartment building in which Plaintiffs were living, which was all that Ficken could afford in the high cost of living environment of Washington, DC, was not aesthetically attractive. To prevent the social workers taking the case to court and C. Ivanof being thrown into the DC foster care system, Ficken was able to find a family from Ivanof's first school that he could stay with pending his getting the social workers' housing concerns corrected. With their not even being Americans (the mother from Holland and the father from Norway who held a high paying job at the World Bank), but having shown Plaintiffs a few acts of kindness in the past, Ficken thought that they could be trusted. But they turned out to be false friends, as before Ficken was able to find other living accommodations that would satisfy the social workers, the family caring for C. Ivanof coerced

12

the social workers into taking the case to family court anyway in what developed as a custody dispute.

17. Because the false friend caretaker family and the DC social workers did not share the same values as Plaintiffs, i.e. Plaintiffs place low priority on the quality and extravagance of their living environment in deference to placing higher value on C. Ivanof's education, whereas the social workers and false friend's values were just the opposite, and because C. Ivanof, being an intellectually gifted child with a tested I.Q. in excess of 150, whereas the children of the family of the false friend caretaker were lucky if they had normal I.Q.'s (indicating a radical difference in values and interests between Ivanof and the false friend's children) and whose children had both been taken to psychologists/psychiatrists in the past for violent and self destructive behavior, in addition to Ivanof's false friend caretaker herself acknowledging having had to voluntarily seek psychological consultations in the past (facts which had previously been unknown to Ficken and/or he could not contemplate the threat which this psychologically maladjusted family posed to him and his son), the false friend caretaker started making allegations to the social workers that Ivanof needed psychological therapy simply because of his having lived in the past in Plaintiffs' run down apartment building, while the social workers made similar allegations concerning Ficken, simply because they didn't agree with his values of placing low priority on the living environment in which Plaintiffs' lived, in deference to placing high value on Ivanof's education and helping to financially support Ivanof's birth family in Romania who were living under far more destitute conditions.

18. In spite of being forced to contend with two psychological examinations in which the social workers furnished false (and even laughable from the psychologist's viewpoint) referral information to the psychologists in a failed attempt to precipitate an adverse diagnosis, and repetitively breaking their word that Ivanof could come home, if nothing were found psychologically wrong with either Plaintiff, they refused to give up, and once they brought their case into the family court, they coerced

the judge into ordering yet a third round of psychological assessments with a DC government allied

agency, which the social workers had always been able to depend upon furnishing adverse

psychological diagnoses in the past, and to whom the social workers sent nine different referral

documents, most of which Plaintiffs still have never even read, but reliably confident that they were

filled with false allegations, in the social workers' relentless quest for an adverse diagnosis. And

while the psychological assessment service that was allied with the social workers, made vague and

false suggestions of possible psychological conditions, even the social workers psychologist

recommended that Ivanof be returned to Ficken's care, something which the social workers refused

to do, even when Ficken had rented and moved into a luxurious condominium that, in combination

with storage costs, was nearly three times as expensive as Plaintiffs' previous rent, and for which the

social workers could find nothing wrong. To counter anything adverse from the social workers'

psychologist, Ficken's family court appointed counsel obtained permission to get a far more

thorough psychological evaluation of Ficken from a far more experienced psychologist in private

practice, who found nothing psychologically wrong with Ficken (aside from some minor depression

attributable to the past year's harassment from the social workers) and urged that Ivanof be returned

to Ficken's care as soon as possible. (Combining both Ficken's and Ivanof's experiences over a two

year period, they had to contend with probably around 30 hours worth of psychological or

psychiatric evaluations from some nine different psychologists and psychiatrists [as well as having

briefly talked with far more than that in trying to find and schedule a professional who was both

competent and understanding of Plaintiffs' situation and values], all needless, but which experience

of having to contend with it is severely psychologically damaging in itself in terms of repetitively

imposing stress on a person of having ones values and psyche probed and questioned, when there is

nothing psychologically wrong with a person). The social workers refused to follow that advice of

family reunification from the more experienced and competent psychologist, because he was not

"their" psychologist. The DC social workers were using the same ploy as what apparatchiks in the former USSR used against political dissidents in the misuse and abuse of the psychological and psychiatric professions to diagnose "mental illnesses" in people whose views were not considered politically correct.

19. Ivanof's false friend caretaker started doing the same thing with Ivanof, initially taking him to a reasonably reputable private psychological testing organization, where nothing psychologically wrong was found, but merely repetitively observing that Ivanof was an exceptionally intelligent child who was unhappy because of the separation from his father. Since she couldn't get an adverse diagnosis from a reputable source, Ivanof's false friend caretaker went to similar DC city psychologists feeding them false referral information also, in an attempt to obtain an adverse diagnosis and to prevent Ivanof from being returned to Ficken's care.

20. By late spring, 1999, as SBA EEO discrimination/retaliation case went into mediation for a second time, it became obvious to Ficken that he could not fight a "two ocean war" of both appropriately litigating the SBA case as well as ensuring that he could get his son back, and since he would never forgive himself if he permanently lost custody of Ivanof, Ficken was forced into an extremely adverse financial settlement of the SBA case, that was no where near it's true value if properly litigated, because the SBA and U.S. Attorney's Office representing the SBA knew that they had Ficken "over the barrel" in terms of Ivanof being "held hostage" to settling the SBA case. After more than 12 years of litigation and unemployment because of it, Ficken was forced into a settlement which left him with a deficit of over $15,000 worth of out of pocket paid attorneys fees for representation at the administrative hearing in the case, plus essentially not having any income for the previous 12 years. Coupled with the exorbitant expenses associated with having wasted thousands of dollars in renting the luxurious condominium, for which the social workers wouldn't allow Ivanof's return anyway, no matter how much money Ficken spent on housing for them, and

with the family court proceeding headed for a trial in which Ivanof's custody could be lost, it was essential that Ivanof be removed from the false friend's custody at all costs, and since the emotional stress of the whole experience had substantially impaired Ivanof's ability to concentrate in school and due to his experiencing memory loss because of it, his school performance dropped precipitously and the French International School, where Ivanof had been attending that year refused to promote him to the next grade or even permit his re-taking his current grade. With Washington, DC having the worst public education system in the nation, and Ivanof having no place to attend school the following year, it was additionally critical to leave the area simply to find a decent school for Ivanof to attend.

21. With great difficulty and time expenditure, by the time school started in Sept. 1999, Ficken had been able to get Ivanof's custody transferred to his sister and brother in law living in Wisconsin, but at the price of "stipulating" to the social workers' case in family court, which is essentially an admission of "neglect" and which was totally false, since Ficken had never done anything in the past that could reasonably be called neglectful, and at the further price of surrendering Ivanof's passports to the DC social workers. The social workers and false friend caretaker had so frightened the family court judge with malicious and false charges against Plaintiffs, and particularly the false allegations of mental illness, simply because of the poor conditions of the apartment building in which they'd been living, that she ordered that Ivanof had to have a session scheduled with a psychologist in WI within a week of his arrival there. After two sessions with the WI psychologist, he found no point in continuing, because there was nothing psychologically wrong with Ivanof.

22. In early Sept., 1999 Plaintiffs moved to WI, with Ivanof being required to stay with Ficken's sister, pending the resolution of the family court case in DC, where the false friend continued to attend the family court proceedings, even though she was not a member of Plaintiffs' family in any way and had no right to be there, vehemently protesting that Ivanof's "needs" were not being handled in WI.

16

She made repeated calls to the WI social workers who refused to discuss any aspect of the situation with her, and who were equally baffled with their DC counterparts' overly aggressive behavior toward Plaintiffs, but were totally helpless to do anything about it, except sending favorable reports urging family reunification back to the family court judge in DC. Several months later, the case was turned over to a different DC family court judge, who, when faced with now dramatically favorable reports from WI in contrast to the horrendously unfavorable and false reports from the DC social workers, ordered another examination from a psychiatrist for Ficken to settle the issue, and which examination found nothing wrong with Ficken that should prevent family reunification, but still caused the process to be dragged out for an additional year and a half from the time Plaintiffs had moved to WI before the case was finally closed in DC. During the summer of 2000 (while the case was still open and Ivanof was still not permitted to live with Ficken) the WI social workers hired an outside social services agency to write an independent report on Plaintiffs that both urged family reunification and stressed the positive effects which the trips to Ivanof's birth family in Romania had for his life, which caused the new family court judge in DC to order the DC social workers to return Ivanof's passports, an order which the DC social workers refused to comply with for three to four months, by which time it was nearly Christmas of 2000, and it had been more than four years since Plaintiffs had been able to make a return trip to Ivanof's birth family. But it was too late. Even though Plaintiffs made a return visit to Romania over Ivanof's Christmas vacation of 2000, the previous April, 2000, while Ivanof's passports were still under confiscation by the DC social workers, Ivanof's birth mother had died a premature death at the age of only about 46, undoubtedly due to the extremely difficult and hard life she had led. The DC social workers had committed the unforgivable atrocity of denying a child the right to even see his own mother for years, until she was dead.

17

23. To add insult to injury, during the summer of 2000, the city of DC condemned the entire apartment building in which Plaintiffs had formerly resided for over six years and charged the slumlords who owned the building with hundreds of housing code violations that potentially could have sent them to prison for over 40 years. But rather than merely vacate the building, the remaining tenants filed a lawsuit against the city of DC for housing discrimination, which led to the city of DC orchestrating a plea bargain with the building's owners that they would give up ownership of the building to the tenants then living there for the total sum of $1. in addition to paying hundreds of thousands of dollars in repair and other expenses which were also supplemented with city provided funds to help rehabilitate the building, in return for the criminal housing violation charges being reduced to only seven, to which they would plead guilty. A couple years later, the association of tenants still remaining there sold the entire building to a housing developer, which netted each tenant the sum of $114,000. Plaintiffs received nothing out of this settlement, except being psychologically harassed for years by the DC social workers and being run out of town for living there, in spite of their having lived there for over six years making them probably the second to longest living family who had lived in the building.

24. Both due to the undeserved intrusion into their lives by the DC social workers, and the years' worth of psychological harassment and financial losses associated with that harassment as well as the loss of value of what they should have received from being tenants in their old apartment building, which the remaining tenants received (all remaining tenants who were permitted to remain in the building were Black or recent immigrant Hispanics, while Plaintiffs are White, supporting Plaintiffs' belief that even the initial intrusion into their lives by the social workers was racially motivated, in that it's OK for Blacks and Hispanics to live in adverse housing in DC, but not for Whites, where one of the city employed Black psychologists who Ivanof had been taken to by the false friend caretaker, asked Ficken point blank "why were living in a Black-Hispanic neighborhood?" as though doing so should

18

be against the law) Plaintiffs here felt that they had to hold the DC social workers accountable for the destruction which they brought upon Plaintiffs' lives, and to prevent the DC social workers from engaging in similar future behavior to other DC residents, who, all too frequently are the city's poor and uneducated, and thus unknowledgeable and incapable of knowing how to defend their rights. But doing so in DC Federal Court would also risk the social workers retaliating against Plaintiffs if they lived anywhere in the U.S. where in every county of every state, there are government social workers to whom the DC social workers could coerce their harassment of Plaintiffs. Consequently, both to ensure that such retaliation would not occur, as well as needing to find the peace of mind of not fearing that it might occur, even if in reality, it did not, Plaintiffs realized that prior to initiating any action against the social workers, they would have to move outside the jurisdiction of the U.S. and to Romania, where they also could be assured of being better able to care for those members of Ivanof's birth family who remained alive.

25. The above account explaining both the horrendous circumstances which Plaintiffs experienced in Washington, DC, and carried over to their moving to WI and finally moving to Romania is supplied for two primary purposes: 1. The approximately two and half years of harassment, and having to repetitively fend off false allegations of a person being "mentally ill" simply because one has higher intelligence than normal, which is indicative of having different values than most people have, in caring about bringing a greater degree of social justice in the world by being willing to live a modest or less expensive lifestyle in return for being better able to care for people in more destitute circumstances, imposed so much stress on both Ficken and C. Ivanof that both their physical and psychological health has sustained long term damage as a result of it, with both Plaintiffs experiencing the classic symptoms of Post Traumatic Stress Syndrome or Disorder (PTSD), which is the only form of "mental illness" which is externally caused by experiencing too severe a level of stress over too long a period of time. (In 2001, after the family court case was closed, Plaintiffs

19

contacted one of the U.S.'s foremost experts on the adverse effects of stress, a psychiatrist who, in conjunction with a colleague decades earlier, had developed various stress scales and tests, assigning a numerical value to various stress events of a person's life. It was developed and scored to show that anytime a person experienced a stress score of over 100 in any given year, either or both physical or mental illness was likely to result. As an illustrative example, a life stress chart for Vincent Van Gogh was presented from what events are known of his life, where a couple years prior to his death his yearly stress level had reached 475. The rest is history. With both Ficken and C. Ivanof taking the most comprehensive version of these stress tests, and it being completely objective in terms of simply asking whether certain events occurred, without subjectively asking Plaintiffs whether they felt "stressed," for the highest stress level year of their lives, 1999, Ficken's stress score was approximately 630 while C. Ivanof's was somewhere between 100-200, which is exceedingly high for a child, and in both cases, the scores are probable understatements of their true stress, due to many of the events which occurred to them during 1999 [as well as in 1998, 2000 and 2001] being so highly unusual, e.g. a family having unwillingly been torn apart with a high prospect of loss of custody and losing one's parent, that the questionnaire used in the stress test didn't even have questions which related to such events, in addition to many of the stress causing events having repetitively occurred during that year, while the scoring mechanism for the test allowing their being recorded only once. Both Plaintiffs are still alive and intend on staying that way, but the PTSD after effects will linger on for years and perhaps for the rest of their lives, weakening their resistance to other stress events, such as those which form the subject of this Complaint. 2. To explain the necessity behind Plaintiffs moving to Romania, which has been instrumental in making it more difficult to stay in touch with what AA was doing with their TWA airline mileage, which AA has stolen, destroyed or otherwise denied Plaintiffs access to and the use of.

26. The critical thrust of points one and two is that 1. Whether an act of harm or injury occurred is measured by an objective, while the extent of the injury experienced is measured using a subjective standard. AA's actions are analogous to someone committing an act of assault and battery (as measured by an objective standard of its occurrence) against a person suffering from a condition of having both extremely fragile bone structure and hemophilia, and walking away from the person leaving him with a completely broken body and bleeding to death (the injuries subjectively experienced by the victim) and 2. Plaintiffs were forced "into exile" in Romania, for the remainder of the time period during which C. Ivanof remains under age 18, as the only means of attaining peace of mind from further persecution. While it should be obvious from the above, the mere financial loss of their TWA airline mileage, which is substantial enough in itself (even when trebled under the provisions of the RICO statute), pales in comparison with the intentionally inflicted stress and emotional pain and suffering which Plaintiffs have experienced since AA's refusal to honor their commitment to transfer their TWA mileage to an AAdvantage mileage account. As will be shown with the comprehensiveness and clarity with which Plaintiffs' communication with AA explained the subjective importance of their loss, none of the Defendants here can claim ignorance of the severity of the intentionally inflicted harm which they have brought upon Plaintiffs lives, and from Plaintiffs location in Romania, they could not have been apprised of the damage that AA was perpetrating upon them, until it became "too late" from AA's perspective, to do anything to stop it.

27. During the earlier months of 2001, the news media widely publicized the fact that not only was TWA in bankruptcy proceedings again, but that they were likely to be bought out by AA and that TWA would likely cease to exist as an independent company. For a period of time during this period when the buyout of TWA by AA was ongoing, there was some joint arrangement by which mileage between the two air carriers could be used on each other's flights. Nearing the time period when Plaintiffs moved to Romania in late August, 2001, and realizing that Plaintiffs might not be

back in the U.S. for a long time, Ficken telephoned AA's AAdvantage program representatives to receive the most accurate account transfer information to ensure that Plaintiffs' TWA mileage would not be lost. The conversation was relatively long (probably a half hour or more) and covered not only the issues concerning the transfer of mileage from one's TWA account to an AA AAdvantage account, but also the issues of how one could redeem the mileage from an overseas location while Plaintiffs were in Romania, intending to possibly use their TWA mileage to return to the U.S. after C. Ivanof finished high school and was over 18 years of age, where AA had a European office in Ireland which handled AAdvantage mileage awards for overseas passengers. To be absolutely sure that there was no mistake in understanding, Ficken reviewed and repeated back his understanding of what information had been told to him by the AAdvantage representative over the telephone, and consistently got the same information and instructions from the AAdvantage representative which were these: A TWA mileage holder could already convert their TWA mileage to an AA AAdvantage mileage account, but once it was converted, the mileage holder would have three years from the date of the conversion within which some "activity" would need to occur in the account to keep the miles valid, which "activity" could be either a deposit or withdrawal of mileage or something which would make it clear to AA that the mileage account holder was still interested in maintaining the mileage in their account. Given the wide variety of means by which such "activity" could be accomplished, and which could even be as simple and inexpensive as buying a few boxes of specially marked breakfast cereal and cutting out the mileage award coupons and sending them in to AA to get several hundred additional miles added to their mileage account, which would constitute the requisite "activity", one could easily stay on top of the situation, so long as a person had a fixed date to keep in mind before which one had to institute the required account "activity." Thus, according to the information given to Ficken in the summer of 2001, he could have converted all three of the TWA mileage accounts to AA mileage accounts right then and there, but the AA

AAdvantage representative also explained that for those TWA account holders who had not already converted their mileage to an AA mileage account, starting on Nov. 1, 2001, AA would automatically convert their TWA mileage to AA AAdvantage mileage, which would effectively push the start date by which the three years during which some "activity" would need to occur in an account, forward by several months, and thereby giving Plaintiffs several months additional time to ensure that their TWA mileage remained active in an AA mileage account by instituting some "activity." Since Plaintiffs were uncertain exactly how many years they'd be in Romania, and might have to rely upon some friend or relative in the U.S. to institute the account "activity" for them, e.g. buying the necessary boxes of cereal and sending in the cut out mileage coupons, it was important to ensure that the mileage remained valid for as long a period of time as necessary, since they might not easily be able to effect such account "activity" on their own from Romania. Ficken is **absolutely positive** of the accuracy of this information given to him by AA's AAdvantage representative, and, as is his habit when dealing with a customer service representative by phone concerning an issue which one needs to depend on, Ficken recollects asking the AAdvantage representative for her name or employee identification number so that there would be a responsible AA employee party to refer back to in case of any misunderstandings, of which Ficken is certain that there was no misunderstanding, since he had re-verified the accuracy of this information multiple times with the AA representative. (Having once worked in a customer service representative call center himself, Ficken would assume that the AA representative who talked with him by phone in or around August, 2001, would also have noted her name or identifying code into AA's mileage account for Ficken (unless AA has now attempted to destroy the evidence of what information their representative had given Ficken in 2001) as proof of the conversation. Thus, Plaintiffs relied upon the accuracy of the information given to Ficken via the AA representative, in making their choice of what to do with their TWA mileage, which, based on that information which they relied upon, it was most prudent to

do nothing, in reliance upon the fact that AA was going to transfer Plaintiffs' TWA mileage to an AA mileage account on or around Nov. 1, 2001. Plaintiffs moved to Romania in late Aug., 2001 comfortable in the knowledge upon which they were relying that their hard earned (and paid for at tremendous and unaffordable personal expense) TWA airline mileage would automatically be transferred to an AA mileage account around Nov. 1, 2001, and that unless they redeemed a mileage award prior to that, that the mileage would remain valid for at least three years after Nov. 1, 2001, i.e. until at least Nov. 1, 2004.

