IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IVAN FICKEN, CIPRIAN IVANOF, and ISAIA IVANOF,<br><br>    *Plaintiffs*,<br><br>v.<br><br>AMR CORPORATION, AMERICAN AIRLINES, INC., AMR EAGLE HOLDING CORPORATION, and KURT STACHE, each of whom has the address of 4333 Amon Carter Blvd., Fort Worth, Texas 76155, and BARRY ROBERTSON and LISA NORRIS,<br><br>    *Defendants*. | No. 1:07cv02166 (RMU)<br><br>CONSENT MOTION<br>FOR EXTENSION OF TIME |

**CONSENT MOTION FOR EXTENSION OF TIME**

    Defendants AMR Corporation, American Airlines, Inc., AMR Eagle Holding Corporation, and Kurt Stache respectfully request an extension of time under Federal Rule of Civil Procedure 6(b)(1)(A) to respond to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss.  Due to the length and complexity of Plaintiffs' arguments, as well as the introduction of certain attachments that raise additional legal issues, Defendants request an extension of time in order to ensure a complete and thorough response.  Moreover, although Defendants received service of Plaintiffs' Memorandum in Opposition and attachments on March 11, 2008 via first-class mail, they are unable to determine the precise date these documents were sent to them.  So that the Court and all parties can operate under a clear deadline, Defendants request an extension of time until March 24, 2008 in which to file a Reply Memorandum.

This is the first request for an extension of time to reply to Plaintiffs' Memorandum in Opposition; Defendants previously requested and were granted a two-week extension of time within which to respond to Plaintiff's Complaint. In an email dated February 28, 2008, Plaintiff Ivan Ficken consented to this request for an extension of time. Mr. Ficken's email and a proposed order are attached.

Dated: March 12, 2008               Respectfully submitted,

                                    /s/ Wayne A. Schrader
                                    Wayne A. Schrader (D.C. Bar No. 361111)
                                    GIBSON, DUNN & CRUTCHER LLP
                                    1050 Connecticut Avenue, N.W.
                                    Washington, D.C. 20036
                                    Telephone: (202) 955-8556
                                    Facsimile: (202) 530-9592

                                    *Counsel for Defendants*
                                    AMR CORPORATION,
                                    AMERICAN AIRLINES, INC.,
                                    AMR EAGLE HOLDING CORPORATION, and
                                    KURT STACHE

**CERTIFICATE OF SERVICE**

      I hereby certify that I caused copies of Defendants' Consent Motion for Extension of Time, Proposed Order, and Attached Email from Ivan Ficken to be transmitted on March 12, 2008 via certified mail, first class mail, and electronic mail to the *pro se* Plaintiffs at the following addresses:

      2020-1/2 Second Street
      Eau Claire, WI 54703

      altruistic10@yahoo.com

Dated: March 12, 2008                      Respectfully submitted,

                                                  /s/ Wayne A. Schrader
                                        Wayne A. Schrader (D.C. Bar No. 361111)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C. 20036
                                        Telephone: (202) 955-8556
                                        Facsimile: (202) 530-9592

                                        *Counsel for Defendants*
                                        AMR CORPORATION,
                                        AMERICAN AIRLINES, INC.,
                                        AMR EAGLE HOLDING CORPORATION, and
                                        KURT STACHE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IVAN FICKEN, CIPRIAN IVANOF, and ISAIA IVANOF,<br><br>*Plaintiffs*,<br><br>v.<br><br>AMR CORPORATION, AMERICAN AIRLINES, INC., AMR EAGLE HOLDING CORPORATION, and KURT STACHE, each of whom has the address of 4333 Amon Carter Blvd., Fort Worth, Texas 76155, and BARRY ROBERTSON and LISA NORRIS,<br><br>*Defendants*. | No. 1:07cv02166 (RMU)<br><br><br>ORDER FOR EXTENSION OF TIME |

## [PROPOSED] ORDER

The Court hereby GRANTS the Consent Motion for Extension of Time and ORDERS that Defendants AMR Corporation, American Airlines, Inc., AMR Eagle Holding Corporation, and Kurt Stache shall file their Reply Memorandum on or before March 24, 2008.