28. A more than adequate number of months prior to Nov. 1, 2004, Ficken e-mailed the AA AAdvantage Dept. and asked for the new AAdvantage account numbers for C. Ivanof as well as I. Ivanof, as well as inquired about Ficken's own TWA mileage being deposited in his AAdvantage mileage account. The initial e-mail response was absurdly shocking and appeared to come from someone who obviously didn't know what was going on in terms of the earlier commitment from an AAdvantage representative given to Ficken around August, 2001, in explaining that AA's deadline for converting TWA mileage to an AA mileage account had expired more than a year earlier, and that they would not allow further transfers of TWA mileage into an AA mileage account. In other words, AA had completely destroyed all of Plaintiffs' TWA mileage and claimed that it was not recoverable. It was obvious that either the AA representative from whom Ficken had received the mileage account transfer information in Aug. 2001 and upon which information Plaintiffs were justifiably relying, didn't know what she was talking about, or AA simply changed their rules thereafter and didn't notify Plaintiffs of the change.

29. Hoping to get to a responsible party, rather than what was probably a recently hired customer service representative, who was probably simply mouthing a script of company policy, and didn't have any power to make exceptions to it, and who didn't understand the gravity of the tremendous financial loss which this would inflict upon Plaintiffs, Ficken asked that this decision be forwarded up the

chain of command, and included an extremely detailed and comprehensive letter explaining all of

the past tremendous expenditures of funds, which were unaffordably lost, in purchasing Plaintiffs'

TWA mileage, as well as their justified reliance upon AA's advice given to them in Aug., 2001, and

additionally included in the e-mail, two sets of scanned photos showing C. Ivanof during his visits to

his birth family in Romania, as well as the funeral and visit to his birth mother's grave site, as proof

of the legitimacy of the information in the text e-mailed to them.  (Both the letter and scanned photos

e-mailed to the AA representative who had initially responded to Ficken's e-mail inquiry [Barry

Robertson] and for which a response was later given by Lisa Norris, is included as an attachment to

this Complaint)  After several weeks, Ficken received a response from Lisa Norris at AA's customer

relations department, which again refused to transfer the TWA mileage to an AA account.  It wasn't

that AA didn't even have the records of the TWA mileage.  In a shocking gesture of insensitivity and

lack of regard for the loss and emotional distress which they were inflicting upon Plaintiffs, AA just

didn't want to look up the TWA records.  Even if the records had been totally destroyed, and similar

to an account holder at a bank bringing in documentation (i.e. a bank book, certificate of deposit,

etc.), AA's callous disregard for the financial and emotional damage which they were inflicting on

Plaintiffs, dictated that AA didn't care whether Plaintiffs would be capable of producing any records

from TWA showing how much mileage they had in their accounts, because AA simply didn't care

about the hurt and loss they had inflicted upon Plainitffs.  (It is important to note here, that since

Plaintiffs moved to Romania with only a number of boxes of checked baggage that the airline they

used would allow them to take, although they brought along a written down list of their airline

frequent flyer numbers, they did not feel it necessary to bring along past TWA mileage statements

showing the exact number of miles that Plaintiffs had in their TWA mileage accounts, because they

were confidently depending upon the information given to them by the AA representative in the

Aug., 2001 phone conversation that the TWA mileage would automatically be converted to AA

RICO action for racketeering losses which result from any of the crimes listed in 18 USC§1961(1)

which involves "… any act or threat involving (other listed crimes deleted, which may or may not

have applicability here but surely is robbery) … robbery … which is chargeable under state law and

punishable by imprisonment for more than one year." Plaintiffs believe that at least some state laws

provide prison punishment for more than one year for the theft, embezzlement, intentional

destruction or robbery of property valued in the amount of the value of the airline mileage stolen by

AA from Plaintiffs here.

30. **RICO CLAIM, GENERAL INTRODUCTORY OVERVIEW**

31. ¶29 adequately places AA's robbery of Plaintiffs' TWA airline mileage in the realm of it being

actionable in civil RICO. Even if it did not, under 18USC§1961(1)B, a civil RICO claim should be

actionable by virtue of AA's claimed inability to transfer Plaintiffs' TWA mileage to an AA mileage

account, in actuality, being a fraudulent excuse in claiming that they "can't" when in fact AA simply

doesn't want to. For reasons of avarice and wanting to make more money off of Plaintiffs, AA

simply doesn't want to transfer the TWA mileage, because it creates a potential future liability to

AA in granting airline award travel to Plaintiffs, in the hope that Plaintiffs will be forced to buy a

ticket instead from AA so that AA can get more money from Plaintiffs in the future instead of

honoring Plaintiffs' property rights in their TWA mileage. In short, AA wants it's cake (advertising

having attractive travel mileage awards) and eat it too (refusal to honor their commitment to transfer

Plaintiffs' TWA mileage, like they promised they were going to do on Nov. 1, 2001) thereby

running a fraudulent travel award program that additionally violates the mail fraud provisions of

title18 USC §1341 which trigger civil RICO liability. Additionally subsection B of the above

section provides for civil RICO liability for losses due to "… any act which is indictable under any

of the following provisions of title 18 USC … §1343 relating to wire fraud …" with the fraudulent

transmission of information from AA to Ficken telling Plaintiffs that AA can't transfer the TWA

mileage to an AA mileage account, when in fact AA simply doesn't want to. At least two

individuals that Plaintiffs know of, i.e. Barry Robertson, and Lisa Norris, were involved in

communicating that fraudulent information to Ficken by wire (at least portions of the transmission of

e-mails being by wire and not only being in interstate commerce, but international commerce), and

probably a number of additional AA employees (of whom Plaintiffs are unaware and need the tools

of the discovery process to determine their names and positions) were additionally involved in that

decision, as well as Kurt Stache, as President of AA's AAdvantage Marketing Programs and for

which he or his predecessors, have developed policies inimical to allowing Plaintiffs to obtain their

TWA airline mileage, in addition to AA as an individual corporate entity being institutionally

involved in that decision and being liable for the acts of their agents and employees under the

doctrine of *Respondeat Superior*—18 USC§1961 "Definitions" defining (3) "person" to include

"any individual, or entity capable of holding a legal or beneficial interest in property." And (4)

"enterprise" to include "any individual, partnership, corporation, association or other legal entity,

and any union or group of individuals associated in fact, although not a legal entity." It is

unquestionable that the conspiracy perpetrated by AA and/or it's officers, agents and employees

created a severe economic loss to Plaintiffs which is the subject of this Complaint. Plaintiffs ask

leave of the Court to amend their pleadings, both for the reason of, not being able to make their

pleadings with the greatest degree of specificity due to, even with the exercise of due diligence and

care in seeking the information necessary to more specifically state their pleadings, Plaintiffs have

not had access to information within the control of AA, and which is necessary to do so and, for the

reason of requesting appointed counsel, in whose professional opinion these pleadings may need to

be stated differently or with greater specificity. In any event, the manner and detail in which

Plaintiffs are stating their pleadings should be presently adequate for the purpose of giving notice to

Defendants of the bases upon which this Complaint is being filed.

28

32. **COUNT ONE: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SEC. 1962 (c) and (d) (Conspiracy: Barry Robertson, Lisa Norris, Kurt Stache and/or additional AA employees and AMR Corporation and AA, Inc. as entities themselves)**

33. All Plaintiffs reallege and restate paragraphs 1 through 32.

34. At all relevant times, Barry Robertson, Lisa Norris, Kurt Stache (or his predecessor) and others, presently indeterminate, and AMR Corporation and American Airlines, Inc. constituted an "enterprise," within the meaning of 18. U.S.C. Sec. 1961(4) and 1962(c), in that it was a group of "individuals" within the meaning of 18 U.S.C. Sec. 1961(4) and each or a sufficient number of the above Defendants are individual "persons" within the meaning of 18 U.S.C. Sec. 1961(3) and 1962( c), who associated with and/or participated in the conduct of said enterprise's affairs between August, 2001 and the present time and who conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. Sec. 1961(1), 1961(5) and 1962(c). Defendants' pattern of racketeering activity consisted of a scheme to defraud the Plaintiffs of their TWA mileage and/or the value thereof, which scheme was knowingly and intentionally devised by Defendants to prevent and thwart Plaintiffs' ability to utilize their TWA mileage in the future, and which created a substantial financial loss to Plaintiffs. For the purpose of and in furtherance of their scheme to defraud, Defendants repetitively transmitted information via e-mail wire transmission services to Plaintiffs that Defendants could not transfer the TWA mileage to an AA mileage account, when previous communications with AA, Inc. employees promised that such mileage transfers would occur automatically, and where AA, Inc. employees could, if they wanted to, transfer Plaintiffs' TWA mileage to an AA mileage account, but for which, Defendants do not want to effect such mileage transfers for the reason of wanting to defraud Plaintiffs out of exceedingly valuable property, i.e. the TWA mileage, for which they had expended large sums of money solely to obtain

that mileage, at a time when Plaintiffs had very little money themselves and would not have

otherwise made the TWA flights which they did, except only for the purpose of purchasing and

obtaining the valuable TWA mileage. Thus, for the purpose of and in furtherance of the scheme to

defraud, Defendants transmitted false, misleading and/or fraudulent information and/or documents

via e-mail through interstate and international commerce, which transmission of fraudulent material

caused Defendants to commit wire fraud, in violation of 18 U.S.C. Sec. 1343. Furthermore,

Defendants placed or foreseeably caused to be placed in a post office, or authorized depository for

mail, and/or other interstate private or public delivery service, matter that furthered the scheme to

defraud by issuing mass mailings to their AA mileage program members as well as advertisements

to non-program members which touted the benefits of having AA mileage program membership, and

which were contrary to the promises and benefits made by another AA employee in Aug., 2001, who

promised Ficken that Plaintiffs' TWA mileage would be automatically transferred to a new AA

airline mileage account, which it never was, and which caused various named and un-named

Defendants working for AA, Inc. to commit mail fraud, in violation of 18 U.S.C. Sec. 1341 each

time they used or foreseeably caused the mails or other interstate private delivery service to be used

to distribute the information and materials described elsewhere in this complaint. Through the

perpetration of this scheme to defraud, Plaintiffs' right to the expectation of honest services was

violated and which is specifically covered in 18 U.S.C. Sec. 1346. These acts of Defendants caused

Plaintiffs to incur severe financial loss which is attributable to Defendants' scheme, consisting of,

but not limited to Plaintiffs' loss of the actual mileage in their TWA mileage account and/or the

economic value of that mileage. These acts of Defendants all occurred after the effective date of

RICO and more than two such acts occurred within ten years of one another.

35. As stated in the last two sentences of paragraph 31, *supra*, and particularly in the context of the

complexity and specificity of the RICO statute and the uncertainties which presently exist

30

concerning how far beyond the Defendants specifically stated in the RICO claims, their conspiracies extended, "Plaintiffs ask leave of the Court to amend their pleadings, both for the reason of, not being able to make their pleadings with the greatest degree of specificity due to, even with the exercise of due diligence and care in seeking the information necessary to more specifically state their pleadings, Plaintiffs have not had access to information within the control of AA, and which is necessary to do so and, for the reason of requesting appointed counsel, in whose professional opinion these pleadings may need to be stated differently or with greater specificity.  In any event, the manner and detail in which Plaintiffs are stating their pleadings should be presently adequate for the purpose of giving notice to Defendants of the bases upon which this Complaint is being filed.

36. **NON-RICO CLAIMS**

37. **COUNT TWO:  RECOVERY OF EITHER THE ACTUAL PROPERTY (TWA AIRLINE MILEAGE IN THE FORM OF IT BEING TRANSFERRED TO AND RECORDED IN AN AMERICAN AIRLINES AADVANTAGE PROGRAM MILEAGE ACCOUNT FOR EACH OF THE PLAINTIFFS) OR THE MAXIMUM DOLLAR RETAIL VALUE OF SUCH MILEAGE, UNDER THE COMMON LAW DOCTRINES OF TROVER, DETINUE, REPLEVIN OR CONVERSION OR ANY OTHER COMMON LAW DOCTRINE APPLICABLE TO THE FACTS OF THIS CASE USING WHATEVER LAW IS APPLICABLE TO THE FACTS OF THIS CASE.**

38. All Plaintiffs reallege and restate paragraphs 1 through 37.

39. Because it is unclear to Plaintiffs which laws of which states or which federal common law may be applicable to this case, Plaintiffs wish to take no chances of overlooking any possibilities and plead for recovery jointly or in the alternatives of the common law doctrines of Trover, Detinue or Conversion, as well as any other common law doctrine applicable to the facts of this case for the recovery of the property or the value of the property which Defendants have taken away from them.

40. Black's Law Dictionary defines Trover as:

> A common-law action for the recovery of damages for the conversion of personal property, the damages generally being measured by the value of the property. ... Quoting Benjamin J. Shipman, *Handbook of Common-Law Pleading* §43, at 99 (Henry Winthrop Ballantine ed., 3d ed. 1923): "Trover may be maintained for all kinds of personal property, including legal documents, but not where articles severed from land by and adverse possessor, at least until recovery of possession of the land. It lies for the misappropriation of specfic money, but not for breach of an obligation to pay where there is no duty to return specific money."

41. Black's Law Dictionary defines Detinue as:

> A common-law action to recover personal property wrongfully taken by another. Quoting R.F.V. Heuston, *Salmond on the Law of Torts,* 111 (17th ed. 1977) "A claim in detinue lies at the suit of a person who has an immediate right to the possession of the goods against a person who is in actual possession of them, and who, upon proper demand, fails or refuses to deliver them up without lawful excuse. Detinue at the present day has two main uses. In the first place, the plaintiff may desire the specific restitution of his chattels and not damages for their conversion. He will then sue in detinue, not in trover. In the second place, the plaintiff will have to sue in detinue if the defendant sets up no claim of ownership and has not been guilty of tresspass; for the original acquisition in *detinue sur bailment* was lawful."

42 Black's Law Dictionary defines Conversion (in tort and criminal law) as:

> The wrongful possession or disposition of another's property as if it were one's own; an act or series of acts of willful interference without lawful justification, with an item of property in a manner inconsistent with another's right whereby that other person is deprived of the use and possession of the property. Also quoting Heuston, *ibid,* at 94 "There are three distinct methods by which one man may deprive another of his property, and so be guilty of a conversion and liable in an action for trover—(1) by wrongly taking it, (20 by wrongly detaining it, and (3) by wrongly disposing of it. The term conversion was originally limited to the third of these cases. To convert goods meant to dispose of them, or make away with them, to deal with them, in such a way that neither owner nor wrongdoes had any further possession of them: for example, by consuming them, or by destroying them, or by selling them, or otherwise delivering them to some third person. Merely to take another's goods, however wrongfully, was not to convert them. Merely to detain them in defiance of the owner's title was not to convert them. The fact that conversion in it's modern sense includes instance of all three modes in which a man may be wrongfully deprived of his goods, and not of one mode only, is the outcome of a process of historical development whereby, by means of legal fiction and other devices,m the action of trover was enabled to extend its limits and appropriate the territories that rightly belonged to other and earlier forms of action." Quoting alsoWilliam Geldart, *Introduction to English Law,* 143 (D.C.M. Yardley ed., 9th ed. 1984) "By conversion of goods is meant any act in relation to goods which amounts to an exercise of dominion over them, inconsistent with the owner's right of property. It does not include mere acts of damage, or even an asportation which does not amount to a denial of the owner's right of property; but it does include such acts as taking possession, refusing to give up on demand, disposing of the goods to a third person, or destroying them."

43. Black's Law Dictionary defines Replevin as:

> **1**. An action for the repossession of personal property wrongfully taken or detained by the defendant, whereby the plaintiff gives security for and holds the property until the court decides who owns it. – Also termed *claim and delivery.* [Cases: Replevin 1. C.J.S. *Replevin* §§ 2-7.]  **2**. A writ obtained from a court authorizing the retaking of personal property wrongfully taken or detained. – Also termed (in sense 2) *writ of replevin.*  Cf. Detinue; Trover.  [Cases:  Replevin 34 C.J.S. *Replevin* § 60.]

> Quoting Benjamin J. Shipman, *Handbook of Common-Law Pleading* § 49, at 120 (Henry Winthrop Ballantine ed., 3d. ed. 1923) "The action of replevin lies, where specific personal property has been wrongfully taken and is wrongfully detained, to recover possession of the property, together with damages for its detention.  To support the action it is necessary: (a) That the property shall be personal. (b) That the plaintiff, at the time of suit, shall be entitled to the immediate possession. (c)  That (at common law) the defendant shall have wrongfully taken the property (replevin in the cepit).  But, by statute in most states, the action will now also lie where the property is wrongfully detained, though it was lawfully obtained in the first instance (replevin in the detinet). (d) That the property shall be wrongfully detained by the defendant at the time of suit."

44. By means of clarification, and in particular reference to the latter common law action referred to of Replevin, which various other legal dictionaries define in multiple different ways, but with a generally common theme of it being the appropriate cause of action when plaintiffs are asking for an *immediate* return of the property, prior to the lawsuit being tried, and giving security for the property, pending the court's eventual adjudication of ownership, Plaintiffs in the present cause of action do not need and are not asking for an order which gives immediate return of the TWA mileage, pending the present cause of action running it's course, nor are they prepared to provide security for the value of their TWA miles which Defendants have wrongfully taken or destroyed. While the possibility exists, and, as explained in the Facts and Allegations portion of this Complaint, Plaintiffs had inquired of the AA AAdvantage customer service representative in Aug., 2001 about how to claim an AA AAdvantage mileage award while they were overseas in Romania, and they might have an interest or need to utilize such a mileage award on their return to the U.S. in either the summer or 2006 or 2007, the need for the restoration of their TWA mileage into an AA AAdvantage mileage account is not an emergency situation for which immediate restoration is necessary.  Thus,

33

depending upon how strictly or in what manner or by which state or federal law the Court might construe an action in Replevin, it may not be the most suitable cause of action to plead in this instance, in deference to the more general causes of action of Trover, Detinue or Conversion.

45. Plaintiffs plead all of the above common law causes of action in their **Count Two**, both jointly and in the alternative, as well as any additional common law causes of action, jointly or in the alternative, which the Court may consider applicable to this case, all common law causes of action being pled jointly and in the alternative, with Plaintiffs being willing to accept either the restitution of their TWA mileage into an AA AAdvantage mileage account or its monetary value, based on the maximum retail value of short notice purchased tickets, which the value of their mileage would otherwise have been able to purchase incrementally for the maximum value of airline ticket awards, through redemption of the total sum of their TWA mileage (but, for which, the awarding of such mileage or it's equivalent case value, would not satisfy **Count One** of Plaintiffs' RICO claim, which exists independent of **Count Two** and **Count Three**, nor would it satisfy any of Plaintiffs' other Counts listed *infra*, (except **Count Three,** which is the statutory equivalent of **Count Two**, to the extent to which a statutory equivalent exists in the law of whatever state or federal law the Court applies), all additional Counts, exclusive of **Counts Two and Three**, being for monetary damages and not for the awarding of any additional admeasure of airline mileage awards.