IT IS SO ORDERED on this ____ day of March, 2008.

_____
RICARDO M. URBINA
UNITED STATES DISTRICT JUDGE

**Robbins, Alexander P.**

| | |
|---|---|
| **From:** | Ivan Ficken [altruistic10@yahoo.com] |
| **Sent:** | Thursday, February 28, 2008 5:10 AM |
| **To:** | Robbins, Alexander P. |
| **Subject:** | Re: Memorandum in Opposition |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |
| **Attachments:** | 1160025426-07-2166 Response to Motion to Dismiss.doc |

Mr. Robbins,

Apologies for the late response. As explained in our phone conversation, the filing in opposition was delivered to the DC Federal Clerk of Courts office at 11:17AM, Feb. 20th. Referencing the following link to the Postal Service's Track and Confirm template, you can enter the document no. of EQ 623733650 US, where it states that it was signed for by "D. Daniels" a person whose name has previously appeared as having signed for deliveries to the Clerk of Courts office, so there's no reason to believe it was delivered to the wrong place.

http://trkcnfrm1.smi.usps.com/PTSInternetWeb/index.jsp

As I mentioned in the phone call, over the past month or so, even documents mailed from the clerks office have indicated a substantial time lag between when the judge signed them and they were entered into the record, causing me to suspect they have a serious backlog of processing documents into the system. I was unable to call them on Wednesday, but will do so on Thursday to ensure that it's there.

Per your request, a copy of the filing is attached (I recall that possibly there was a minor grammatical correction made on the screen before printing the documents, but it's insignificant, I don't recall exactly where, and does not change any meaning, as is) though without the further attachments referenced in the filing (be assured that they are there in the paper filed copies and are what they are purported to be), which would need to be scanned which is beyond my current level of technical expertise.

If it is your intent to file a reply and you want or need an extension of time within which to do so, particularly given the unexpected delay in the document showing up in the electronic records, I have no objection to your requesting a time extension for filing and you can utilize this statement as verification of that.

I only learned of your emailing (below) later in the day of the 20th, beyond what would be your expected business hours, where I had too many other Internet obligations to attend to that had been deferred due to the time spent on drafting the document during the preceding days, that took up the time I had at the library until it closed (I do not have a home Internet connection). Additionally, I wished to address the difficulty of obtaining the certified mailed documents which you sent, the last one of which (I assume the consent to an enlargement of time within which to respond, but I don't know) has not been received. Other untypical events have intervened since last week, where I made an initial concerted effort to try to get something sent earlier, but failing in that, I assumed that the document would have been posted by now, where the running of time would make it less pressing than it appeared originally.

While unavoidably I had to send the summons & pleadings to AA via certified mail (to get a third party delivery person to verify receipt and return that receipt to the DC Federal Clerk of Courts office as proof of service of summons) I know of no such similar requirement for exchange of other subsequent documentation between parties to a cause of action--my lack of sending a paper copy to you in the past is due to my assumptions, from your phone representations, that Gibson, Dunn had a CM/ECF account through which all documentation was delivered.

While I had been home the day that your motion to dismiss was delivered and upon hearing the doorbell, getting up, throwing some clothes on and yelling after the postal delivery person who had already headed up the sidewalk and couldn't hear me, I was able to intercept running barefoot through the snow (which, assuredly, I don't mind). But because I usually tend to be up quite late at the local university library using their Internet access, which, coupled with a lengthy trek walking home and getting something to eat before going to bed, has pushed my sleep cycle into one being extremely late and sleeping late into the morning which, when interrupted by the postman ringing the doorbell,

which I may or may not hear or may or may not be able to intercept, I'm less acclimated to having to get up in the middle of a morning's sleep to chase after postal officials in the sub-zero temperatures of Wisconsin, and then being able to get back to sleep again. (While referenced tangentially in the AA pleadings [paragraphs 25-26, 52, 55, 58, 61], and more comprehensively in the CV04-0350 pleadings against the DC social workers for the years worth of harassment that they subjected Cip and me to [paragraphs 79, 80, 88-90, 96, 104-5, 111, 119, 124, 140, 156-7, 184], and which inflicted severe post traumatic stress disorder on both of us, which has caused me to need far more sleep ever since [as one's dreams hopelessly try to integrate the irrational events of that experience into one's psyche], or otherwise I feel like I'm in a fog of jet lag, sleep has become an extremely valued commodity in my life ever since.)   In short, could you just send copies of any filings by regular mail instead of certified?  It's less trouble to receive them.  If you want an email reply that either or both emailed and paper mailed documents have been received, which substitutes for a certified return receipt, I'm willing to give you that.