46. <u>**COUNT THREE:**</u>  **IN ADDITION TO, OR AS AN ALTERNATIVE TO COUNT TWO, THE RECOVERY OF EITHER THE ACTUAL PROPERTY (TWA AIRLINE MILEAGE IN THE FORM OF IT BEING TRANSFERRED TO AND RECORDED IN AN AMERICAN AIRLINES AADVANTAGE PROGRAM MILEAGE ACCOUNT FOR EACH OF THE PLAINTIFFS) OR THE MAXIMUM DOLLAR RETAIL VALUE OF SUCH MILEAGE, UNDER WHATEVER STATUORY LAW EXISTS UNDER WHATEVER STATE OR FEDERAL LAW WHICH THE COURT DECIDES IS APPLICABLE IN THIS CASE,**

**WHICH STATUTORY LAW SERVES TO STATUTORILY IMPLEMENT OR REPLACE THE COMMON LAW DOCTRINES OF TROVER, DETINUE, REPLEVIN OR CONVERSION OR ANY OTHER COMMON LAW DOCTRINE APPLICABLE TO THE FACTS OF THIS CASE USING WHATEVER LAW IS APPLICABLE TO THE FACTS OF THIS CASE.**

47. All Plaintiffs reallege and restate paragraphs 1 through 46.

48. Because it is unclear to Plaintiffs which statutory laws of which states or which federal statutory law may be applicable to this case, Plaintiffs wish to take no chances of overlooking any possibilities and plead for recovery jointly or in the alternative, any and all statutory laws of whatever states and federal statutes which may be applicable to the facts of this case for the recovery of the property or the value of the property which Defendants have taken away from them.

49. In addition to or as an alternative to any of the above common law causes of action pleaded specifically or unspecified additionally in their **Count Two**, both jointly and in the alternative, which the Court may consider applicable to this case, Plaintiffs plead any and all statutory causes of action jointly and in the alternative, which would be applicable under the laws of whichever state or federal laws which this Court will apply in this case, which had been enacted to replace whichever other common law causes of action (such as those listed above in **Count Two** of Trover, Detinue, Conversion or Replevin or any other applicable common law doctrines which would be appropriate to use in recovering property wrongfully taken or destroyed) which otherwise might enable a Plaintiff to recover the value of or the specific items or goods wrongfully stolen, taken, detained, destroyed or otherwise denied a plaintiff the use of their property, with Plaintiffs being willing to accept in satisfaction of either **Count Two** or **Count Three**, either the restitution of their TWA mileage into an AA AAdvantage mileage account or its monetary value, based on the maximum retail value of short notice purchased tickets, which the value of their mileage would otherwise have

35

been able to purchase incrementally for the maximum value of airline ticket awards, through redemption of the total sum of their TWA mileage (but, for which, the awarding of such mileage or it's equivalent case value, would not satisfy **Count One** of Plaintiffs' RICO claim, which exists independent of **Count Two** and **Count Three**, nor would it satisfy any of Plaintiffs' other Counts listed *infra* or *supra,* (except **Count Two,** which is the common law equivalent of **Count Three**, to the extent to which a common law equivalent exists in the law of whatever state or federal law the Court applies), all additional Counts, exclusive of **Counts Two and Three**, being for monetary damages and not for the awarding of any additional admeasure of airline mileage awards.

50. **COUNT FOUR:   INTENTIONAL INFLICTION OF PSYCHOLOGICAL AND EMOTIONAL DISTRESS AND PAIN AND SUFFERING BY DEFENDANTS AGAINST CIPRIAN IVANOF**

51.  Ciprian Ivanof realleges and restates paragraphs 1 through 50.

52. AMR Corporation and American Airlines, Inc., directly, and by and through their agents, Barry Robertson and Lisa Norris and through other unknown and unnamed AMR Corporation and American Airlines, Inc. employees and agents, both directly and under the doctrine of *Respondeat Superior*, intentionally inflicted psychological and emotional distress upon Plaintiff Ciprian Ivanof, who, at the time was a minor child, and consequently, because of his young age, was unusually susceptible to the adverse effects of being psychologically and emotionally traumatized, and additionally, by virtue of having been further severely psychologically and emotionally traumatized by the actions of the Washington, DC social workers in completely disrupting and psychologically emotionally traumatizing his life during the previous several years prior to learning of his loss of his TWA mileage, had still been suffering the effects of and aftereffects of Post Traumatic Stress Disorder (PTSD) and thus was particularly and unusually susceptible to the further intentionally inflicted psychological and emotional distress on the part of Defendants here by their stealing,

36

taking, detaining or otherwise denying the use and/or existence of his TWA mileage and not transferring that mileage to a new AA AAdvantage mileage account, which AA had expressly promised and committed themselves to doing. C. Ivanof had been depending upon utilizing his hundreds or thousands of miles of TWA mileage in the future and throughout his life to be able to make return visits from the U.S. to Romania to visit and continue making humanitarian relief trips to help the survival of the remaining members of his birth family living in Romania, including, but not limited to his birth father, Plaintiff Isaia Ivanof, as well as being able to, or being more easily able to make return visits to his adoptive family, Plaintiff Ivan Ficken, during the upcoming years when Ciprian Ivanof would be attending college or otherwise located geographically distant from both C. Ivanof's birth family and adoptive family and for which he could easily or more easily utilize his large accumulation of hundreds of thousands of TWA airline miles, which he had been depending upon being transferred to and converted into AA AAdvantage miles for which future airline trips on AA or the large number of it's partner airline would enable him to use to make trips to visit both his birth and adoptive families. The prospect of further disruptions of C. Ivanof's familial relations with both his birth family and adoptive, by not being able to and easily be able to make future trips and visits, and particularly being mindful of the complete and near total financial destruction which his adoptive father, Ivan Ficken, had sustained during the previous several years of litigation with and familial separation caused by the Washington, DC social workers, meant that such airline trips to better be able to visit and stay in touch with both his birth family and adoptive family, would not otherwise be easily affordable, and for which his hundreds of thousands of TWA airline miles would probably be crucial in being able to make any or many visits to his family at all. The realization of losing his hundreds of thousands of TWA airline miles, for which, he can well remember as a young child having taken many and frequent and long airline trips solely to purchase and accumulate those airlines mileage, was a particularly psychologically depressing and emotionally stressful blow to C.

Ivanof, in learning at a young age, that one cannot trust people and organizations to respect their promises and commitments and to fulfill their obligations which they promised, even when C. Ivanof had completely fulfilled his commitments of taking all the airline flights required to have accumulated that airline mileage, and watching his father expend thousands of dollars for airline tickets, which might otherwise have been utilized to better the habitability of C. Ivanof's life as he was growing up, and which may well impact C. Ivanof's future ability to trust anyone or any organization's promises in the future, by having learned a very bitter lesson at a very young age that no matter what one does, people simply can't be trusted, made that much worse, by C. Ivanof having previously been betrayed by the false friend into whose care Plaintiff Ficken had entrusted C. Ivanof, to specifically avoid the DC social workers taking their intervention into Plaintiffs' life to family court and then later realizing that not only had C. Ivanof's caretaker stabbed him in the back by coercing the DC social workers into taking the case to court in a custody dispute, but also the social workers lied in their commitment that they would not take the case to family court, so long as Plaintiffs had a suitable home in which C. Ivanof could stay.  Keeping in mind, the principle of law discussed, *supra,* that whether a tort occurred is measured on an *objective* standard (here, C. Ivanof having both objectively suffered the loss of his TWA mileage, for which *anyone*, would logically experience *some* objectively measured psychological and emotional distress at the loss of property of such a large magnitude and value), while the extent of one's injuries is measured using a *subjective* standard, as the extent of the loss is subjectively experienced by the victim (here, C. Ivanof, by recently having experienced years worth of psychological and emotional distress from the separation from his adoptive father, and the consequences of betrayal by the person mistakenly chosen to care for him as a means of avoiding further social worker action of destruction of Plaintiffs' family unit, and the experience of being betrayed by the social workers themselves in breaking their promise to not take the case to family court, which substantially further worsened and extended the

38

psychological and emotional distress experienced by C. Ivanof), C. Ivanof's experience of

intentionally inflicted psychological and emotional distress is particularly severe and far more

substantial than might be the normally perceived loss which the *average* AA frequent flyer might

experience, upon learning of their loss of hundreds of thousands of airline miles, for which *anyone*

would experience at least some emotional distress at the loss.  AMR Corporation, AA, Inc., and their

employees Barry Robertson and Lisa Norris (as well as probably Kurt Stache or his predecessors)

cannot claim ignorance of the severity of the psychological and emotional distress which their

actions inflicted upon C. Ivanof, given that Ficken had e-mailed a comprehensive letter to them,

explaining the importance and adverse impact which Defendants' actions were inflicting upon

Plaintiffs, which letter, including, two pages of color photo montages, are attached to this Complaint

and labeled **Attachment 1**, showing C. Ivanof along with his birth family in Romania taken during

previous trips which Plaintiffs made to Romania in visiting C. Ivanof's birth family and during

which Plaintiffs brought along the maximum amount of humanitarian relief items to help C. Ivanof's

birth family survive, as well as showing in the photo montage the effects of C. Ivanof not being able

to visit his birth family for years (between 1996 and the end of 2000, with the time period of not

being able to visit between 1998 and 2000 being totally caused by the actions of the DC social

workers and in their confiscating C. Ivanof's passports, during which time C. Ivanof's birth mother

died in Romania and Plaintiffs didn't even know about it until some seven months later), with the

second photo montage showing C. Ivanof's mother's dead body during her funeral in the birth

family home and later, after Plaintiffs were able to make a long overdue visit during C. Ivanof's

Christmas vacation in late 2000, C. Ivanof visiting his birth mother's grave site with his birth father,

Plaintiff, I. Ivanof.  In short, with all the evidence which Plaintiffs brought to Defendants' attention

prior to Defendants' final decision to refuse to return, reinstate or transfer C. Ivanof's TWA mileage

to an AA AAdvantage account, Defendants cannot deny having actual knowledge of the extremely

severe intentionally inflicted psychological and emotional distress which Defendants' actions have brought upon C. Ivanof, in reckless disregard for his hard earned property rights of accumulating that mileage as well as reckless disregard for the obviously psychologically and emotionally damaging distress which they were inflicting on C. Ivanof's life.

53. **COUNT FIVE:  NEGLIGENT INFLICTION OF PSYCHOLOGICAL AND EMOTIONAL DISTRESS AND PAIN AND SUFFERING BY DEFENDANTS AGAINST CIPRIAN IVANOF**

54. Ciprian Ivanof realleges and restates paragraphs 1 through 53.

55. To whatever extent Defendants' actions do not rise to the level of intentionality discussed in **Count Four**, in addition to and, additionally, as an alternative to, C. Ivanof pleads Defendants' negligent infliction of psychological and emotional distress.   AMR Corporation and American Airlines, Inc., directly, and by and through their agents, Barry Robertson and Lisa Norris and through other unknown and unnamed AMR Corporation and American Airlines, Inc. employees and agents, both directly and under the doctrine of *Respondeat Superior*, negligently inflicted psychological and emotional distress upon Plaintiff Ciprian Ivanof, who, at the time was a minor child, and consequently, because of his young age, was unusually susceptible to the adverse effects of being psychologically and emotionally traumatized, and additionally, by virtue of having been further severely psychologically and emotionally traumatized by the actions of the Washington, DC social workers in completely disrupting and psychologically and emotionally traumatizing his life during the previous several years prior to learning of his loss of his TWA mileage, had still been suffering the effects of and aftereffects of Post Traumatic Stress Disorder (PTSD) and thus was particularly and unusually susceptible to the further intentionally or negligently inflicted psychological and emotional distress on the part of Defendants here by their stealing, taking, detaining or otherwise denying the use and/or existence of his TWA mileage and not transferring that mileage to a new AA

40

AAdvantage mileage account, which AA had expressly promised and committed themselves to

doing. C. Ivanof had been depending upon utilizing his hundreds or thousands of miles of TWA

mileage in the future and throughout his life to be able to make return visits from the U.S. to

Romania to visit and continue making humanitarian relief trips to help the survival of the remaining

members of his birth family living in Romania, including, but not limited to his birth father, Plaintiff

Isaia Ivanof, as well as being able to, or being more easily able to make return visits to his adoptive

family, Plaintiff Ivan Ficken, during the upcoming years when Ciprian Ivanof would be attending

college or otherwise located geographically distant from both C. Ivanof's birth family and adoptive

family and for which he could easily or more easily utilize his large accumulation of hundreds of

thousands of TWA airline miles, which he had been depending upon being transferred to and

converted into AA AAdvantage miles for which future airline trips on AA or the large number of it's

partner airline would enable him to use to make trips to visit both his birth and adoptive families.

The prospect of further disruptions of C. Ivanof's familial relations with both his birth family and

adoptive, by not being able to and easily be able to make future trips and visits, and particularly

being mindful of the complete and near total financial destruction which his adoptive father, Ivan

Ficken, had sustained during the previous several years of litigation with and familial separation

caused by the Washington, DC social workers, meant that such airline trips to better be able to visit

and stay in touch with both his birth family and adoptive family, would not otherwise be easily

affordable, and for which his hundreds of thousands of TWA airline miles would probably be crucial

in being able to make any or many visits to his family at all. The realization of losing his hundreds

of thousands of TWA airline miles, for which, he can well remember as a young child having taken

many and frequent and long airline trips solely to purchase and accumulate those airlines mileage,

was a particularly psychologically depressing and emotionally stressful blow to C. Ivanof, in

learning at a young age, that one cannot trust people and organizations to respect their promises and

commitments and to fulfill their obligations which they promised, even when C. Ivanof had

completely fulfilled his commitments of taking all the airline flights required to have accumulated

that airline mileage, and watching his father expend thousands of dollars for airline tickets, which

might otherwise have been utilized to better the habitability of C. Ivanof's life as he was growing up,

and which may well impact C. Ivanof's future ability to trust anyone or any organization's promises

in the future, by having learned a very bitter lesson at a very young age that no matter what one does,

people simply can't be trusted, made that much worse, by C. Ivanof having previously been betrayed

by the false friend into whose care Plaintiff Ficken had entrusted C. Ivanof, to specifically avoid the

DC social workers taking their intervention into Plaintiffs' life to family court and then later

realizing that not only had C. Ivanof's caretaker stabbed him in the back by coercing the DC social

workers into taking the case to court in a custody dispute, but also the social workers lied in their

commitment that they would not take the case to family court, so long as Plaintiffs had a suitable

home in which C. Ivanof could stay.  Keeping in mind, the principle of law discussed, *supra,* that

whether a tort occurred is measured on an *objective* standard (here, C. Ivanof having both

objectively suffered the loss of his TWA mileage, for which *anyone*, would logically experience

*some* objectively measured psychological and emotional distress at the loss of property of such a

large magnitude and value), while the extent of one's injuries is measured using a *subjective*

standard, as the extent of the loss is subjectively experienced by the victim (here, C. Ivanof, by

recently having experienced years worth of psychological and emotional distress from the separation

from his adoptive father, and the consequences of betrayal by the person mistakenly chosen to care

for him as a means of avoiding further social worker action of destruction of Plaintiffs' family unit,

and the experience of being betrayed by the social workers themselves in breaking their promise to

not take the case to family court, which substantially further worsened and extended the

psychological and emotional distress experienced by C. Ivanof), C. Ivanof's experience of

intentionally inflicted psychological and emotional distress is particularly severe and far more

substantial than might be the normally perceived loss which the *average* AA frequent flyer might

experience, upon learning of their loss of hundreds of thousands of airline miles, for which *anyone*

would experience at least *some* emotional distress at the loss. AMR Corporation, AA, Inc., and their

employees Barry Robertson and Lisa Norris (as well as probably Kurt Stache or his predecessors)

cannot claim ignorance of the severity of the psychological and emotional distress which their

actions inflicted upon C. Ivanof, given that Ficken had e-mailed a comprehensive letter to them,

explaining the importance and adverse impact which Defendants' actions were inflicting upon

Plaintiffs, which letter, including, two pages of photo montages, are attached to this Complaint and

labeled **Attachment 1**, showing C. Ivanof along with his birth family in Romania taken during

previous trips which Plaintiffs made to Romania in visiting C. Ivanof's birth family and during

which Plaintiffs brought along the maximum amount of humanitarian relief items to help C. Ivanof's

birth family survive, as well as showing in the photo montage the effects of C. Ivanof not being able

to visit his birth family for years (between 1996 and the end of 2000, with the time period of not

being able to visit between 1998 and 2000 being totally caused by the actions of the DC social

workers and in their confiscating C. Ivanof's passports, during which time C. Ivanof's birth mother

died in Romania and Plaintiffs didn't even know about it until some seven months later), with the

second photo montage showing C. Ivanof's mother's dead body during her funeral in the birth

family home and later, after Plaintiffs were able to make a long overdue visit during C. Ivanof's

Christmas vacation in late 2000, C. Ivanof visiting his birth mother's grave site with his birth father,

Plaintiff, I. Ivanof. In short, with all the evidence which Plaintiffs brought to Defendants' attention

prior to Defendants' final decision to refuse to return, reinstate or transfer C. Ivanof's TWA mileage

to an AA AAdvantage account, Defendants cannot deny having actual knowledge of the extremely

severe intentionally inflicted psychological and emotional distress which Defendants' actions have

brought upon C. Ivanof, in reckless disregard for his hard earned property rights of accumulating
that mileage as well as reckless disregard for the obviously psychologically and emotionally
damaging distress which they were inflicting on C. Ivanof's life.

56. **COUNT SIX:  INTENTIONAL INFLICTION OF PSYCHOLOGICAL AND EMOTIONAL**
**DISTRESS AND PAIN AND SUFFERING BY DEFENDANTS AGAINST IVAN FICKEN**

57. Ivan Ficken realleges and restates paragraphs 1 through 56.

58. AMR Corporation and American Airlines, Inc., directly, and by and through their agents, Barry
Robertson and Lisa Norris and through other unknown and unnamed AMR Corporation and
American Airlines, Inc. employees and agents, both directly and under the doctrine of *Respondeat*
*Superior*, intentionally inflicted psychological and emotional distress upon Plaintiff Ivan Ficken and
because and by virtue of having been further severely psychologically and emotionally traumatized
by the actions of the Washington, DC social workers in completely disrupting and psychologically
and emotionally traumatizing his life during the previous several years prior to learning of Plaintiffs'
loss of their TWA mileage, had still been suffering the effects of and aftereffects of Post Traumatic
Stress Disorder (PTSD) and thus was particularly and unusually susceptible to the further
intentionally inflicted psychological and emotional distress on the part of Defendants here by their
stealing, taking, detaining or otherwise denying the use and/or existence of his TWA mileage and
not transferring that mileage to a new AA AAdvantage mileage account, which AA had expressly
promised and committed themselves to doing.  Ficken had been depending upon utilizing the
hundreds of thousands of miles of TWA mileage accumulated in both his and C. Ivanof's mileage
account in the future and throughout his life to be able to make return visits from the U.S. to
Romania to visit and continue making humanitarian relief trips to help the survival of the remaining
members of C. Ivanof's birth family living in Romania, including, but not limited to C. Ivanof's
birth father, Plaintiff Isaia Ivanof, as well as being able to, or being more easily able to make visits to

44

and receive visits from, his adoptive son, Plaintiff C. Ivanof, during the upcoming years when C.