The above situation of accessing attempted certified mail deliveries has been recently worsened by the Eau Claire Post Office having moved their mail pickup service (i.e. where one has to go to pick up certified mail that was attempted to be delivered, but no one answered the attempt because I wasn't home that morning, so they left a postcard for a person to pick it up later at the post office) to an annex miles away at the edge of the other side of town (where, even with shoes on, I dread having to spend hours walking through the sub-zero temperatures and snow to get there and back), whereas previously one could pick up such items at the main Post Office which is only slightly less than a mile away. Last week, after mailing the opposition to be filed, I phoned the annex and asked them if they could forward your certified mailing to the main Post Office, which they said that they would and it would be there the next day (i.e. Feb. 21).  Upon going to the main Post Office both on Feb. 21 and 22, they couldn't find it, nor could the annex which sent it out, meaning that it appears to be lost somewhere at or between the two places, with Feb. 22nd being the scheduled date of being returned to you, meaning that even if they find it, it's likely to be sent back immediately.  If they don't find it, it's unlikely that you'll ever receive the return receipt.

Because you've made multiple side channel communication initiatives to me, I believe it permits the following reciprocal communications.

Noting the asterisked practice provision of your email template, as well as your having been awarded the apparent most comprehensive list of honors from last year's graduating class at the University of Chicago Law School, which, no doubt, was at least partially instrumental in your receipt of employment with Gibson, Dunn, you, your parent(s), spouse (or significant other), friends, other relatives, faculty at U. Chicago Law, and anyone who knows you, must be justifiably proud of your academic accomplishments.  If so, and anyone should be, then, in any subsequent communications that you've had since coming to GDC in DC, you should also justifiably point with pride in your discussions with the above parties on the legal initiatives that you've undertaken since: specifically here, not only attempting to destroy a Romanian adoptee kid's right to visit with his birth family with an appropriate level of frequency to be able to ensure and help support their survival,

([separated from text only due to length of parenthetical so you can jump back to the continuation of text at it's end more smoothly] reference again the CV04-0350 case, *passim,* describing initiatives engaged in by others to prevent Cip from revisiting his birth family and the tragic results which flowed from that, i.e. not even being able to see his own mother for years, and then, as a result of the DC social worker's confiscation of his passports, not *ever* being able to see her again, and not even learning of her death until seven months after it occurred---Mr. Robbins, I'm giving you an excuse to read not only the 160+ pages of the pleadings in the CV04-0350 case but all subsequent filings in that case since, under the rationale of getting a better assessment of the opposition based on behavior in a different case, also, so far, being handled *pro se,* so that you can justify racking up lots of additional billable hours against AA and increase your year end bonus [word on the street is that GDC hired new associates, outside NY, last year at 160K and that the DC office gave bonuses of at least 35K for first years, as I presume it was pro-rated for you not having been there the whole year, with extras if you billed out in excess of 2250 hours, so I'm trying to help you reach your quota], where, given that Cip and I expended many thousands of dollars *solely* to accumulate the TWA mileage, even where there was otherwise no other reason to fly, now that we're in financially dire straits, and having had that mileage stolen from us by AA, making subsequent trips to Cip's birth family is no longer prevented by the loss of his passports, but by unaffordability due to the loss of the airline mileage)

but additionally trying to prevent Cip's very participation in this lawsuit, simply because I had signed his name on his behalf.

I'm making an assumption here, Mr. Robbins, that you entered law school roughly immediately or shortly after

graduation from college, which, if accurate, means that you're probably far closer to being Cip's age than at least mine, and the probabilities are reasonably good that one or both of your parents may still be living. How would you feel toward *anyone* who would be actively engaging in initiatives to deny you the right to ever even see your parents again? (Rhetorical question, and, in fact, all of the questions posed here, *except one which I will identify,* are rhetorical questions).