Ivanof would be attending college or otherwise located geographically distant from both C. Ivanof's

birth family and Ficken and for which he could easily or more easily utilize his large accumulation

of in excess of a hundred thousand TWA airline miles, as well as C. Ivanof's accumulation of

hundreds of thousands of TWA miles, which he had been depending upon being transferred to and

converted into AA AAdvantage miles for which future airline trips on AA or the large number of it's

partner airlines would enable him and C. Ivanof to use to make trips to visit both C. Ivanof's birth

family and for C. Ivanof's adoptive family to experience more frequent contacts and visits. The

prospect of further disruptions of C. Ivanof's and Ficken's familial relations with both C. Ivanof's

birth family and adoptive family, by not being able to and easily be able to make future trips and

visits, and particularly being mindful of the complete and near total financial destruction which

Ficken, had sustained during the previous several years of litigation with and familial separation

caused by the Washington, DC social workers, meant that such airline trips to better be able to visit

and stay in touch with C. Ivanof's birth family as well as Plaintiffs' adoptive family themselves,

would not otherwise be easily affordable, and for which the total of Plaintiffs' hundreds of thousands

of TWA airline miles would probably be crucial in being able to make any or many family visits at

all. The realization of losing Plaintiffs' hundreds of thousands of TWA airline miles, for which,

Ficken and C. Ivanof had taken many and frequent and long airline trips solely to purchase and

accumulate that airline mileage, was a particularly psychologically depressing and emotionally

stressful blow to Ficken, in confirming that one cannot trust people and organizations to respect their

promises and commitments and to fulfill their obligations which they promised, even when Ficken

and C. Ivanof had completely fulfilled their commitments of taking all the airline flights required to

have accumulated that airline mileage, and expending thousands of dollars for airline tickets, which

might otherwise have been utilized to better the habitability of C. Ivanof's life as he was growing up,

and which may well impact both Ficken's and C. Ivanof's future ability to trust anyone or any

organization's promises in the future, by having learned a very bitter lesson that no matter what one

does, people simply can't be trusted, made that much worse, by Ficken having previously been

betrayed by the false friend into whose care Ficken had entrusted C. Ivanof, to specifically avoid the

DC social workers taking their intervention into Plaintiffs' life to family court and then later

realizing that not only had C. Ivanof's caretaker stabbed both Ficken and C. Ivanof in the back by

coercing the DC social workers into taking the case to court in a custody dispute, but also the social

workers lied in their commitment that they would not take the case to family court, so long as

Plaintiffs had a suitable home in which C. Ivanof could stay.  Keeping in mind, the principle of law

discussed, *supra,* that whether a tort occurred is measured by an *objective* standard (here, Ficken

having both objectively suffered the loss of his TWA mileage, and vicariously experienced C.

Ivanof's loss of his TWA mileage, for which *anyone*, and any parent, would logically experience

*some* objectively measured psychological and emotional distress at the loss of property of such a

large magnitude and value), while the extent of one's injuries is measured using a *subjective*

standard, as the extent of the loss is subjectively experienced by the victim (here, Ficken, by recently

having experienced years worth of psychological and emotional distress from the separation from his

adoptive son, and the consequences of betrayal by the person mistakenly chosen to care for his son,

as a means of avoiding further social worker action of destruction of Plaintiffs' family unit, and the

experience of being betrayed by the social workers themselves in breaking their promise to not take

the case to family court, which substantially further worsened and extended the psychological and

emotional distress experienced by Ficken), Ficken's experience of intentionally inflicted

psychological and emotional distress is particularly severe and far more substantial than might be the

normally perceived loss which the *average* AA frequent flyer might experience, upon learning of

their loss of hundreds of thousands of airline miles, for which *anyone* would experience at least

46

some psychological and emotional distress at the loss. AMR Corporation, AA, Inc., and their

employees Barry Robertson and Lisa Norris (as well as probably Kurt Stache or his predecessors)

cannot claim ignorance of the severity of the psychological and emotional distress which their

actions inflicted upon Ficken both directly and vicariously, upon learning of the huge loss of TWA

mileage that was contained in Ficken's and C. Ivanof's TWA mileage account, given that Ficken had

e-mailed a comprehensive letter to them, explaining the importance and adverse impact which

Defendants' actions were inflicting upon Plaintiffs, which letter, including, two pages of color photo

montages, are attached to this Complaint and labeled **Attachment 1**, showing C. Ivanof along with

his birth family in Romania taken during previous trips which Plaintiffs made to Romania in visiting

C. Ivanof's birth family and during which Plaintiffs brought along the maximum amount of

humanitarian relief items to help C. Ivanof's birth family survive, as well as showing in the photo

montage the effects of C. Ivanof not being able to visit his birth family for years (between 1996 and

the end of 2000, with the time period of not being able to visit between 1998 and 2000 being totally

caused by the actions of the DC social workers and in their confiscating C. Ivanof's passports,

during which time C. Ivanof's birth mother died in Romania and Plaintiffs didn't even know about it

until some seven months later), with the second photo montage showing C. Ivanof's mother's dead

body during her funeral in the birth family home and later, after Plaintiffs were able to make a long

overdue visit during C. Ivanof's Christmas vacation in late 2000, C. Ivanof visiting his birth

mother's grave site with his birth father, Plaintiff, I. Ivanof. In short, with all the evidence which

Plaintiffs brought to Defendants' attention prior to Defendants' final decision to refuse to return,

reinstate or transfer Ficken's and C. Ivanof's TWA mileage to an AA AAdvantage account,

Defendants cannot deny having actual knowledge of the extremely severe intentionally inflicted

psychological and emotional distress which Defendants' actions have brought upon Ficken, in

reckless disregard for his hard earned property rights of accumulating that mileage as well as

reckless disregard for the obviously psychologically and emotionally damaging distress which they were inflicting on Ficken's life. During virtually each and every day since receiving the e-mail communications from AA, Inc.'s Barry Robertson and Lisa Norris refusing to transfer Plaintiffs' TWA mileage to an AA AAdvantage mileage account, Ficken unavoidably wastes time thinking about the loss, experiencing a sense of emotional outrage and disgust at AA's actions and particularly upon even seeing a commercial airliner flying through the skies, feels a shudder and flash of remembrance of this loss, which now borders on his almost experiencing a fear of flying, knowing that commercial airlines simply can't be trusted to fulfill the obligations which they have previously committed to doing, associated not only with their frequent flyer programs, but any aspect of their operations, including airline safety.

59. **COUNT SEVEN: NEGLIGENT INFLICTION OF PSYCHOLOGICAL AND EMOTIONAL DISTRESS AND PAIN AND SUFFERING BY DEFENDANTS AGAINST IVAN FICKEN**

60. Ivan Ficken realleges and restates paragraphs 1 through 59.

61. To whatever extent Defendants' actions do not rise to the level of intentionality discussed in **Count Six**, in addition to and, additionally, as an alternative to, Ivan Ficken pleads Defendants' negligent infliction of psychological and emotional distress. AMR Corporation and American Airlines, Inc., directly, and by and through their agents, Barry Robertson and Lisa Norris and through other unknown and unnamed AMR Corporation and American Airlines, Inc. employees and agents, both directly and under the doctrine of *Respondeat Superior*, negligently inflicted psychological and emotional distress upon Plaintiff Ivan Ficken and because and by virtue of having been further severely psychologically and emotionally traumatized by the actions of the Washington, DC social workers in completely disrupting and psychologically and emotionally traumatizing his life during the previous several years prior to learning of Plaintiffs' loss of their TWA mileage, had still been suffering the effects of and aftereffects of Post Traumatic Stress Disorder (PTSD) and thus was

48

particularly and unusually susceptible to the further negligently inflicted psychological and emotional distress on the part of Defendants here by their stealing, taking, detaining or otherwise denying the use and/or existence of his TWA mileage and not transferring that mileage to a new AA AAdvantage mileage account, which AA had expressly promised and committed themselves to doing. Ficken had been depending upon utilizing the hundreds of thousands of miles of TWA mileage accumulated in both his and C. Ivanof's mileage account in the future and throughout his life to be able to make return visits from the U.S. to Romania to visit and continue making humanitarian relief trips to help the survival of the remaining members of C. Ivanof's birth family living in Romania, including, but not limited to C. Ivanof's birth father, Plaintiff Isaia Ivanof, as well as being able to, or being more easily able to make visits to and receive visits from, his adoptive son, Plaintiff C. Ivanof, during the upcoming years when C. Ivanof would be attending college or otherwise located geographically distant from both C. Ivanof's birth family and Ficken, and for which he could easily or more easily utilize his large accumulation of in excess of a hundred thousand TWA airline miles, as well as C. Ivanof's accumulation of hundreds of thousands of TWA miles, which he had been depending upon being transferred to and converted into AA AAdvantage miles for which future airline trips on AA or the large number of it's partner airlines would enable him and C. Ivanof to use to make trips to visit both C. Ivanof's birth family and for C. Ivanof's adoptive family to experience more frequent contacts and visits. The prospect of further disruptions of C. Ivanof's and Ficken's familial relations with both C. Ivanof's birth family and adoptive family, by not being able to and easily be able to make future trips and visits, and particularly being mindful of the complete and near total financial destruction which Ficken, had sustained during the previous several years of litigation with and familial separation caused by the Washington, DC social workers, meant that such airline trips to better be able to visit and stay in touch with C. Ivanof's birth family as well as Plaintiffs' adoptive family themselves, would not otherwise be easily affordable,

and for which the total of Plaintiffs' hundreds of thousands of TWA airline miles would probably be

crucial in being able to make any or many family visits at all. The realization of losing Plaintiffs'

hundreds of thousands of TWA airline miles, for which, Ficken and C. Ivanof had taken many and

frequent and long airline trips solely to purchase and accumulate that airline mileage, was a

particularly psychologically depressing and emotionally stressful blow to Ficken, in confirming that

one cannot trust people and organizations to respect their promises and commitments and to fulfill

their obligations which they promised, even when Ficken and C. Ivanof had completely fulfilled

their commitments of taking all the airline flights required to have accumulated that airline mileage,

and expending thousands of dollars for airline tickets, which might otherwise have been utilized to

better the habitability of C. Ivanof's life as he was growing up, and which may well impact both

Ficken's and C. Ivanof's future ability to trust anyone or any organization's promises in the future,

by having learned a very bitter lesson that no matter what one does, people simply can't be trusted,

made that much worse, by Ficken having previously been betrayed by the false friend into whose

care Ficken had entrusted C. Ivanof, to specifically avoid the DC social workers taking their

intervention into Plaintiffs' life to family court and then later realizing that not only had C. Ivanof's

caretaker stabbed both Ficken and C. Ivanof in the back by coercing the DC social workers into

taking the case to court in a custody dispute, but also the social workers lied in their commitment

that they would not take the case to family court, so long as Plaintiffs had a suitable home in which

C. Ivanof could stay. Keeping in mind, the principle of law discussed, *supra,* that whether a tort

occurred is measured by an *objective* standard (here, Ficken having both objectively suffered the loss

of his TWA mileage, and vicariously experienced C. Ivanof's loss of his TWA mileage, for which

*anyone*, and any parent, would logically experience *some* objectively measured psychological and

emotional distress at the loss of property of such a large magnitude and value), while the extent of

one's injuries is measured using a *subjective* standard, as the extent of the loss is subjectively

experienced by the victim (here, Ficken, by recently having experienced years worth of psychological and emotional distress from the separation from his adoptive son, and the consequences of betrayal by the person mistakenly chosen to care for his son, as a means of avoiding further social worker action of destruction of Plaintiffs' family unit, and the experience of being betrayed by the social workers themselves in breaking their promise to not take the case to family court, which substantially further worsened and extended the psychological and emotional distress experienced by Ficken), Ficken's experience of negligently inflicted psychological and emotional distress is particularly severe and far more substantial than might be the normally perceived loss which the *average* AA frequent flyer might experience, upon learning of their loss of hundreds of thousands of airline miles, for which *anyone* would experience at least some psychological and emotional distress at the loss. AMR Corporation, AA, Inc., and their employees Barry Robertson and Lisa Norris (as well as probably Kurt Stache or his predecessors) cannot claim ignorance of the severity of the psychological and emotional distress which their actions inflicted upon Ficken both directly and vicariously, upon learning of the huge loss of TWA mileage that was contained in Ficken's and C. Ivanof's TWA mileage account, given that Ficken had e-mailed a comprehensive letter to them, explaining the importance and adverse impact which Defendants' actions were inflicting upon Plaintiffs, which letter, including, two pages of color photo montages, are attached to this Complaint and labeled **Attachment 1**, showing C. Ivanof along with his birth family in Romania taken during previous trips which Plaintiffs made to Romania in visiting C. Ivanof's birth family and during which Plaintiffs brought along the maximum amount of humanitarian relief items to help C. Ivanof's birth family survive, as well as showing in the photo montage the effects of C. Ivanof not being able to visit his birth family for years (between 1996 and the end of 2000, with the time period of not being able to visit between 1998 and 2000 being totally caused by the actions of the DC social workers and in their confiscating C. Ivanof's passports, during which time C. Ivanof's

51

birth mother died in Romania and Plaintiffs didn't even know about it until some seven months later), with the second photo montage showing C. Ivanof's mother's dead body during her funeral in the birth family home and later, after Plaintiffs were able to make a long overdue visit during C. Ivanof's Christmas vacation in late 2000, C. Ivanof visiting his birth mother's grave site with his birth father, Plaintiff, I. Ivanof.  In short, with all the evidence which Plaintiffs brought to Defendants' attention prior to Defendants' final decision to refuse to return, reinstate or transfer Ficken's and C. Ivanof's TWA mileage to an AA AAdvantage account, Defendants cannot deny having actual knowledge of the extremely severe negligently inflicted psychological and emotional distress which Defendants' actions have brought upon Ficken, in reckless disregard for his hard earned property rights of accumulating that mileage as well as reckless disregard for the obviously psychologically and emotionally damaging distress which they were inflicting on Ficken's life. During virtually each and every day since receiving the e-mail communications from AA, Inc.'s Barry Robertson and Lisa Norris refusing to transfer Plaintiffs' TWA mileage to an AA AAdvantage mileage account, Ficken unavoidably wastes time thinking about the loss, experiencing a sense of emotional outrage and disgust at AA's actions and particularly upon even seeing a commercial airliner flying through the skies, feels a shudder and flash of remembrance of this loss, which now borders on his almost experiencing a fear of flying, knowing that commercial airlines simply can't be trusted to fulfill the obligations which they have previously committed to doing, associated not only with their frequent flyer programs, but any aspect of their operations, including airline safety.

62. **COUNT EIGHT:   BREACH OF EXPRESS AND IMPLIED CONTRACT ON THE PART OF DEFENDANTS AGAINST ALL PLAINTIFFS.**

63. Plaintiffs reallege and restate paragraphs 1 through 62.

64. Both AA, Inc. and TWA, in the pursuit of their marketing promotions, advertised that members of the flying public who purchased tickets and took flights on each of their respective airlines, would

receive the accumulation of frequent flyer mileage credited into an individual airline mileage account, that was identified by the customer's name and an identifying mileage account number, in the same manner in which a bank maintains records or deposits, balances and withdrawals of actual cash deposited. TWA always lived up to their obligation of appropriately crediting their frequent flyer account holders with the appropriate mileage, based on the number of flights taken and/or the mileage traveled during those flights. Plaintiffs lived up to their obligations of this contractual arrangement, in the purchase of airline tickets and taking the requisite flights to obtain their frequent flyer mileage, with probably even a majority of Plaintiffs' flights being purchased and flown specifically to obtain the accumulation of and the benefits of accumulating as much frequent flyer mileage as possible.

65. Upon Defendants AMR Corporation and/or AA, Inc. buying out the assets of TWA, which was in bankruptcy proceedings, Defendants agreed to follow the previous practice of the airline industry in assuming the frequent flyer mileage deposited in TWA's airline mileage program and transferring that frequent flyer mileage to either an existing or a new AA AAdvantage airline mileage account with AA, Inc. Indeed, in the phone call which Ficken made to AA's AAdvantage Dept. in Aug. 2001, the customer service representative claimed that she could do the transfer of Plaintiffs' TWA mileage to a new or existing AA AAdvantage mileage account right then and there, or, in the absence of doing that transfer at the customer's request at an earlier date, the TWA mileage would automatically be transferred to a new or existing AA AAdvantage mileage account on or about Nov. 1, 2001, which was a preferable course of action for Plaintiffs, since it would push the three year validity date of the mileage transferred some months further into the future, even without any interim account "activity" which would automatically restart a new three year mileage expiration date, in the absence of any further account "activity." Ficken verified and re-verified the accuracy of that information with the AA customer service representative several times, and is absolutely certain that

that is what the terms of the transfer of TWA mileage was. Plaintiffs relied upon the accuracy of the information given to Ficken by the AA customer service representative in Aug. 2001 (it would have been completely financially irrational behavior to have *not* immediately transferred the TWA mileage to an AA AAdvantage mileage account, based on any AA supplied information *other* than what was actually given to Ficken, in contrast to the manner in which AA, Inc. actually handled the transfer of TWA mileage accounts, when the offer was made right during the phone call to transfer Plaintiffs' TWA mileage at that time, or simply do nothing and wait until the TWA mileage would be transferred automatically on or about Nov. 1, 2001, as the AA customer service representative promised that it would be). Plaintiffs had expended too much money and time solely for the accumulation of their TWA mileage for them to simply allow it to be destroyed. Plaintiffs TWA mileage was of such paramount importance that Ficken repetitively verified the accuracy of the information which AA's customer service representative told him in Aug. 2001, to ensure that there was no misunderstanding. Plaintiffs relied upon the information given to Ficken by AA, in Aug. 2001 that the TWA mileage would be transferred automatically to an AA AAdvantage mileage account, and AMR Corporation and/or AA, Inc. failed to adhere to their contractual agreement to transfer Plaintiffs' TWA mileage, and further failed to adhere to airline industry practice that had previously been in places, and which Plaintiffs believe continues to be in place, that when airlines merge or are bought out by another entity or airline, the previous holders of airline mileage with the company being bought out, have their airline mileage transferred and preserved in accordance with the same rules or practice which would be followed in the banking industry of honoring and respecting the financial accounts of the banks' depositors.

66. Ficken's e-mail communications with AA's Barry Robertson and Lisa Norris adequately pre-dated the Nov. 2004 potential expiration date of mileage which had previously been told to Ficken by the AA customer service representative, since Ficken didn't want to take any chances in losing the

mileage by allowing the full three years to pass. Even in spite of AA's Barry Robertson and Lisa

Norris' refusal to transfer Plaintiffs' TWA mileage into a new or existing AA AAdvantage account,

on or shortly before Nov. 1, 2004, Plaintiffs set up a new AA AAdvantage account for C. Ivanof and

I. Ivanof, which new account should constitute adequate account "activity" (it's a clear indication to

AA that an AA AAdvantage account was wanted, or otherwise there would have been no point in

even establishing such an account), with C. Ivanof's AA AAdvantage account having the assigned

number of 4R849RO and I. Ivanof's AA AAdvantage account having an assigned number which is

unknown and unavailable for listing at the time of the filing of this Complaint, but whose name is

distinctive enough that AA should have no trouble locating I. Ivanof's AAdvantage mileage account

(as noted, *supra,* in this Complaint, I. Ivanof's TWA account no. and exact airline miles balance is

unknown, but it is recorded in TWA's records under the slightly misspelled name of Isai Ivanof,

rather than Plaintiff Isaia Ivanof's accurate name), so AA should not be capable of claiming that

Plaintiffs should not be entitled to their TWA mileage, due to a lack of any account activity within

three years of the mileage being entered into the account, because AA has adamantly refused to enter

*any* of Plaintiffs' TWA mileage into an AA AAdvantage account. In the world of "David vs.