And if your response is that simply because Cip's birth parents were not the parties fully raising him to adulthood that he shouldn't feel any sense of attachment to them as you might to your own parent(s), arguably and legitimately, it might be exactly the opposite, because, again referencing the fact situation of CV04-0350, during most of the early through mid-90s I had carefully made return trips to Romania with Cip to visit his birth family at least annually and sometimes semi-annually, specifically to instill in him a sense of responsibility for caring for them, given the probable eventuality that Cip would be the only family member ever likely to be financially capable of helping to support his birth relatives, a responsibility which he takes seriously, and perhaps to a greater extent than the average kid growing up in America feels to a single pair of birth parents who exclusively raised him, where the norm in the U.S. seems to be how can a student extract more money from his parents. Again, rhetorically, are you supporting your own parents or siblings?

This leads to the single non-rhetorical question of this email, which is this "was it your or Mr. Schrader's idea to so aggressively destroy Cip's ability to even participate in this cause of action?" I ask this not because of wanting to seek personal retribution from either of you (I don't do that sort of thing), but out of curiousity. Obviously, just by being a partner at GDC, as well as looking at the type of cases and clients that he services, Mr. Schrader takes a completely amoral view toward any representation he would assume, and cares nothing about the moral or ethical consequences of the result.

My curiosity is whether people leaving with honors from law school these days already have been similarly corrupted or whether it takes years' worth of practice to become so. In this regard, *n.b.* footnote 4 of my filing in opposition, and the publications of Arthur Isak Applbaum of Harvard concerning the adversarial professions.

Everyone knows that the theory of adversariality in legal proceedings, i.e. both sides pressing their best arguments yields the best chance for the truth to emerge and justice to be served, in practice, doesn't work that way, otherwise, if it did, top drawer firms like GDC would just randomly, or based on compatible personalities, pick the people they hire, and which they could for far less than the 160K which they spend doing so. Everyone wants an "edge" in their favor, and the presumption is that if a firm only hires those garnering top honors at the elitist law schools, they will have or can be cultivated to have an edge in favor of whoever they're representing, no matter the ethics, which brings in the most affluent clients who have perpetrated the most egregious and costly offenses, who pay top billable hourly rates, which in turn pay the 160K salariess of recently hired associates. The upshot of this is that often the most expensive law firms are representing the most culpable clients, so long as they have money. The bottom line here, as relating this back to the instant case, seems to be that AA wants to go to any extreme to prevent the truth and the photographs of Cip's visits to his birth family from ever coming before a jury because they know how damaging it will be.

Which brings us back to your trying to eliminate Cip from even being a litigant, simply because I had signed his name on his behalf, which, so far, has been fine with the District Court, the USCADC, and the Supreme Court, in addition to, simply because he's in college, the IRS doesn't mind his being classified as a dependent child on my tax return, and the Department of Defense treats him as a dependent child for all military retirement benefits that he draws on my behalf, up until he's at least age 22.

Mr. Robbins, if you can't point to and discuss with pride each of the legal initiatives you're involved in at GDC in communications with each of the people who rightfully congratulated you last year for all the law school awards you received, then what's the motivating animus that allows you to do it? The money?

Knowing nothing about your background or age, but making typical assumptions of someone who had gone to law school directly after graduating from college, and assuming that all the awards that you received last year are indicative of some level of historical integrity and conscientiousness in your life, extending over the long term, imagine to yourself what your reaction might have been ten to fifteen years ago had someone told you that you'd now be working to destroy a Romania adoptee's right to visit his own birth family who means a lot to him. What would your response have been at that younger age?

And if you think that I'm taking this too personally, it cannot help but be taken any other way, concerning the issues

involved. Referencing again footnote 4, of the opposition, and Hannah Ahrendt's statement about the banality of evil to which the WWII German concentration camp guards succumbed, claiming that they were just doing their job (which, the presiding commission at the Nuremberg Trials pre-emptorily barred as a defense even before any trials began), we're all accountable for our own actions, and simply saying that you're following orders or that one is raising an issue on behalf of a client, no matter the ethics of doing so, only because of one's obligation to one's client, remains an inadequate defense.