Goliath" tactics, it is particularly outrageous and appalling that the United States' probable largest

and most financially successful airline (and possibly the world's largest and most financially

successful airline), chooses to stoop to cheat a child (who came from a background of

incomprehensible destitution, and even being forced to spend the early years of his life in a

Romanian orphanage), out of his largest single financial asset, his TWA airline mileage, which was

accumulated through the expenditure of a huge amount of his time in needlessly flying TWA flights,

solely for the purpose of accumulating the TWA airline mileage, to be able to make future return

visits to his birth family in Romania, and to continue helping them out financially, as he grows into

adulthood, with those flights being paid for by his adoptive father, who had little or no remunerative

55

employment at the time (save his Naval Reserve monthly weekend drills, that seldom even paid for

the cost of the airline flights to attend them), and could ill afford to squander what little savings he

had on useless airline flights, except for the one factor which made it all worthwhile—the

accumulation of Plaintiffs' TWA mileage, which Defendants are now trying to steal or completely

destroy. The mean spirited reprehensibility of Defendants' actions here is beyond belief, particularly

where AA's Barry Robertson ended his e-mail to Ficken (in which he refused to transfer Plaintiffs'

TWA mileage) with the words "Mr. Ficken, we know we must earn the respect and loyalty of our

customers by providing them with outstanding service and we hope you will give us the opportunity

to do so very soon" in the manner of, on the one hand, totally robbing Plaintiffs of tens of thousands

of dollars worth of value of their airline miles, and then rubbing their nose in the loss, by claiming

that AA " ... must earn the respect and loyalty of our customers by providing them with outstanding

service...." Plaintiffs do not know whether it is the corporate culture of AA, Inc. that is out of touch

with reality or just Mr. Robertson, but Plaintiffs believe that a jury is capable of understanding the

offense, both in terms of the intentionally inflicted financial loss and emotional and psychological

pain, suffering and stress, which Defendants have inflicted upon Plaintiffs, but also Defendants'

incredibly naïve and offensive attitude toward Plaintiffs in adding insult to injury by telling them

that Defendants expect to earn Plaintiffs' respect by providing them with outstanding service.

67.                                        **PRAYER FOR RELIEF**

68. **WHEREFORE,** Plaintiffs Ivan Ficken, Ciprian Ivanof and Isaia Ivanof demand trial by jury and

respectfully seek and request that they be granted the following relief and judgment from the Court

as follows:

69. To issue an order directed to Defendants to either transfer all of Plaintiffs' TWA mileage into an AA

AAdvantage mileage account (being mindful that if Defendants have destroyed Plaintiffs' TWA

mileage account records, that Defendants must utilize the latest TWA mileage statements, in the

same manner as bank account statements, and that Plaintiffs will be unable to supply such TWA mileage account statements prior to either the late summer of 2006 or the late summer of 2007, depending upon when Plaintiff C. Ivanof is able to get admitted into an acceptable college in the U.S. for attendance during the school year following his admittance), or that Defendants provide monetary compensation to Plaintiffs for the cash equivalence of the value of their TWA airline mileage, as calculated by utilizing the maximum value, short notice increments of airline fares, which would be the equivalent cost of purchasing such airline tickets at short notice rates commensurate with what AA AAdvantage travel awards would be capable of purchasing.

70. To award compensatory damages against Defendants both as the alternative form of compensation as described in the preceding paragraph, and additionally to include compensatory damages calculated for the loss of Plaintiffs' access to their airline mileage accounts and for the emotional and psychological distress and pain and suffering of experiencing, recollecting and worrying about the loss of their airline mileage since becoming aware of it, as well as compensatory damages for any other damages or losses which Plaintiffs have sustained or reasonably can be anticipated to be sustained as a result of Defendants' actions here.

71. To award punitive damages against Defendants to the maximum extent provided by applicable statutory or common law, being mindful of the callous intentionality with which Defendants acted, particularly in view of having been put on notice and being aware of the extreme emotional distress which Defendants' actions were having upon Plaintiffs (through Plaintiffs having emailed Defendants the letter and photos of **Attachment 1**, which explained and proved the emotional distress which Defendants' actions were having upon Plaintiffs) and proceeding to inflict as much emotional distress as what Defendants could, in spite of being knowledgeable of the damage they were inflicting upon Plaintiffs.

72. To treble the amount of said damages pursuant to 18 U.S.C. Sec. 1964(c);

57

73. To award prejudgment interest on the amount of damages and/or losses that Ivan Ficken, Ciprian Ivanof and Isaia Ivanof have sustained;

74. To award all cost of litigation incurred by Ivan Ficken, Ciprian Ivanof and Isaia Ivanof, including their reasonable attorneys' fees and expert witnesses' fees, pursuant to 18 U.S.C. Sec. 1964(c).

75. Plaintiffs request leave of the Court to add to or amend this Prayer for Relief subject to any new information which may be disclosed in the discovery process of these claims.

76. To award all other legal and equitable relief to which Plaintiffs may otherwise be entitled and as the Court and jury may deem appropriate.

77. **JURY DEMAND**

78. Plaintiffs hereby demand a trial by jury, as provided by any Acts, legislation or common law rights applicable to this Complaint.

Plaintiff Ivan Ficken

Plaintiff Ciprian Ivanof

Plaintiff Isaia Ivanof

58

F-2166
RMU

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Ivan Ficken, Ciprian Ivanof & Isaia Ivanof<br>2020-1/2 Second St.<br>Eau Claire, WI. 54703    88888 | AMR Corporation, AMERICAN AIRLINES, INC. & AMR EAGLE HOLDING CORPORATION,<br>AND Kurt Stache, President of AAdvantage Marketing Program, AND Barry Robertson, AND<br>Lisa Norris, c/o American Airlines., 4333 Amon Carter B;vd/., Ft. Worth, TX. 76155 |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Eau Claire, WI.
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)** Tarrant, TX
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Unknown, Probable In-House counsel
2020-E. Second St.
Eau Claire, WI.

Case: 1:07-cv-02166
Assigned To : Urbina, Ricardo M.
Assign. Date : 11/30/2007
Description: Pro Se General Civil

JURY ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN X IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
◉ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | **OR** | ◉ F. *Pro Se General Civil* |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☒ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

RICO Act, 18 U.S.C. Secs. 1961 through 1968, Conspiracy to deprive Plaintiffs of valuable property rights

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ unspecified <br> JURY DEMAND: | Check YES only if demanded in complaint <br> YES ☒   NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**     (See instruction)     YES ☒     NO ☐     If yes, please complete related case form.

DATE Nov. 19, 2007  ~~30~~     SIGNATURE OF ~~ATTORNEY~~ PARTY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# ATTACHMENT 1



07 2166   **FILED**

NOV 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT





RE: Frequent Flyer Accounts under the following names/numbers

| Name | AAdvantage No. | TWA No. |
|------|----------------|---------|
| Ivan Ficken | H632802 | 49619695 |
| Ciprian Ivanof | unknown or nonexistent | 77183481 |
| Isai Ivanof | unknown or nonexistent | account exists but number presently unavailable |

Relationship among above names:  Ciprian Ivanof is the adopted son of Ivan Ficken;  Isai Ivanof is Ciprian's birth father here in Romania and due both to location and English language deficiencies, could not conceivably have been put on notice of having to take action to protect his TWA mileage.

Dear Mr. Robertson,

I'm sorry for not responding earlier to your last e-mail, referenced in this reply, but meeting short deadlines of filing some legal documents concerning a case that I have on appeal in the Wisconsin court system as well as a local family living crisis of having to defend ones rights under a lease that our landlord wishes to change, has occupied too much of my time and emotional energy to get back with you sooner.

Worsened by being on top of the stress associated with the uncertainty of whether or not we have a place to live, there is no way that I can adequately describe the extremely high level of emotional stress and frustration which your last response has created in our lives. During these last several weeks since receiving your response, I have spent countless hours trying to figure out how to even communicate with someone whose apparent insensitivity to what is being attempted to be perpetrated here (the destruction of our TWA mileage accounts is nothing short of a theft or embezzlement of assets worth many thousands of dollars worth of future air travel eligibility) is so profound, that the person one is communicating with assumes the lackadaisical attitude which you seem to be taking.  Frankly, I don't know how you could sleep at night knowing your involvement in attempting to destroy both one of my major assets as well as what clearly is my son's major financial asset (our TWA air miles eligibility).  Mr. Robertson, what is your major financial asset?  Your house?  Your car?  How would you feel if you came home tomorrow and in spite of doing everything reasonable for years to ensure that it had been bought and paid for, taxes has been paid and all other appropriate procedures of ownership followed, found that someone had bulldozed your house down and claimed that they had the right to because, after all, their "systems were no longer operational?" How would you feel if you went out to get into your car, which was fully paid for and you had done everything appropriate to protect your rights of ownership and found that someone had run it through a trash compactor and now it was merely a two meter square

block of crunched metal and plastic and the person who did it claimed they had the right to because, after all, their "systems were no longer operational?" There is only one explanation: That of organizational behavior where someone at a higher level of authority makes a decision which subordinates are then ordered to carry out, and due to a lack of communication back to the original decision makers who are not informed of the effects which their policy decision has caused, some extreme cases of injustice start occurring.

It is unfair to heap abuse on the messenger, which at this point, and beings that you have so far been the only one responding to the couple e-mails which I sent, I assume you are. I am neither denigrating your position nor you personally, but it is apparent that this issue has to be resolved at a higher level of authority than what it has reached so far, and I am asking you to bring this to whatever higher level of authority exists and where some of those original decisions were made so that they realize that this is not the type of case which they intended to place in the position which it is presently in. For the sake of brevity, from herein out I will refer to American Airlines under it's parent corporate abbreviation of AMR, rather than AA, due to the negative connotation which the abbreviation AA conjures up in my mind of that other organization known by those same double letters, and I would prefer to believe that I'm corresponding with a more professional organization than the other. (In spite of the temptation, I'll try to refrain from any corporate or personal insults, beyond saying that even among those few people who I have known to have problems controlling their alcohol consumption, they often at least have their heart in the right place, which is more than I can say for anyone responsible for the responses which I've gotten so far from AMR concerning their theft and destruction of my and my son's TWA air mileage). In spite of my request that this letter be forwarded to higher authority (and what I mean by that is higher than anything in the Customer Relations Department, since unless this is resolved more favorably, it will rapidly escalate to a public relations issue and beyond), I do want you, Mr. Robertson, to read this letter in it's entirety, including the additional enclosures, since I expect that you would have to play at least some sort of advocacy role in ensuring that it can get to the appropriate levels of authority where something can be done. I say this because, additionally, in spite of your negative responses so far, and even in spite of Lord Acton's perceptive statement that "Power tends to corrupt and absolute power corrupts absolutely", I hold a belief that most people in positions of responsibility will try to do that which is ethical and right rather than stooping to unethical treatment of people.

While I will address the concept of one's "reliance interest" more directly in the section of this letter dealing with what it means as a legal concept, what is critically important and what should be understandable and decisive even to a lay person not trained in the subtleties of what it may mean as a legal concept, is the fact that both for years in the past, as well as my most recent direct verbal communication by phone with an AMR representative in AMR's AAdvantage Department, I relied upon the information which was given to me as being accurate and trustworthy enough to rely upon and acted accordingly in the most logical and appropriate manner that any reasonable person would. Yet, in spite of this, AMR is now attempting to destroy the thousands of dollars worth of

future air travel eligibility which we worked so hard and spent so much money, under circumstances where that money expended was not easily affordable, but was spent solely for the purpose of receiving the air mileage credit, (in effect, merely converting cash into air miles, and having to contend with doing the air travel only as an inconvenience to attain the air mileage) which represented a future financial asset to us of even greater value than the cash expended. In spite of AMR probably assuming more liabilities than assets in buying out TWA, all of that past cash which I expended on TWA tickets solely to attain the air mileage enriched TWA's and now AMR's coffers to the same dollar degree that it was spent so AMR cannot claim to have gotten nothing out of it, but now it seems AMR wants its cake (the money for the cost of the tickets) and to eat it too (by refusing to follow through with what was promised, i.e. the conversion of the TWA frequent flyer miles to AAdvantage miles). What so far you, or AMR, doesn't seem to appreciate, is that to AMR, the air mileage credit is simply a marketing scheme, while to us, it is an investment that has all the same attributes as a bank account, albeit one for which it's redemption is in future air travel. Banks engage in marketing schemes also, but the fact that they do does not exempt them from a fiduciary responsibility to care for the assets of another which have been entrusted to them. Carrying the banking analogy one step further, while the air miles may not represent a dollar for dollar physical deposit of cash that, in the absence of laws regulating a bank's fiduciary responsibility, they could mere abscond with to their own enrichment, the failure or unwillingness of AMR to transfer the TWA miles in question represents essentially the same thing, where, in the absence of a customer's air miles to redeem, AMR's expectation would be that future air travel would necessitate a customer having to spend actual cash to receive the travel desired, and thus AMR would stand to financially benefit from it in the same manner in which a bank would, by simply confiscating an inactive bank account.

What you need to realize is that what we are dealing with here is not some penny-ante amount of air mileage, but, though I don't have the last received statements with me here in Romania, a total air mileage amount in just a couple accounts that is close to or probably exceeds half a million miles, and has an economic value of many thousands of dollars.

For years, since the inception of it's program, I relied upon TWA's representations that their air mileage would never expire. This was important to me because primarily for the benefit of my adoptive son's TWA account, it represented his future ability to easily and inexpensively be able to travel between the U.S. and Romania later in his life to visit and financially help out his birth family living here in Romania who are destitute (didn't even have electricity in their house at the time of Chip's adoption until I got it installed for them and they still don't have indoor plumbing or any means of heating other than that used to cook food) and likely to remain so throughout their lives. By any reasoning, through AMR's assumption of TWA's assets and liabilities in whatever the terms of the buyout were, AMR would assume that same commitment upon which TWA customers had relied and may well have been instrumental in AMR changing it's own frequent flyer rules to reflect at least a degree of permanency in air mileage assets such that so long as

there was some activity in the account at least every three years, the air mileage assets of the account would not expire.

Secondly, I relied upon the publicity of industry statistics and past practices that even with all the mergers, bankruptcies and buyouts and demises of such carriers as Frontier, Pan Am, Eastern and others, no one had lost any of their air mileage.

And if none of the above means anything to AMR who think that they can set a new precedent of callous insensitivity of merely destroying someone's assets worth thousands of dollars and that since neither TWA's representations nor industry practice of the past had anything to do with any representations by AMR, and consequently they think they shouldn't be bound by it, then the third issue of reliance should be more germane: Perhaps I didn't explain this adequately or in enough detail in the previous e-mail. In reviewing your e-mail responses, you either have a complete misunderstanding of the history of how this situation developed (and continue to attempt to place blame on me for not doing something to ensure the mileage was transferred between accounts, whereas I assuredly did follow what was going on and had a thorough telephone discussion with an AAdvantage representative in July or August, 2001, immediately prior to our leaving for Romania, specifically to ensure that I knew what the rules were concerning how the mileage would be converted and I acted in accordance with instructions given to me by the AAdvantage representative), or you are intentionally ignoring the facts of this situation and think that by doing so and trying to push blame onto me, that I will quit and give up. Be assured that the reason I had not been back in touch with AMR concerning our mileage accounts until our recent e-mail interchange was because I was specifically told by an AAdvantage representative in July or August, 2001 that the conversion of the TWA mileage to AAdvantage mileage would occur automatically around November 1st, 2001 and I would not need to do anything else to make it happen.. The bottom line here is that I did nothing to contact AMR earlier because I was told by an AMR representative that I would not have to do anything for the TWA mileage to be converted to AMR mileage. It was reliance upon your representative's assurance which has caused this to happen and not due to any neglect or lack of caring about this on my part. Consequently, Mr. Robertson, I am beginning to question whether you have even read the content of my past e-mails, or if you have, whether you are intentionally ignoring the facts that I described in them and just trying to stone-wall or obfuscate the issue here to erroneously try to shove blame onto me where it does not lie. Because I know of no other means of getting your attention to read something, the following is printed in

**BOLD FACE, LARGE FONT SIZE, CAPITAL LETTERS----THIS SITUATION DEVELOPED NOT BECAUSE OF ANY NEGLECT OR OVERSIGHT ON MY PART. I WAS AWARE OF AMR'S IMPENDING ASSUMPTION OF TWA'S FREQUENT FLYER PROGRAM THOUGHOUT THE FIRST HALF OF 2001 AND I STAYED IN TOUCH WITH TWA AND AMR REPRESENTATIVES TO ENSURE THAT THE MILEAGE WOULD BE TRANSFERRED CORRECTLY. AS EXPLAINED IN THE TEXT OF THIS LETTER,**

4

**BOTH ABOVE AND BELOW, IN JULY OR AUGUST, 2001, IN MY LAST PHONE COMMUNICATION WITH AN AADVANTAGE REPRESENTATIVE, I WAS ADVISED THAT I COULD EITHER TRANSFER THE MILEAGE RIGHT THEN, OR I COULD DO NOTHING AND THE MILEAGE WOULD BE TRANSFERRED AUTOMATICALLY ON OR ABOUT NOVEMBER 1st, 2001. TO ALLOW THE MAXIMUM THREE YEAR ELIGIBILITY OF THE TWA MILEAGE, I OPTED TO DO NOTHING, TO DELAY THE DATE OF TRANSFER UNTIL NOVEMBER 1ST, 2001.**

Explaining the above in greater detail, during the earlier months of 2001, the publicity about the buyout of TWA's assets by AMR became more frequent or more reliable. Though I don't recall what the date was of the initial phone call or calls to AMR's AAdvantage Department, I made inquiry at an early enough period of time that although there was some assurance that the TWA mileage would be assumed by AMR, your representatives didn't have details on it yet.  Since we had plans to and I knew we would be leaving for Romania about the end of August, it was either in July or early August that I telephoned AMR's AAdvantage Department specifically to discuss how to ensure that the TWA mileage would be credited to one's AAdvantage account and I was told that they could either convert the mileage now or simply allow time to run until November 1st, 2001 or thereabouts, when it would be converted automatically.  Either way, it was explained to me that one would have three years from the point in time of the conversion of the mileage within which some activity would need to occur within the account to ensure that the mileage would not expire.  While for my account (which received regular additions through having and using a CitiBank AAdvantage credit card) it was an irrelevant issue, because of Ciprian's account having less regular activity, I wanted to ensure that the date from which the three year time period would begin running would be pushed as far ahead as possible to ensure that there would be a minimal risk of loss of mileage.  So the strategy that made the best sense was simply to do nothing, for both accounts and wait for both accounts to be converted automatically around November 1st, 2001 so we'd have the maximum amount of time before it's timed expiration date.

I discussed with the AAdvantage representative what possibilities would exist, short of taking flights, to ensure that there was activity in Ciprian's account and she covered a number of them, some being as easy as purchasing several of the boxes of cereal on which there were coupons for mileage credit and sending them in.  It was a long telephone conversation, that covered not only the above issue of AMR's assumption of TWA mileage (which I went over with her several times to ensure that I was absolutely sure that I understood the rules of the program), but also what possibilities existed to redeem the air mileage with your partner airline, British Airways, which flies into Bucharest, Romania, though AMR does not.  I remember distinctly trying to find some way by which mileage could be redeemed locally here in Bucharest, on a British Airways flight, though she said it could not, because it would have to go through your headquarters back in Dallas.  She mentioned your satellite AAdvantage office in Ireland,

although it's my recollection that she said even they couldn't redeem an AAdvantage award on a partner airline.