The German concentration camp analogy may be more appropriate here than one initially might think. After all, to the extent that the guards and prisoners were capable of communicating with each other, the guards may very well have said to families protesting being separated (usually forever) "don't take this personally, I'm only doing my job" and, given that most western Judeo-Christian religions at least allow the possibility of (if not an active part of their religious tenets) families being reunited in the hereafter, there very well may have been words of reassurance given to the victims that they'll meet their relatives again in the hereafter. Is that the argument which AA is making here in so aggressively wanting to deny Cip the right to revisit what members of his birth family remain alive in Romania, i.e. that he'll be able to see and visit them in the hereafter, so forget about being able to see them as mortal human beings?

I'm surprised that your motion to dismiss didn't "pull a Kenneth Starr." A term which deserves explanation to be meaningful. That explanation follows:

During one of the subsequent visits to Romania in completing Cip's adoption, a Romanian family (the brother and sister in which I had got interested in helping facilitate and act as translators for Americans coming to Romania to adopt children), was hosting as paid houseguests, two women from Richmond, VA., who I got to know quite well during several weeks there. One of them was named Julie Hiatt Steele, who was in the process of adopting a several months old boy who she had just found. Keeping in touch with her after returning to the U.S., when I had some Naval Reserve training duty in DC that December, Julie invited Cip and me to spend Christmas at her house, the location of which was the first Christmas that Cip spent in America. After Cip and I moved to DC, Julie also sent me $100 (I realize an insignificant amount to you who probably bills more than that in ten minutes time, but it probably was more than a month's income to Adam's birth parents) to deliver to the birth parents of her son Adam, during one of the trips made back to Romania around 1993, which entailed spending all day completing the task, as the Romanian driver (who had even been there before), couldn't find the place, and had to bring along the County Clerk(who remembered having been there before with Julie) of the jurisdiction in which the birth family lived, making it nightfall by the time we arrived, and their having no electricity, I gave them the money, plus expended a roll of 1600 ASA film taking pictures by the lights of the car of the birth family to send back to Julie. By sheer luck, they turned out perfectly, and Julie treasured them as a keepsake for Adam.

On another occasion, Julie had phoned me in DC concerning a situation where the Catholic Charities organization in Richmond had funded a young child's trip to the U.S. for long term medical treatment, which ended up taking so long, that the child now identified with his host family as his parents, who wanted to keep him. To preserve their credibility as an agency that could be trusted in the future to return children to the place that sent them, Catholic Charities wanted to send the child back to Romania. While it was unclear what the Romanian birth parents thought about this, they seemed at least tolerant of wanting their child to have a better life than what he likely would have in Romania, but obviously cared about him too, and wanted to see him again. She thought I might have some ideas on how to help. I called up the State Dept.'s Office of Children's Issues where I knew person there, due to her having previously worked at the embassy in Bucharest, and her husband was also a former Foreign Service Officer, and brainstorming some ideas, since the child had been in the U.S. for more than two years, the U.S. host family could just drive to an American Embassy or Consulate in Canada (because, strangely, one can't do this in the U.S. directly) and fill out paperwork claiming or verifying that the child had been living with them for more than two years, where, some special legislation that exists, with the primary intent of it being a dispensation for military families who have taken in a kid while stationed overseas for a couple years, can legally adopt them, and bring them into the U.S. for processing as a U.S. citizen, while, at the same time, making a commitment to Catholic Charities and to the child's birth family that they'd make visits to Romania as he was growing up, so that they could stay in touch with him and see that he was doing OK, making this probably a win-win situation for all parties, without Catholic Charities' reputation becoming impaired.

If Julie's name doesn't ring a bell with you, perhaps it should (unless you were too young at the time to be paying close attention to national news events), as she was the sole person to be criminally prosecuted by Kenneth Starr in his role as Special Prosecutor trying to impeach Bill Clinton, where Julie, being simply a bystander to the whole drama, had the misfortune to be personal friends with Kathleen Willey, who made allegations concerning a meeting with Clinton,

and told Julie about it. (It turned into a "she said", "no, she said" situation with ominous consequences.)