The phone call probably lasted for more than an hour since not only many different issues were discussed, but, at least in regard to the TWA mileage, I reviewed it several times with her to ensure that I understood it completely. I don't know whether I even gave her my name and/or AAdvantage number (I do recollect that either on that occasion or perhaps a previous call to your AAdvantage Department, the representative there asked me what was the usual method by which I had been earning miles, which in recent years, since doing less flying than in the past, it had been through the use of my CitiBank credit card), though typically your representatives ask for one's name or AAdvantage number upon calling them, and if I didn't mention the name or number, then there'd be no chance of a notation having been made in my mileage account. If I did give my name or number, then I would assume that my AAdvantage account would at least be documented by her that I had called in and, in general terms what was discussed. I say that because for a brief period of time while in Eau Claire, WI (our last address in the U.S. prior to leaving for Romania), I worked at a call center (though not one for an airline) and I remember that any phone conversation had to be documented on a customer's account. If AMR has the same rules at their call center, then there should be evidence of the phone call having been received sometime in July or August of 2001 to verify the accuracy of the above explanation. If it is an AAdvantage representative's practice to document phone calls from account holders, then please at least check my AAdvantage account no. H632802 to see whether evidence of the phone call exists there. I mention the above with some hesitancy, because, based on your e-mail responses so far, my calling your attention to evidence which helps corroborate the explanation above, might simply enable you to destroy the evidence, an issue which will be discussed further later in this letter concerning other legal technicalities.

I recognize the possibility that you may not doubt the veracity of any of the above and simply respond that all of this happened prior to Sept. 11, 2001, which changed the economics and other factors of the airline industry so severely that you simply changed the rules. There are or should be limits to the degree to which you can indiscriminately play a shell game of hide the ball or change the rules without telling a person about it, when they, in good faith, are relying upon the rules which were last communicated to them. Whatever rule changes you may have instituted regarding your frequent flyer mileage program after Sept. 11th were not communicated to us, and we have a justifiable right to rely upon the last information which was given to us by an AMR AAdvantage representative in July or August, 2001. While the events of Sept. 11th may have changed some aspects of the airline industry, even the most rudimentary understanding or appreciation of human decency should dictate that AMR should not be trying to enhance their profit margins by stealing airline mileage from a destitute Romanian kid who spent most of his early years in a Romanian orphanage and needs the mileage to enable him to be able to visit and help out his birth family in the future. Doing so would bring new meaning to the old expression of "this is as easy as stealing candy from a baby" and makes a complete mockery of AMR's program of allowing it's members to contribute air

miles to your charitable organization designed to enable either sick kids or families of sick kids who can't afford the air transportation to seek medical treatment.

Mr. Robertson, just think through this situation logically. Given the importance which the huge amount of mileage involved here (which, as explained above is near or may even exceed half a million miles) holds to us, after calling the AAdvantage representative in July or August, 2001 shortly before leaving for Romania for the last couple years, if the AAdvantage representative had told me anything **other** than what I described above, why would I have done nothing while I was talking to her in July or August, 2001 to ensure that the mileage was converted? I assume that converting the TWA mileage to AAdvantage mileage would have been as simple as simply telling the AAdvantage representative over the telephone to convert it. Why wouldn't I have told her to do that while I was talking with her on the telephone? The only logical answer is because she told me that it would be done automatically around November 1st, and it made sense to me at the time that it would be better to have a later conversion date to ensure that the three year time period of mileage validity would start at a slightly later point in time. My getting in touch with you via AMR's website e-mail system around the end of this October was in concert with my keeping track of the time period and realizing that about two years had passed since the mileage conversion and I wanted to check on the status of it and figure out a precise deadline about a year in the future, within and before which I could engage in efforts to ensure that there was some activity in Ciprian's mileage account to ensure that it would not expire and be good for another three years. All of my actions were in concert with and consistent with the information that the AAdvantage representative told me in July or August, 2001 that the mileage accounts would be converted automatically on or about November 1st, 2001. They are not consistent with your attempt to characterize this as neglect or oversight on our part in not paying attention to what was going on in AMR assuming TWA's assets and liabilities. At this point, I have sincere regrets that I did not record the telephone conversation so that I could send you a copy of it to listen to, but I never anticipated that AMR would so seriously renege on the information and commitments that were told to me by one of your AAdvantage representatives during the phone call. If the information given to me by the AAdvantage representative was erroneous, all I can say is that it is not my fault for the error, and the holders of the TWA accounts in question here, do not deserve to lose thousands of dollars worth of future air travel eligibility as a result of that erroneous information.

**MR. ROBERTSON, JUST TO GET YOUR ATTENTION AGAIN, I WOULD STAKE MY LIFE ON THE ACCURACY AND TRUTH OF THE ABOVE ACCOUNT, IN WHICH I MADE ALL REASONABLE EFFORTS TO ASCERTAIN HOW TO PROTECT OUR TWA MILEAGE WHILE WE WERE STILL IN THE U.S., SO PLEASE DO NOT SEND ANOTHER RESPONSE ATTEMPTING TO SHIFT THE BLAME ONTO ME BY ALLEGING MY NOT SEEING WHATEVER NEWSPAPER ADS YOU RAN CONCERNING THIS.**

Regarding the excuse that you stated in your last e-mail that you didn't want to do this because the "systems were no longer operational", I find it less than credible that somewhere in either AMR's or TWA's archives that there is not either a print out or existing program that could be searched to ascertain the existence of these TWA mileage accounts. It would be preferable for both of us that you would do this now, rather than later, under a court order. Even if what you say is completely true and if the records have been completely destroyed, who was responsible for their destruction? In the assumption of TWA's assets and liabilities, it was AMR which holds responsibility for protecting critical records such as these. There would be no excuse for their destruction other than intentionally wanting to destroy evidence which would be important in any claim or litigation against AMR, with intentional destruction of evidence potentially useful even in a civil matter, opening AMR to the risk of incurring criminal penalties. To whatever extent you claim it is too difficult or impossible to locate the mileage amounts, although I do not believe that I brought any of the past TWA statements with us to Romania, I am certain that I have a number of them with our other possessions in a storage facility in Eau Claire, Wisconsin awaiting our return to the U.S. which is not anticipated for another two and a half years. There was never any mileage redemptions made from Ciprian's TWA mileage account and the ones which were made from my personal account were done quite a few years prior to AMR buying out TWA. Analogizing this with a bank account, which, for all practical purposes it is, even if the bank lost or destroyed all of it's records, a deposit holder's last bank statement would be adequate proof of both the existence of the account and the amount, and this situation is not materially different to justify treating the burden of proof any differently.

In the above discourse, since I haven't been able to even access my own pre-existing AAdvantage account via the Internet I really have no way of knowing for sure whether or not the TWA mileage (well into the six figures for my TWA account, so undoubtedly you can ascertain whether or not the TWA mileage was added into my account, since my pre-existing AAdvantage mileage was not that large) was or was not ever added in—I'm simply assuming it wasn't due to your initial e-mail response—I do wish to offer an explanation of the other TWA account listed at the heading of this letter. The TWA account for Isai Ivanof is that which belongs to Ciprian's birth father, and though, not nearly as large as either of the others for Ciprian or me, if you're willing to verify and convert the TWA account for Ciprian and me, the one for Isai Ivanof should be done at the same time (I'm sure it would entail minimal extra effort once you are able to clear the psychological or "system" or database hurdle of deciding to look for it). I'm sorry that I don't have the TWA number of that account easily at hand, but due to the distinctive name, I'm relatively certain there's not a duplicate name (the mileage amount would only be in the low to medium four figures).

At this point, if the above discussion has reached someone who can understand and empathize with the injustice of what has occurred here and if a commitment has been made to do something positive about transferring the miles, then there would be no need to read further, aside from giving the favorable decision maker the internal satisfaction

that they have done the right thing. If whoever reads this is still not convinced, then it is essential that they read further.

The discussion now turns to describing the history of how these TWA accounts came about in the level of magnitude which the accounts hold and the level of importance which they hold in our lives. While your initial impression may be that this is irrelevant and you don't care, the discussion is essential for three important reasons:

1. It is necessary to corroborate the truth of the discussion in the previous eight pages with both a more detailed explanation and additionally including photographic evidence of how and why the sizable amount of TWA air miles came to be in our, and especially Ciprian's, accounts, just in case anyone at AMR, even after reading the preceding eight pages, thinks that I'm "putting you on" concerning any of this discussion. On the assumption that it is not you personally, Mr. Robertson, who is blocking our ability to get our TWA mileage transferred to AAdvantage accounts, I'm providing you with ammunition and sound arguments which you may need in playing an advocacy role in convincing others at AMR that the mileage needs to be transferred. Somewhat related to this, but a distinctly different reason is—
2. By reviewing the details of both the extraordinary efforts which Ciprian and I engaged in to accumulate those miles as well as the huge expenditure of money made for many of the miles (which led to our taking air travel, not because of wanting or needing to go someplace, but taking the flights and going there strictly for the air miles) at a point in time when our economic situation was so poor that even "adequate housing", at least as defined by some Washington, DC social workers, was unaffordable, it is necessary to impress upon you the importance which our TWA miles held in our lives, which both corroborates the truth of the information given to you in the previous eight pages as well as proving to you that it is simply not credible that I would have neglected and ignored whatever was told to me as being necessary and appropriate to do in order to protect our TWA mileage and ensure that it was transferred to an AAdvantage account.
3. By providing the following information to you, and by using a political term, I am removing any "plausible deniability" that anyone at AMR could claim in the future concerning their being ignorant of both the efforts and means by which the mileage was accumulated as well as both the present and future effects on both Ciprian's and my life of losing that mileage. This is essential in case AMR chooses to force this situation into a "hardball" posture of litigation and by removing any "plausible deniability," the following information would support our claim, not only for specific performance of restoring and transferring the mileage, but also our claim of emotional distress caused by AMR in refusing to do so, as well as punitive damages against AMR for what they are trying to do, with full knowledge of the adverse effects which they are causing.

During the early to mid-1980s I held a job as an attorney with a Federal agency in the Dallas-Ft. Worth area, not far from where AMR is headquartered and I assume you are at. The director of the office was a Machiavellian manager who hated attorneys (primarily

9

because they objected to or tried to reign in his tendencies to orchestrate illegal or unjust personnel practices) and ultimately led to my filing both a grievance and EEO complaints followed by the manager engaging in multiple acts of illegal retaliation, which led to my filing retaliation complaints, resulting in an escalating battle of more than a dozen complaints that culminated with his terminating my employment in 1987 after previously hiring two additional attorneys to replace me.  Another attorney work colleague was terminated without due process and a third one simply resigned and is now in private practice in Arlington, TX.  Believing that one does not solve problems by running away from them, I continued the EEO retaliation complaints through the government's EEO administrative process, where, an Administrative Judge agreed that officials in the agency had retaliated against me, though the issues I was successful in at the admin. hearing did not trigger job reinstatement and back pay, due to the government using witnesses giving perjured testimony at the admin. hearing, which, due to bureaucratic backlogs in the process, didn't even occur until late 1992.

In early 1990, after the Romanian revolution and news reports began appearing in the western press concerning the overcrowded orphanage situation here, I came to Romania and visited orphanages throughout the country, eventually finding Ciprian (AKA "Chip") Ivanof who was little over two years old.  With no U.S. air carriers flying to eastern Europe at the time, I flew on TWA to Istanbul on two of the trips over here, traveling overland across Bulgaria to get here.  With all the paperwork requirements, both in the U.S. and Romania, it took three trips in all and I returned to the U.S. with Chip in late 1990.  Due to the extremely sad circumstances of his ending up in the Babadag orphanage, (near the small fishing village that abutted a lake connected with the Black Sea right below the Danube Delta where his birth family lived), caused by destitution of his birth family, where Chip had been at home with his birth family for the first seven or eight months of his life, with both parents still living and an older brother and sister (malnourished and largely surviving on what they could beg from the inhabitants of their village) were living at home, I resolved to do whatever I could to help out his birth family, no matter what the cost, as well as make regular returning visits in the future as Chip grew up to instill both a sense of familial relationship with his birth family and a sense of responsibility to also help them when he got older and was living an independent life.

Between late 1990 and 1992, when Chip and I moved to Washington, DC (if you keep records in your AAdvantage files of members past addresses, you can trace the change of addresses in my AAdvantage account to corroborate all of what I'm telling you here) I held a Naval Reserve Officer's billet at a reserve unit which met monthly for a weekend drill at the Navy's Historical Center at the Washington, DC Navy Yard and generally brought Chip along with me, maximizing the frequent flyer mileage for both of us by buying the cheapest advance purchase tickets on a series of short hops across the country (the cheap airfares caused by Southwest Airlines being in most of the markets and the major airlines needing to advertise comparable prices to remain competitive).  The usual itinerary was DFW to Little Rock, Little Rock to St. Louis, St. Louis to Chicago, Chicago to Cleveland, and Cleveland to Washington, DC, or sometimes Chicago to DC directly,

depending on the fare structure, at least attempting to fly TWA as much as possible, due to their retaining a better minimum mileage credit of 750 miles regardless of how short the flight was as well as nicer first class, space available upgrade privileges for "gold card" holders who had exceeded their annual minimum mileage level, which gave us even more frequent flyer miles by having the ticket upgraded free to first class. (At probable age four, Chip may well have been TWA's youngest gold card holder, accustomed to flying first class on as little as $19 airline tickets, as well as being well known and endeared by the personnel in their airport clubs at DFW and Washington, DC, due to our regular flights of at least once per month). Once, simply to renew my drivers' license, which I assumed I had to do in person at the state where I had last lived in South Dakota, Chip and I did the same thing between DFW and Sioux Falls, SD. Keep in mind that while the airfares consumed most of my reserve pay, at a time when I had no job and was a full time single parent, with only an additional outside income of a couple thousand dollars per year from a fractional interest that I had in a small family farm in Nebraska, meaning we were living off of an ever declining balance of savings which I had accumulated while working for the federal government, it made economic sense to continue doing this because of the large and rapid accumulation of frequent flyer mileage which Chip and I were picking up, which to us, was like money in the bank that we relied upon TWA's representations that it would never expire and Chip could use in the future to make it easier to visit his birth parents here in Romania.

In early 1992, Chip and I made our first return visit to his birth family here in Romania, bringing them clothing, food and tools, with it working out so well (simply the delight in the eyes of his older brother and sister upon seeing him again, when they had thought that he had been lost from them forever, was enough to convince me that this was the right thing to do) that we made another trip there later that year (also stopping at Chip's orphanage to deliver clothing and toys to the kids remaining there and to let the orphanage staff follow the favorable progress of Chip growing up, which should work to the benefit of helping to facilitate international adoptions by other Americans, when the orphanage staff would realize that the kids who left were doing well and that at least some of them recognized a sense of obligation to return and help out other younger kids remaining at the orphanage) before moving to Washington, DC in the fall of 1992 for Chip to attend school at a bi-lingual French-English school there, to better enable him to capitalize on his dual citizenship in the future, when Romania became part of the EU and it would be useful to him to be able to have some European language skills beyond English so that he would have the choice of being able to work in either the U.S. or Europe. Though my Naval Reserve unit obligation at the Naval Historical Center was also instrumental in moving to Washington, DC, the usual two year time limit of holding onto a pay billet, caused my losing it at about this same time, and though I continued to attend reserve meetings in a volunteer status, which at least enabled a person to occasionally get some paid active duty for a two week period, it seriously damaged the small level of income that I had even had in the past, and left me with only about $3000 per year from the farm income and what little interest I could get on the remaining savings which I still had, while at the same time having to pay Chip's private school tuition of between $6000 to $8000 per year. After a couple years there, we shifted

schools to the French Lycee near Washington to strengthen the French component of Chip's education, and though the tuition was slightly less, it still exceeded my annual income. Mr. Robertson, or whoever at AMR is reading this far, can you imagine trying to live anywhere in the U.S. on only $3000 per year? Rhetorically asking, what is your pay there at AMR—at least ten times that much or depending upon your level of responsibility if this letter can start moving up the chain of command, perhaps twenty times that much or more?

Being faced with school tuition bills that were double or triple my income, we had no choice but to find the least expensive housing within a reasonable walking distance of the school which Chip was attending. At $400 per month, even that was expensive for us, and yet it was probably a third of what conventional small apartments were renting for in DC, due to it being located in a run down building that turned out to be far worse than I expected, though with many other families living there, the commiseration and sense of "all being in the same boat" mentality amongst the residents made it tolerable. In spite of this overwhelming financial disparity between income and expenses, during the winter of 1993 or 1994, TWA came up with a mileage promotion, the details of which I don't recall, but by flying a certain number of segments (well into the teens) as well as making two trans-Atlantic flights during the winter off-peak period, they would award a traveler a bonus of something like 200,000 frequent flyer miles. Again, for reasons of it being a good investment in terms of the rate of airline mileage return for the dollars spent, it made economic sense to do it, in spite of it incurring an unnecessary expenditure of a couple thousand dollars. On one of the trans-Atlantic flights, we made another visit to Chip's birth family here in Romania, going to what was then TWA's eastern most destination in Western Europe (TWA had suspended flights to Istanbul by that time) and traveling by train, about two days' worth, to Romania and back again. To make the other trans-Atlantic trip, we got tickets for one of TWA's destinations in Germany, stayed overnight at the airport for the requisite Saturday night layover and returned the next day (being able to find a free facility within the airport specifically designed for families with young children where there was even some semblance of a mattress for a child to sleep on, which was a luxury, considering the large number of times that Chip and I at other locations of short hops across the U.S. would have to schedule a Saturday night or inadvertently another night's stay at the airport where he had nothing but a blanket and pillow to sleep on top of the carpeting covering the floor surrounding the interior of an airport gate). The remainder of the segments necessary to qualify for the TWA mileage promotion were picked up with some flights between DC and New York and Boston on their shuttles.

(Again, Mr. Robertson, or whoever else is reading this, when you take your family on the free flights that you rate by being an AMR employee, do you and your family sleep on the carpet of whatever your airport destination is? Of course not. But when one is economically stretched far beyond what is affordable with what little income that I had in the first place to even justify taking all those flights just to accumulate the TWA mileage, it wouldn't have made economic sense for us to have wasted more money at a hotel and it may very well have destroyed the value of buying the frequent flyer mileage, and taking

the flights, a necessary inconvenience which one had to do to get the mileage credit. And as a preview of what catastrophic events followed this some years later, in regard to Washington, DC social workers invading and destroying our lives, I wouldn't be surprised whether the standard of what is considered "socially acceptable" by so-called "child protection" agencies is so distorted that they would probably take a child away from it's parents, on a bogus claim of "abuse" or "neglect" for spending the night sleeping on an airport carpet, in spite of the fact that it's probably safer and more comfortable than the environments in which half the population of all the children of the world are accustomed to sleeping in).

In 1995-6, after exhausting a couple years' worth of appealing the administrative judge's decision (for not finding more issues of illegal retaliation than what she did) to the EEOC, I had no choice but to file suit in Federal Court in DC concerning the EEO retaliation issues against the Federal Agency for whom I used to work. In an ironic twist of one being penalized for one's competence, the eligibility that a litigant is normally entitled to in an EEO Title VII case of appointment of counsel was denied to me, due to a perception that I was handling the case adequately, which led to my appealing this to the DC Federal Court of Appeals accompanied by more delays. (Keep in mind that these two courts and some of the same judges are those which handled the Justice Department's attempt to break up Bill Gates' Microsoft Corp. and the DC Federal Court system is considered the nation's most influential and competent layer of courts directly below the Supreme Court).