Kenneth Starr unquestionably has an excellent technical grasp of the legal initiatives which he pursues. But, upon failing to impeach Clinton, he apparently thought that he needed to vindicate his prosecutorial role by prosecuting somebody, *anybody,* to prove that the millions of dollars that were expended on his Special Prosecutor assignment were not wasted.

I offer no opinion nor make any observation whether Julie Hiatt Steele committed perjury or even whether I have any knowledge of whether she committed perjury. The point is simply that Judge Starr seems to have lacked any sense of decency and common sense by turning his prosecution sights on Julie, to even think that a jury would likely convict her, under those circumstances. And, apparently, as part of his prosecution team's attempt to get Julie to plead guilty or otherwise coerce her, inquiries and threats were made concerning investigating whether Julie's adoption of Adam was even legitimate. E.g. See following link (bottom two paragraphs of first page)

http://query.nytimes.com/gst/fullpage.html?res=9D07E1D6153FF932A35752C1A96E958260&scp=5&sq=%22Julie+Hiatt+Steele%22&st=nyt

Even today, Googling the discrete search term "Julie Hiatt Steele" yields over 3500 hits. Without the quotation marks, 12,400.

That's what I mean by the term "pulling a Kenneth Starr."

The point of my telling you this story is---you might have overlooked something here in your zealousness to eliminate Cip as a plaintiff. While I think you've crossed a line of appropriateness in even trying to eliminate him as a plaintiff through challenging my having signed his name, since you've crossed it this far, why not go further?

You may be able to find something "wrong" with Cip's Romanian adoption. Completely aside from the adverse reputation that *all* of Eastern Europe has regarding corruption, Romania (due to Ceaucescu's special initiatives of singling out and emasculating the intellectual elite class of opinion molders, i.e. teachers [from grade school to grad school, grades are bought for bribes], medical doctors [Romania has universal health care, but if you don't pay off the doctors, they're unlikely to see you or help you], etc. [though probably not lawyers, who, no matter what political system in which they are cast, almost *always* know how to maintain a high level of income], by lowering their income to that of a street sweeper, so that they could only survive by taking bribes, meaning that when it's known that you're taking bribes, the threat of criminal prosecution for it, forces you to keep your mouth shut and not engage in political activism) has perfected it to it's highest art form. (Romania's first post-revolutionary ambassador to the UN, who later became Romania's second post-revolutionary ambassador to the U.S., and then just quit his job, and took up American citizenship because he tired of the idiocies of his masters back in Bucharest, as his wife gave Cip tutoring lessons in French, he spent time talking with me, as he observed "Romania will be corrupt for the next 200 years.") In short, corruption has been rampant in Romania for decades.

Wouldn't it be a source of even more pride that you could tell your parent(s), spouse (significant other), friends, relatives, former law professors at Univ. of Chicago law, etc., if you could manage to void Cip's adoption, as well as his U.S. citizenship (which he's held since about early 1992) and deport him back to Romania, where he isn't even capable of speaking the local language and wouldn't have any survival skills, but, heck, that's alright, because, afterall, he's over 18 years old, and being an adult, he's deemed capable of caring for himself, isn't he?

If you're mildly offended by this exercise in extremism, then imagine how Cip and I feel, which I can assure you is even worse concerning the offense of having had to contend with nearly ten years worth of having one's life, finances and employability destroyed by misguided social workers and others, and the domino/cascading effects which this has produced in all too many other facets of a person's life, where, after finally believing that one is free from further harassment from the DC social workers (yet another reference for you to justify expending time on AA's billable hours tab to review the filings of CV04-0350), then one comes to find out that AA has stolen or destroyed all of our airline mileage, making it that much more difficult and unaffordable to ever be able to make future visits to Cip's birth family, as well as your motion to dismiss containing attempts to eliminate Cip as a plaintiff even before getting to any legitimate issues.