It was in late 1998 that DC social workers came into our lives, claiming that the apartment in which Chip and I were living was "unsafe" (in reality there was no safety issue involved and Chip had never experienced any illness or injury by us living there), and to keep it out of court and from Chip being thrown into the foster care system of DC (probably the worst in the nation) I phoned a family who we had known from Chip's first school he attended in DC to see whether they could temporarily take him in until I got the social workers' housing concerns straightened out. While they did, what I did not realize was the extent which the difference in values which people have would create in the situation. With the mother being from Holland and the father from Norway who held down a high paying job at the World Bank, these people valued their status as DC socialites habituated to entertaining guests in their lovely home and swimming pool uppermost in their life and they could not relate to my values of valuing Chip's education as being uppermost, with our living situation being meaningless. (Having lived in, visited or traveled through over 40 countries, many of them in the "Third World", and having visited and stayed with Chip's birth family for weeks or more under conditions of no indoor plumbing and next to no heat, even in sub-freezing temperatures, I know beyond any doubt that children can be safely raised in conditions far less than what American social workers apparently consider essential. In comparison with Chip's birth family here in Romania, we were living in luxury, even in a decrepit apartment building in DC). The "false friend" caretaker of Chip coerced the social workers into taking the case to court, in what turned out to be a custody dispute, of Chip's caretaker trying to completely destroy the parent-child relationship which had existed since his adoption in 1990. Being caught

in the middle of this and in spite of his caretaker's efforts to "throw money in his face" by trying to buy his affection and entertaining his whims, Chip disliked the family he was with, and it caused him so much stress that he couldn't concentrate in school and complained of memory loss (all characteristics which the social worker responsible for this claimed were "normal" for a child separated from it's parents, but about which she would do nothing to correct), which led to his grades dropping and the French School refusing to promote him to the next grade or even allow him to repeat his current grade. (This occurring in a kid with a tested I.Q. of over 150, and in spite of only starting to learn English at the age of about three, within a couple years, his vocabulary and complexity of grammar had far exceeded his native English speaking peers).

Being faced with the grave prospect of losing Chip's custody forever (the false friend caretaker started making false allegations to the social workers that Chip was mentally ill—an erroneous perception caused by her and her kids being lucky if they even had normal intelligence and not being able to understand the needs and characteristics of an intellectually gifted child, as well as the fact that, unknown to me prior to entrusting her with Chip's care, she herself had had mental problems in the past for which she had had to seek professional help and so had her kids—which led to her taking Chip to psychologists and making false allegations to them—and then becoming angry because the diagnostic report simply dwelled on Chip's unhappiness and the fact that he should be returned to his father as soon as possible), I felt that I could not fight a "two ocean war" of both trying to get Chip back as well as the employment discrimination case, both of which were becoming more than full time obligations, so I had no choice but to settle the EEO retaliation claims I had against the government agency responsible for the office director's offenses more than 10 years prior to that. What should have been worth well into the six figures in terms of lost pay and benefits if properly litigated ended up causing me more than a $15,000 out of pocket loss in terms of what I had already paid out in attorneys' fees for representation at the administrative hearing seven years prior to that, even completely disregarding the more than 12 years of lost pay by not having a job during that period of time.

The false allegations made both by the false friend caretaker of Chip as well as the social workers so seriously jeopardized Chip's being able to come back with me, that the only hope of regaining his custody lay with getting his custody transferred to sister and brother in law in Eau Claire, WI, which I was able to do in late summer of 1999 (the 2516 Skeels Ave. in Eau Claire, WI, probably being the last known address you have in my AAdvantage account). But as a price of being able to transfer his custody, the DC social workers talked the DC judge into confiscating Chip's passports so that, even then, with it being several years overdue in terms of being able to visit his birth family here in Romania, we could not go. Though the Wisconsin social workers were entirely different to deal with and could not understand why their counterparts in DC were behaving in the manner in which they were, aside from sending the most positive reports back to DC, the case was still locked in the DC family court system, where the false friend who had been caring for Chip continued to protest to the judge, with no effect. Eventually, upon the Wisconsin social workers hiring an outside social services agency to write a highly

favorable report urging reunification as well stressing the positive benefits of Chip being able to visit his birth family here in Romania, the DC judge ordered the DC social workers to return Chip's passports, something which they even refused to comply with for three or four months thereafter, it did allow us to make a return visit during Chip's Christmas 2000 school vacation.

What we did not realize until only several weeks before leaving, upon making an e-mail Internet contact with someone to check on the status of Chip's family, since we hadn't been able to visit them for four years, was that Chip's mother had died (aged only 46, and ultimately no doubt caused by the tough life she had had to lead throughout her life) the previous April, during the period of time during which Chip's passports were under confiscation by the DC social workers. Upon hearing the news, Chip's only reaction was to say "well, are they (the DC social workers) happy now that my mom is dead" as he went outside to beat a crowbar against the ice on the driveway to vent his anger and frustration.

On our return visit to Romania over that Christmas vacation, we were also able to get Chip's older sister back into a high school, from which she had had to drop out the previous spring, due to the death of her mother, to go back home (there is no high school in the village in which the family lives) and help care for her father and older brother.

As a final denouement of this saga, in July, 2000, the Washington Post reported that in lieu of charging our former landlord in DC, who owned the apartment building in which we were living with hundreds of housing code violations which could have sent him and his son to prison for over 40 years, they worked out a plea bargain with him such that for the price of one dollar, he would surrender ownership of the building to the tenants then living there, plus expend hundreds of thousands of dollars worth of repairs, temporary housing costs and attorneys' fees, all of which would be supplemented with hundreds of thousands of dollars worth of city rebuilding funds, which would, in effect, give each of the tenants then living there, a free condominium worth, on average, probably more than $30,000, while Chip and I got nothing, except being run out of DC for living there. Mr. Robertson, or whoever else is reading this, I want you to be comfortable with the truth of everything I'm telling you in the above account, so in addition to sending photographic evidence, which is explained below and being sent as separate enclosures, I'm also sending you an on-line version of the Washington Post story from July 12th, 2000, which explains the plea bargain and windfall awarding of free housing units at our former apartment building, the address of which you could double check against your past AAdvantage statement mailings between 1992 and 1999 when they were sent to that address in Washington, DC.

It was only in February, 2001 that the case was finally terminated in DC, still over the strenuous objections of the DC social workers, who, even after being informed of the unforgivable atrocity which they had perpetrated against Chip of denying him the right to see his own mother for years, until she was dead, and they still wanted to keep the case open to orchestrate more stress and terror in our lives.

I want to assure you that Chip and my being here in Romania is not that of being fugitives from the law. It is just that, after the unimaginable stress and horrors which the DC social workers put us through for a period of several years, after Chip finished the school year in 2001, it was apparent that we could not ever again assume the risk of something like this happening again, and since so-called "child protection" agencies such as this exist in every county in the U.S., the risk is very real that something like this could happen again if we lived in the U.S. Consequently until Chip reaches 18 years old after which no social worker could do anything to us any more because we weren't living in extravagant, unaffordable housing, it is apparent that, aside from some brief visits back to the U.S., we cannot live there anymore and constantly be under the threat of social worker intervention due to their not liking the housing in which we may be living.

(Additional advantages of being here are that we can more carefully and frequently monitor the extent of the poverty stricken nature of Chip's birth family, before any more of them die prematurely (and as noted at the end of this letter, we had wanted to travel across Romania to visit them during this holiday season, but may find that the time consumed in drafting this letter will prevent that) and, to enable other families of children adopted in Romania to be better able to contact the birth families of their adoptive children, I have in the past done so, and continue to hold a commitment in the future to try to locate and pass on any information, photographs, gifts or whatever that a family who had adopted a Romanian child may want to send to the child's birth family, free or at least at no more cost than one's expenses in doing so. (So, Mr. Robertson, if you know of any families, whether they be AMR employees or other friends, relatives or associates of yours who had adopted a Romanian child, and if either the child or it's adopted parents have ever had thoughts or inclinations of wanting to contact the child's birth parents, if you want to put them in touch with me, I'll do whatever I can to help them find their adoptive children's birth parents, free of charge, unless the expenses become too great, in which case, it would be helpful to be able to cover ones expenses. During the 1990s, the Los Angeles Times ran a series of article concerning international adoptions in which one was devoted to the importance, particularly in the lives of international adoptees who are teenagers or young adults, which being able to contact their birth parents had in their lives and that particularly in the Korean experience, there had been so many requests from adopted Korean kids to contact their birth parents that the Korean government set up a special office to act as an information clearing house to help them do so. Though I've tried to do something similar to that here in Romania, the corruption and other problems endemic in the Romanian economy and government has resulted in any governmental offices giving me the run around or cold shoulder towards the idea so far. AMR could even turn this into a marketing scheme, of not only having transported families wanting to adopt kids to Romania and back, but 10 to 15 years later, trying to encourage them to return to find their familial and cultural roots).

Mr. Robertson, or whoever else is reading this, ask yourself (if you have any children) what your reaction might be if insensitive and uncaring people, acting under state authority, came to your home and took your children away and then, upon imposing a set

of demands to be met in order for your children to be returned, all of which you subsequently met, repetitively changed and escalated those demands, in the manner of a kidnapper asking for a progressively higher ransoms to release their captive, what would be your reaction?  Can you even begin to contemplate how stressful a situation this would create both for you and for your children?  Some people might say that I've led a high stress life where, periodically in the past, as a full time commodity futures trader, there have been times when for days running, one's financial position might be increasing or decreasing daily by amounts well into the five figures, but aside from some stomach wrenching overnight as I adjusted myself to a different economic state, this didn't bother me much at all.  I served on active duty in the Navy in the war zone of Vietnam in 1969-1970, and that didn't bother me much at all.  I survived the first year of law school, which most people find pretty stressful (remember the movie, *The Paper Chase*, some years ago?) at a law college where everyone knew that the bottom half of the class would "wash out" after the first year, and it didn't bother me I bit, because I knew I'd be well in the top half.  But even putting all these stressful situations together simultaneously doesn't come close to the stress which one experiences when someone is holding your children hostage and playing games with you in terms of continually changing the rules concerning what it will take to get them back.

You've undoubtedly heard the expression that "stress kills."  I have no doubt that the stress which the DC social workers put Chip and me through has materially shortened my probable expected lifespan and has severely damaged Chip's educational future as well as his probable future health and outlook on life.  As tedious as you may have found the above account to read, it doesn't even include some of the most serious human rights abuses which the DC social workers put us through, which are irrelevant for the purposes intended in telling you of the events which I did.  I believe in personal accountability and in developing a strategy of holding the DC social workers and the false friend caretaker of Chip legally responsible for what they have done to our lives, I've enlisted the help of one of the top experts in the U.S. on the adverse consequences of stress, Dr. Richard Rahe, a psychiatrist who, many years ago, helped develop various versions of stress scales, which assign a specific point value to disruptive events which may occur in people's lives and by adding up the points in any given year, if they exceed 100, or whatever, it is likely that the person will experience some adverse physical and/or mental illness (even if only depression) due to the stress overload.  Dr. Rahe has testified as an expert witness in the past and has agreed to help us in any action brought against the parties who caused this.  At least a couple years ago, Dr. Rahe had an on-line stress test which was far more comprehensive than some of the abbreviated versions which you may have seen and which covered each year of one's life.  As an illustrative sample of what a person's life stress chart might look like, how it worked and the effects of stress, his website showed how the events which were known about Vincent Van Gogh's life culminated in his reaching a stress level of 475 a year or two before committing suicide.  Using the same chart and analysis which objectively simply assigns a set point value to each event which occurred within a set time frame, my highest stress value during the time the dispute with the social workers was raging was well over 600 and that's an understatement due to some of the events happening multiple times and his program not allowing for multiple

occurrences of events within the same year. While Chip's score was not as numerically extreme, it was far above what he was accustomed to or what any child should be subjected to, and the factors affecting a child are more profound due to their occurrence during a developmental period of their lives, which can have far more serious future effects in distorting the development of their personality. I'm still alive and intend on staying that way, but the point of this discussion is that both several years ago, as well as both Chip and me still experiencing the after effects of a prolonged period of an unhealthy inordinately high period of stress activity, the effects of AMR improperly destroying hundreds of thousands of miles of our TWA mileage, which, as stated at the outset of this letter, represent **the** major financial asset which Chip owns and at least one of my major assets, only serve to catapult the stress levels in our lives back up to severely unhealthy levels. Mr. Robertson, when, at the outset of this letter, in paragraph two, I stated that ". . . there is no way that I can adequately describe the extremely high level of emotional distress and frustration which your last response has created in our lives(.)" I was not using hyperbole and was referring to effects, on top of everything else, which I do not believe you are capable of even understanding, much less relating to or empathizing with, because you are not looking at or experiencing this situation through the same high stress prism as we are. Cutting to the chase of the end of this letter, which discusses the posture of what AMR may be forcing this situation into, if a resolution cannot be reached otherwise, in tort law, while an objective standard is used to determine whether an injury has occurred, once that hurdle is cleared, it is a subjective standard, taking into account all unique or subjective characteristics of the plaintiff, which determines the amount of the damages, which, I can assure you are higher than what you seem to have been capable of appreciating so far. Although I had not planned to use Dr. Rahe's expert witness testimony in contexts other than an action against the DC social workers, it is apparent that his testimony would also be relevant in any action against AMR in regard to the high degree of stress which both Chip and I were under and how having one of one's major financial assets unjustly taken away from a person, can only worsen the damage caused by the high level of emotional stress that a person was under even prior to that.

Going back to the three stated reasons why I am relating the details of this history to you and tying it in with Enclosures AMR1 and AMR2, which are being sent with this letter, you need to be satisfied with the truth of what information I have sent to you. In proving that you need to appreciate the level of importance and the extremely high personal cost, both in terms of dollars spent (even at a time when it was unaffordable to do so, and when, at least according to DC social workers, we were not even capable of affording adequate housing) as well as the time and personal inconvenience experienced in earning those miles and realize that it would be totally irrational and out of character, in terms of what importance these air miles held in our lives, to not pay attention to the impending buyout of TWA that AMR effected in 2001, and that yes, I did pay attention to the publicity about it and it was the misleading, erroneous or later to be out of date information which an AAdvantage representative gave to me in July or August, 2001 that the TWA accounts would be transferred to AAdvantage accounts automatically, that caused me to do nothing more after that, until contacting AMR by e-mail in late October, 2003 to ensure that I could create some activity in Chip's account prior to the running of

the three year time limit, to ensure that the miles would be good for at least another three years.

Turning to the photographs scanned in Enclosures AMR1 and AMR2, not only does it provide photographic proof of the truth of the account which I related to you, above, but you need to realize the degree of importance which staying in physical touch with Chip's birth family here in Romania has meant to him and to me as he was growing up. You need to realize that after he reaches age 18 and we would return to the U.S. that taking flights back here to Romania periodically to visit and help his birth family is the only practical means of staying in touch with them (no, to the best of our knowledge, there is no one in the village where Chip's family lives who even has an Internet connection at home and no Internet cafes have even sprung up yet) and the redemption of his TWA air mileage, which should have been converted to AAdvantage mileage, is the only practical means of doing so well into the future, given the cost of air travel to eastern Europe from the U.S. and the unlikelihood that Chip is going to come into enough surplus cash in his years of either going to college or shortly thereafter to easily afford doing so at his own expense.

In AMR1, from left, top to bottom, the top photo shows Chip (to the right, holding the cat) with his older brother Gabriel and sister Larisa, inside his birth family's home, taken on the first visit we made back to them in 1992. Below that (middle photo) are the three kids together out in the street of Jurilovca during the winter of 1993-4 when TWA had their mileage promotion that made it attractive to make the trip, while the bottom photo shows Chip's birth family's house, consisting of a series of rooms end to end, with a thatched roof. (Compare it to the home or apartment that you are living in, Mr. Robertson. Does it seem attractive? Luxurious? A place where you and your wife would live and raise a family? What, if anything, are you doing personally to make a positive impact upon the terrible housing conditions which probably more than half of the world's population have to contend with? Regardless of your answer to that, why is AMR attempting to make it harder for Chip and me to be able to make future trips to Chip's birth family to try to help them attain even a fraction of the standard of living which you and so many other Americans take for granted, by refusing to transfer our TWA mileage merely because some "systems are no longer operational"?) At the time of Chip's adoption his family didn't even have electricity, some of the rooms had only a dirt floor, with others having wood planking over the dirt, no indoor plumbing and heat in only one room from the stove used to cook food. On the right side of AMR1, the top photo shows Chip getting a ride on the bicycle that we had brought over to give to his older brother Gaby on the second trip that we had made there in 1992, while the photo below it, is outside the family's house, with Chip's birth father, Isai Ivanof (referenced at the outset of this letter as having a TWA account which also needs to be transferred to an AAdvantage account, though of a more modest size of miles than what Chip's or mine are) kneeling down beside him and his maternal grandmother (now dead) in the background with a chicken in the foreground.

In AMR2, from top to bottom, a photograph taken by the Jurilovca village photographer at the funeral of Chip's mother in April, 2000 (as explained in the text, above, we were not there, it occurred at a point in time when Chip's passports were under confiscation by the DC social workers and we didn't even know of the occurrence of her death until late November, 2000), the middle photo taken during our visit over Christmas, 2000, when we made a return visit to Chip's orphanage (as we generally had done on most of all the past trips) and brought toys for the kids who remained there. The bottom photo shows Chip with his birth father visiting his mother's grave site in late December, 2000. I can assure you that all of these photographs and many others taken during our trips to Chip's birth family and his orphanage to bring them much needed clothing, food, tools and toys will be entered into evidence and presented to a jury as evidence both of our prior trips here earning the mileage which AMR is trying to take away from us, as well as as verification of Chip's and my commitment to financially aid and help out his birth family and the orphanage which cared for him.

Mr. Robertson, it is important that you both read the above account as well as look at the photos, and if you are not personally empowered to do the right thing in terms of getting our TWA mileage transferred to AAdvantage accounts, it is necessary that you bring all of this to the attention of anyone up the chain of command in AMR's organization until you do reach someone who does have both the authority and understanding to realize that it is the appropriate thing to do and will ultimately work to benefit of AMR's interests to do so. I believe in exhausting all possibilities within an organization first to allow them to behave and act in a responsible manner before going outside to obtain enforcement. Keeping in mind reason No. 3 of why I related the above account to you, regardless of whether you or anyone else at AMR chooses to read and view this letter and photos in it's entirety, it is essential that I tried my utmost to enable you to do so and that you had the opportunity to do so, for the reason of taking away any "plausible deniability" that AMR could otherwise claim of being ignorant of the effects of their actions which is important for purposes of ensuring the maximum amount of punitive damages in case AMR refuses to do the right thing and drives this into a posture of litigation.