OK, let's summarize what's going on here. (Just for the sake of argument [and not because I know *anything* about what happened in Julie's case with Kenneth Starr, which, in reality, I don't, other than what I read in the newspapers],

let's assume that Kenneth Starr is smart enough to know what he's doing in writing up a criminal charge sheet, and that Julie was a perjurer [after all, the case ended with a hung jury, so he must have convinced *somebody*, before he came to his senses and realized that this just wasn't a worthwhile case to pursue]). And yet, she's the one who has exhibited extraordinary care, and concern about both helping her adoptive son's birth family, as well as the potential plight of other Romanian children in not sending them back to a pretty tough existence.

(And I'll even throw in a self serving statement concerning my own efforts, where, realizing that there was a dearth of accurate information concerning Romanian adoptions, during the process of adopting Cip and immediately afterward, I drafted and circulated for free a series of reports that totalled over 50 single spaced typed pages to anyone who asked me for it [even sent a copy to an attorney who was on the verge of going to Romania herself to adopt a child, and had to pay for overnight express mail to get it to her before she left, and based on people to contact and places to go, she found not only one, but two kids to adopt and bring home], specifying only that the material not be sold or charged for by anyone else, [something I'm aware of some adoption attorneys getting a copy of and utilizing it for profit for themselves in advising clients], as also the adoption agency who wrote up my home study circulated copies for free, solely for the reason of enabling the maximum number of children to be adopted. [I don't believe in the concept of "intellectual property", as, to the maximum extent possible, any information should be capable of being accessed for free, so I'd make a terrible GDC attorney, who, from GDC's website promo starts out with "Information is the most valuable intellectual property. ..."])

So here's Julie, who is an alleged perjurer, engaging in extraordinary efforts to help out as many kids from Romania as what she can, while Mr. Robbins, and Mr. Schrader, who, as members of one of America's premier law firms might wish to lay claim to the highest standards of ethical behavior, and particularly Mr. Robbins, who just within the last year has been awarded the most academic prizes of any student from the graduating class at the Univ. of Chicago Law School, are engaged in extraordinary efforts to affirmatively deny Cip, as an adoptee from Romania, both his right to the most valuable asset that he owns, i.e. his former TWA airline mileage, but even beyond that, they are attempting to deny Cip even the *right to participate* as a plaintiff in trying to get that asset back, so that he could more frequently visit and financially help out his own flesh and blood birth family. On the scale of reprehensibility, where does or should jury and judicial empathy lie? At what point in time does GDC's conduct here (completely separate and distinct from AA's offensive conduct)offend a jury even more than did Kenneth Starr's against Julie? Is AA going to make the argument that there's no need or value to Cip in being able to see the surviving members of his birth family because, after all, they'll all eventually be reunited in heaven anyway? Given the multiplicity of sources through which AA pledged to transfer the TWA mileage (just a couple of which I found easily accessible on the Internet in Attachments 3 & 4) how can GDC continue making a claim that such a verifiable and dependable commitment should mean nothing?

These are all questions to merely ask yourself. And, by your simply having read the above email, even completely aside from any effort you may make to delve further into the Plaintiffs' background and circumstances which brought this cause of action about, by reading the pleadings and subsequent filings in Plaintiffs' other case or cases, you've probably been able to chalk up at least another half hour of billable hours to AA for just reading this email. You do *not* need to send me a referral fee, as, I observed in the opposition filing, Texas appears to be the only state where a person can do that, and I wouldn't want it anyway, even if we were in Texas.

Sincerely,
Ivan Ficken

*"Robbins, Alexander P." <ARobbins@gibsondunn.com>* wrote:

> Mr. Ficken-
> I just called you at 715-855-1172 but was unable to leave a voice message. Because your memorandum in opposition is due today, we wanted to ask if you would be willing to email us a copy of it as soon as reasonably possible. We intend to continue emailing you a copy of whatever we file, and hope that this practice is convenient for you.
> Best regards,
> Alex Robbins
> _____
>
> Alexander P. Robbins
> Gibson, Dunn & Crutcher

1050 Connecticut Ave, NW
Washington, DC 20036
DD: 202.887.3751
Fax: 202.530.9541
* Only licensed to practice law in California; currently practicing under supervision of the principals of the firm.
==========================================================================

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
==========================================================================

Be a better friend, newshound, and know-it-all with Yahoo! Mobile. Try it now.