But even before that, I'm willing to try and resolve this through contacting any or all of the following and any others that I will think of in the immediate future, if AMR is unwilling to adhere to common human decency and honest business practices (the wonderful thing about the Internet is that one can contact these organizations through their websites from most anywhere in the world both rapidly and at no cost):

**The Texas Attorney General's Office:** (While I personally believe that what has happened here lies in the criminal realm of theft, embezzlement or whatever one wishes to call the unjustified taking of one's financially valuable accounts, into which one had invested thousands of dollars specifically to buy the benefits [air mileage] which could then be redeemed for thousands of dollars worth of air travel, and where one had relied upon information given to them [the phone calls to your AAdvantage department in July or August, 2001] and acted accordingly, I wouldn't be surprised whether the AG's office might balk at a criminal filing and merely refer me to any of a number of consumer

protection organizations operating either within their aegis of authority and influence or independently as another state agency or independent consumer protection organization, either at the state or national level. In any event, I'm sure they will be helpful in referring me to other consumer protection organizations, who will have leads of others, *ad infinitum).*

**Any National Consumer Protection Agencies or organizations:** Even if the AG's office proves totally unhelpful, there are numerous national consumer protection agencies and organizations that are accessible with just a touch of a computer mouse.

**The Dallas and Ft. Worth (and any other, particularly hub, cities where AMR operates) Better Business Bureau:** Being one of the most famed and best reputed organizations to ensure honest business practices on the part of businesses, I'm personally confident that they'd be appalled at what happened here, particularly when my actions were entirely shaped by relying upon what an AAdvantage representative told me would happen in terms of our TWA accounts being destined to be automatically transformed into AAdvantage accounts on November 1, 2001. The critical issue here is that a customer cannot trust the truth of what an AMR (the call to your AAdvantage department representative in July or August, 2001) representative tells him, and even when the cost of breaking that trust runs into the value of thousands of dollars (the value of the airline miles).

**The Federal Aviation Agency and/or any other Federal regulatory body which exerts any regulatory control over the airlines.**

**Any or all of the various Internet or other media based organizations which track and receive input concerning airline industry frequent flyer programs**: They need to know that AMR is an airline that cannot be relied upon in regard to information promulgated by their AAdvantage program representatives.

**Any Internet or other media based travel industry organizations:** They need to at least have the opportunity to circulate news to their travel agent industry members that AMR is an airline that cannot be relied upon in regard to information promulgated by their AAdvantage program representatives. Particularly for their customers who value getting and holding their frequent flyer mileage, travel agents need to know which airlines can and which airlines cannot be trusted regarding information given out by their frequent flyer mileage department representatives. Travel agents need to know that AMR is an airline whose representations by their frequent flyer mileage representatives cannot be trusted and that they will unexpectedly destroy thousands of dollars worth of earned air miles.

**The Dallas Morning News, The Dallas Times Herald and the Ft. Worth Star Telegram in addition to any national newspapers which would take an interest in it (as well as any local DFW TV stations which might have a website and who would respond to my e-mails):** I assure you that I have no interest in engaging in any corporate

libel or slander, but what I will tell them is merely the truth, which is that while Northwest Airlines as well as TWA have been extremely kind in the past in allowing Chip and me to check through multiple and additional free pieces of baggage beyond the two authorized, because we were taking food, clothing and tools to a destitute family in Romania as well as clothing and toys destined for Chip's orphanage, AMR is literally destroying and stealing Chip's air mileage accumulated at TWA during those trips so that he cannot (or at a minimum, find it unreasonably expensive to do so as frequently as what he otherwise would) continue to bring clothing, food and tools to his birth family or his orphanage which cared for him up to about age three. In a particularly kind gesture, Northwest Airlines even allowed us to ship a refrigerator as an additional piece of free checked baggage which exceeded their size limits (though it was not a full size fridge).

**Northwest Airlines, Delta, United, Continental and any other airlines having routes in which you are in competition with:** I feel it is appropriate to tell your competition, particularly those personnel working in their frequent flyer program departments, what AMR has done in regard to holders of TWA mileage (as well as the general character of the company in doing that which was described in the paragraph immediately preceding) who acted in reliance upon representations made to them by personnel in AMR's AAdvantage department, both for whatever use they can make of it in promulgating it throughout their organization so that their employees can publicize it however they see fit to their customers, as well as a cautionary tale to keep in mind in the future in case there are any other impending mergers, buyouts or other consolidations of the players in the airline industry to make sure, as one of the conditions of effecting the merger or buyout, that the other airlines' frequent flyer members are adequately protected so that something like this stands no chance of occurring again in the future, if AMR should buy out any other airline.

**Starting a Website with enough references to American Airlines, that it will show up in the usual searches which people initiate to find the American Airlines site on the Internet, which explains to people interested in American Airlines' operations exactly what happened here.**

There are many other possibilities of getting the truth out. I will attempt as many as possible as rapidly as possible to ensure that only minimal time passes on this. Believe me, Mr. Robertson, I am not intentionally wanting to embarrass either you, any other employee of AMR or AMR itself. I am sincerely trying to resolve this internally within AMR before going outside, and I am trying to give you the opportunity to (using the language of the last sentence that you ended your e-mail with) "… earn the respect and loyalty of our customers …". Seriously, Mr. Robertson, I'm not trying to ridicule the verbiage you used in your concluding sentence, but in saying that, after continuing to refuse to transfer our TWA mileage, can't you see that the following sentence that you transmitted simply comes off as a sick joke? You said—

> Mr. Ficken, we know we must earn the respect and loyalty of our customers by
> providing them with outstanding service and we hope you will give us the

opportunity to do so very soon.

Mr. Robertson, there is only one way that you or any of your AMR colleagues can ever hope to earn any respect or loyalty from Chip or me or anyone who we talk to about this, and that is to transfer the TWA mileage which your AAdvantage representative assured me would be done in November, 2001. The above statement you sent has all the characteristics of a stock script which someone in the communication department came up with as a means of concluding all e-mail transmittals. Can't you see that to use it under the circumstances which you did, merely rubs salt into a wound that has been badly hemorrhaging in both Chip and me ever since we received your initial e-mail claiming that transferring the miles is something which you couldn't do?

If even going outside AMR and contacting various consumer protection organizations, news media and other airlines does no good, the only recourse I have remaining is litigation. I mentioned in my page nine to ten of this letter (immediately following the three reasons why I was explaining the details of the background of our earning the TWA miles) that my last job had been with a Federal Agency as an attorney, so it is necessary to convince you that I have both the ability and resolve to see through any litigation which may need to be initiated on this. I also mentioned in the same referenced paragraph on page nine to ten that another attorney working for the same Federal Agency, at roughly the same time had simply resigned out of disgust with working there and is now in private practice in Arlington, TX. I've known him for many years and he knows Chip very well from the time we were living there. He owes me a favor (and even if he didn't, he'd do this for free anyway because of knowing Chip and because of the tremendous weight of jury sympathy that would run in our favor, which makes a case such as this almost a litigator's dream in terms of jury sympathy, that almost any attorney would fantasize about being able to litigate it) for having written a settlement proposal for him some years ago, which was convincing enough to the insurance company involved that they unquestionably paid out their insured's policy limits of $30,000 to his injured client. He'd be more than happy to get something like this started, to whatever extent having someone there locally would facilitate matters.

And if you think that the financial devastation which we have suffered at the hands of the social workers is simply something that AMR should take advantage of and assume that anyone as bad off as we have become would not or could not afford to return to the U.S. solely to conduct a trial or to testify concerning what happened here, then consider that, though I am not rich, having just recently turned age 60, it is a turning point in the life of someone who has spent over 26 years in the Naval Reserve in terms of receiving retirement pay which is a percentage of what one would earn if on active duty at one's last and highest rank. I may not be getting rich on a retired Naval Commander's pay, but it assuredly is enough to be able to make multiple trips back to the U.S. to conduct a trial and/or testify concerning what AMR did to us. Furthermore, after age 60, though I'd still have to travel a bit here in Europe to reach a location where the U.S. operates military planes, both Chip (as my dependent) and I are now eligible for free Space-Available

travel on military flights and could return easier and for less cost than you might anticipate

Consequently, if you think that my being in Romania, a third of the way around the world is an insurmountable obstacle to carrying out any litigation against AMR, it isn't. As I mentioned in the first paragraph of this letter that I hadn't gotten back to you sooner because of a case which I have on appeal in Wisconsin, as awkward as what the situation may appear to be, one can do it, and I would even invite you to call Cornelia Clark, the Clerk of the Court of Appeals in Madison, WI to verify that there is an ongoing appeal, Case No. 03-2985, that has my name on it as the appellant. Her phone number is (608) 266-1880.

Furthermore, if you want to verify that I'm an attorney (not that I or any colleague holding bar membership should be treated differently by AMR; it's just that one's legal training enables one to know when a severe injustice has occurred [which is assuredly has here] and one also knows how to correct it), call the Nebraska State Bar Association in Lincoln, NE at (402) 475-7091 to verify my bar membership, referencing my attorney number of 11280.

Regarding one's resolve to see through any litigation until one wins, I have only to refer you back to the events which followed my employment termination with the Federal Agency in 1987, which led to litigation that lasted until 1999 when it was only Chip being held hostage by the social workers which led to it's termination. Beings that we are in Romania and out of reach of social workers who might try that again, it does not present the same risks that would interfere with ones ability to prosecute a litigation situation to it's conclusion. I can even give you a Federal Reporter citation to the action of appealing the DC Federal District Court's declining to appoint counsel (rejected by the DC Federal Court of Appeals only because they decided not to accept interlocutory appeals in Title VII matters) which verifies the truth of information given to you earlier concerning the employment litigation lasting over 12 years—it's 147Fed3rd978 (DC Circuit, 1998), which is accessible on-line.

Believe me, Mr. Robertson, I am not trying to push this into a litigation situation. I am doing my utmost to bend over backwards to give you enough reasons to resolve this by transferring the miles without resorting to litigation. If you are not authorized to resolve this favorably, and won't or can't even send a printout or transfer the e-mail to higher authority, I'm willing or prepared to send this e-mail to whatever individuals lie up AMR's chain of command all the way to the CEO's office. I would prefer to be able to focus my time, litigation skills and energy where it is needed worse: In holding the DC social workers and the false friend caretaker of Chip liable for the human rights abuses and destruction which they wrecked upon our lives, because the impact of doing so has much more far reaching societal effects in terms of stopping them from doing the same thing to other families which they routinely are doing. But my sense of social justice is such that I cannot ignore what AMR is attempting to do here, and if this can't be resolved by your transferring the miles, I have no choice but to force the issue in whatever

directions will bring about a just result. Some attorneys work for the money, while others work for the objective of achieving social justice. I'm not denigrating any of the personnel in AMR's legal department is saying this, but it is hard for me to imagine that any of the attorneys employed there are doing it solely for the objective of achieving their vision of social justice which is what I do in choosing what cases to take and pursue to their conclusion until some semblance of social justice is achieved.

If litigation is what AMR is trying to push this to, I can only say that a case like this would be almost a litigator's dream in terms of the jury sympathy that would be generated. What do you think is going to happen when a jury is faced with the situation of the country's pre-eminent airline stealing hundreds of thousands of air miles from a kid who had to spend most of his early years in a Romanian orphanage, and who needs the air miles to be able to make future trips back to help out his destitute birth family as well as bring clothing and toys back to the orphanage who cared for him? Don't hold your breath waiting for a verdict in favor of AMR.

If AMR forces this case into litigation, it is not merely the air miles that will be sued for, but also ;the emotional stress which AMR has put Chip and me through since you have sent us your last couple e-mail responses rejecting our request to transfer those miles. And furthermore, it is not merely the air miles and emotional distress that will be sued for, but the maximum punitive damages that one can get. This is the significance of reason number three in my explaining the detail which I did of how the TWA air miles were accumulated and the importance they have in our lives. By removing any "plausible deniability" that AMR could claim concerning this, AMR's action in refusing to transfer the miles is all the more culpable and reprehensible because AMR knew good and well the extent of the emotional stress and loss which they caused Chip and me. Although far from being the largest award of punitive damages, probably the most publicized is the infamous six million dollar spilled cup of McDonald's coffee. That was just an accident. What is happening here is intentional and with full knowledge of the effects which this has on our lives and with full knowledge of the difficult efforts and unaffordable price which accumulating those miles caused us. And not only punitive damages, but personally, I believe that a case such as this has terrific RICO potential. While the Racketeering, Influence and Corrupt Organization statute and its later successors was originally passed to reach corrupt Mafia practices, litigation and court decisions have expanded it's effects far beyond that into seemingly unimaginable areas of civil litigation as remote and mundane as even divorce proceedings. Basically all one has to prove in regard to a civil RICO action is that the offending party developed or participated in a conspiracy to financially injure the victim, which in this case is Chip and me and the conspiracy was developed by AMR in contravention to the representation which were made to us by one of AMR's AAdvantage representatives. The damages awarded in a civil RICO action are by statute defined to be "treble", that is, as in "triple." Any or all of the above might also be combinable with a class action that could hold AMR liable not only for the three TWA accounts in question here, but the remainder of the TWA account holders that AMR has turned away since their last account transfer in addition to being

forced to hold all the remaining unclaimed accounts in a claimable status for far longer than AMR wishes to do.

Certainly in a case like this, where in the original air mileage programs there is not an arms length negotiation posture between the parties, and it's a "take it or leave it" proposition by TWA or AMR setting forth the terms of their AAdvantage air miles program, the legal concept of one's "reliance interest", which was mentioned at the early stages of this letter, would have an overwhelming sway. Since participants in your AAdvantage program don't have the ability to individually bargain over the terms of it, they have no choice and are forced to rely upon information given to them by an AAdvantage representative, just as I did, when last calling them in July or August, 2001. By relying upon the information which was given to me and acting accordingly, that is, waiting until November 1, 2001 for our TWA miles to be transferred automatically instead of telling the AAdvantage representative to do it right then and there, we relied upon the information which was given to us and which any reasonable person had the right to rely upon. It is that justified reliance upon representations made by an AMR representative that would hold overwhelming sway in determining that AMR should transfer the miles, and any court or jury would come to that conclusion.

Mr. Robertson, I don't pretend to be privy to what you were referring to when you gave us the excuse that the TWA or whatever "systems were no longer operational" as a reason why the mileage could not be transferred. But it was someone at AMR who made a decision to make those systems "no longer operational." I am sure that somewhere, there is either a printout or records of what the TWA miles of the three accounts in question here were before AMR made those systems non-operational and the information can be accessed. If any further destruction of those systems occurs after AMR's receipt of this letter, I consider it (and I believe that any court would also consider it) an intentional act of destruction of evidence to simply make it appear even harder to access those systems. Keep in mind that intentional destruction of evidence even in a civil matter can result in criminal penalties for the party doing the destruction.

Believe me, Mr. Robertson, I'm willing to work with AMR, if anyone there thinks that trying to resurrect that system of records would entail too many thousands of dollars to simply access the accounts. As I mentioned previously, although I don't have any of the statements with me in Romania, and consequently can't FAX or scan a copy of our latest TWA statements to you, they are in storage in Eau Claire, WI, though at a location which would not be accessible or locatable by anyone other than me, and I don't have plans of returning there for probably at least another three years. If realistically, it costs a tremendous amount of money for AMR to try to resurrect their systems which you claim are no longer "operational", then perhaps some alternatives might be possible, one of which might be that AMR could send me a letter signed by it's CEO or other person at a high enough level of responsibility that their promise could be trusted (unlike the AAdvantage representative whose advice we followed and now AMR will not stand behind the representations which she made to us) that our submission of a copy of the last available TWA mileage statements any time within the next five years would be accepted

as valid evidence of the existence of and the amount of miles in our TWA accounts which would be transferred to AAdvantage accounts once the statements were received at your headquarters. If you claim that you can't wait that long, then you might consider authorizing us a free flight back to the U.S. and return (Minneapolis is close enough, since AMR doesn't fly directly into Eau Claire, WI) here within the next few months (far enough in the future that I don't get frostbitten having to unpack an unheated storage unit in Wisconsin until I would find whatever boxes might contain some TWA mileage statements) so that I can search for the statements and send them to you. If neither of these seem workable, and since I had mentioned to you earlier in this letter that in all probability, the total of Chip's and my TWA accounts exceed half a million miles (though I don't know by how much), an acceptable "settlement" of this (an appropriate approach, since it appears that AMR has driven this nearly to the point of my having to initiate litigation, which is going to cost AMR considerable time, expense and trouble to defend, regardless of the outcome) would be to credit both Chip with a newly established AAdvantage account of half a million miles as well as my existing AAdvantage account with a half a million miles addition, and Isai Ivanof's (Chip's birth father) at least 10,000 miles, which I think would be adequate to cover any of our TWA losses.

Lastly, although I may not have the right to ask for anything beyond what belonged to us at the outset, i.e. that our TWA mileage be restored in an AAdvantage account like AMR's AAdvantage representative promised that it would, both the emotional distress that we have experienced during the last month since receiving your last e-mail response, as well as having our Christmas holiday season ruined by my having to mentally construct what I needed to say in this letter and spending the time and frustration typing it out over the last week, I'd like to draw a comparison with most airlines' attempts to compensate passengers for delays, late flights or other inconveniences for which the airline assumes responsibility. Mr. Robertson, I want to assure you that no flight delay or any other airline caused inconvenience while in transit on a trip has caused any emotional stress and frustration even close to what you have put Chip and me through over the last month since sending out your last e-mail. Considering that airlines generally hand out some type of voucher for flight delays and inconveniences that can be traded in for either a free dinner or a couple thousand miles of extra mileage, once you can get yourself over the psychological hurdle of realizing that it is better to establish and transfer our TWA miles into AAdvantage accounts, I think you should give serious consideration to additionally crediting the accounts in question with quite a few bonus miles for the horrendous stress and inconvenience which you put us through in addition to having to draft this letter and send it to you. If you, as you said in the last paragraph of your last e-mail, want to " … earn the respect and loyalty of (your) customers by providing them with outstanding service …" you're going to have to credit us with a lot of miles. Additionally, using the stock phraseology of the last sentence of your last e-mail, I'm giving you the opportunity to do so right now.

In spite of the frustration which you have caused us, I realize that in all probability, it is not you personally, Mr. Robertson, who is responsible for the response that you were ordered to send us in the last e-mail. I realize that you are probably being "squeezed"

between the harshness of AMR's organizational behavior where someone made a policy decision without adequately thinking through the consequences of what it was creating to people like Chip and me and probably did not realize that we, and perhaps other TWA mileage holders, were misled by erroneous information being given out by AAdvantage representatives. In spite of what you may perceive to be the adversarial and hostile tone of this letter, Chip and I do want to wish you and your family an enjoyable and happy holiday season for what remains of it. We had planned to much earlier than today, be able to travel to Chip's birth family for several days and bring them some food which would be unobtainable in the village in which they live or unaffordable even if it were obtainable, but the greater than anticipated job of getting this written (which I felt was necessary to do before the end of the year, or otherwise AMR would just allege that the end of the year gives them an additional excuse to claim that accessing the TWA accounts is even more difficult because they destroyed them at year's end) and getting the photos scanned and sent via an Internet café, is taking up so much time, it's questionable whether it's possible to or worthwhile even making the trip with as little time as remains before Chip's school starts again.

I hope to hear from you or your supervisor soon. (And yes, in spite of everything that AMR has been trying to do to us in terms of stealing our TWA mileage, I was dead serious, when, on page 16 of this letter, I made the offer that I would even help out an AMR employee for free who had adopted a child in Romania and might want to make contact with the child's birth parents. Regardless of how insensitive the behavior of the adult might be in stealing a once destitute orphanage bound Romanian child's airline mileage, the benefits of re-establishing contact with a child's birth parents accrue to the children themselves as well as their birth family, and a child shouldn't be punished for the sins of their adoptive parents).


Sincerely,

Ivan Ficken