**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**RECEIVED**

MAR 2 4 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IVAN FICKEN, etal

       Plaintiffs

vs.                                     Civil Action No. 07-2166 (RMU)

AMERICAN AIRLINES, INC., etal

       Defendants

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs thank the Court for granting an enlargement of time within which to file this Opposition to Defendants' Motion to Dismiss. While not germane to its status, but out of concern for a potentially adverse mindset developing in the Court's chambers concerning Plaintiffs' ability to meet filing deadlines, as well as for future reference, the granted extension noted that the correct due date for this response was Jan. 21, 2008. With Plaintiffs being unsure which Federal Rule governed what date it was due, Plaintiffs conjectured a worst case scenario of applying Local Rule LCvR7, which allowed only 11days to Jan. 29th, a date within which Plaintiffs filed their request for an extension. To the best of Plaintiffs' knowledge, Defendants' Motion to Dismiss was filed on Friday, Jan. 18, 2008. Is it possible that the Court allows only three days over the weekend within which Plaintiffs were obligated to file their Opposition or might the Court's reference to the Jan. 21st date by which Plaintiffs were obligated to file a response have been mistaken?

**PLAINTIFFS' RESPONSE TO AMERICAN AIRLINES[1] COVER SHEET/STATEMENT OF REPRESENTATION**

---

[1]For the sake of brevity, hereinafter all Defendants will collectively be called "AA", unless discussing differentiating features of individual Defendants.

In Counsel for Defendants' initial filing asking for a enlargement of time within which to file their Motion

to Dismiss, it was stated that Counsel was not representing Barry Robertson or Lisa Norris. Now in both

AA's Motion to Dismiss and their consent to Plaintiffs' request for an enlargement of time to respond,

Counsel repetitively claims that he is representing Mr. Robertson and Ms. Norris, additionally claiming that

they haven't been served with process. Referencing **Attachment 1**, which copies the U.S. Postal Service

Certified Mail Return Receipt mailing stubs for all copies of the summonses and pleadings sent to

Defendants, all Defendants were sent a copy of their respective summons and pleadings, leaving the Eau

Claire Post Office the same day.[2]  Ficken placed his return address in identical format on each certified

mailing, with the green certified receipt of delivery addressed to the Clerk's Office of the U.S. District

Court for DC to verify to the Court that the summons and pleadings had been served, all in accordance with

instructions which were given to Plaintiffs by Clerk of Court personnel several times, (including the

knowledgeable Ms. Higgins, whose long tenure in the Clerk's Office make her instructions virtually

unchallengeable) as the appropriate way to have the third party, U.S. Postal Service, serve summons and

process on a defendant. Plaintiffs have no way of knowing what AA's policies are concerning receipt of

certified mail, but if like most organizations, a person or persons designated in AA's mail reception center

will sign for all certified and registered mail to be later routed internally to the appropriate addressee party.

Plaintiffs have no direct knowledge of whether any living person working for AA even has or had the legal

name of "Barry Robertson" or "Lisa Norris", which might well even be pseudonyms that various AA

employees use in email communications with AA's customers to avoid divulging an employee's real name.

Plaintiffs only know that email communications from AA to Ficken in purportedly came from Ms. Norris

and Mr. Robertson.  Plaintiffs are confident that all six envelopes individually containing the respective

summons and pleadings to the person to whom they were addressed were delivered as required by postal

---

[2] The Dec. 11 postmark date on the two certified mailings to American Airlines, Inc. and AMR Corp. is attributable to Ficken's attempt to mail as many of the envelopes from the Univ. of WI, Eau Claire Postal Substation on Dec. 11 as what he could before the facility closed for the day, having already experienced it's last mail pickup. The remaining four certified envelopes were mailed from the main Post Office the following day of Dec. 12, the same day as what the

regulations, because Plaintiffs did not receive any of the certified mail envelopes sent back as unclaimed, undeliverable or unsigned for. Whatever failure of delivery or intentional refusal to open which occurred internally at AA, which causes Counsel to claim that Mr. Robertson and Ms. Norris were not served with a summons and complaint is a situation wholly under AA's control and the service of Plaintiffs' Summons and Complaint, at a minimum, should constructively be held to be valid as against Mr. Robertson and Ms. Norris.[3]

**RESPONSE TO I. Introduction**

Counsel's statement that "Mr. Ficken has chosen to employ the benefits of his legal education (sic) bring unfounded claims ..." serves no purpose other than intending to prejudice the Court against Plaintiffs, and their Cause of Action, by maligning Ficken's character as though a family's legitimate attempt to protect their assets constitutes something inappropriate or untoward. Counsel for AA knows that how someone utilizes their legal education is totally irrelevant to this Cause of Action and if AA's Counsel wishes to compare education and career trajectories, Ficken has no difficulty claiming the moral high ground.[4]

---

Dec. 11 postmarked envelopes were picked up by the central Postal Service, causing all six mailings to physically leave Eau Claire the same day.

[3] Given AA's desire to thwart liability for all aspects of their behavior of stealing or destroying Plaintiffs' assets of their airline mileage, and particularly because Counsel filing motions on AA's behalf is located in DC and probably were referred this case by AA's corporate counsel, without impugning the honesty of DC Counsel in this regard, AA's in house corporate counsel may well have become the first to be alerted to the presence of Plaintiffs' certified mailed summonses and pleadings on AA's premises, and, upon a cursory review of the nature of the pleadings, and noting the RICO provisions, which require coordinated actions on the part of several individuals or AA entities, their initial response may well have been to initially track down Mr. Robertson and/or Ms. Norris and specifically order them to decline to receive or open Plaintiffs' certified mailings in the belief that somehow thwarting service of process on these individuals might obviate the RICO charge on the grounds that neither party was actually served with process, with that representation being made to AA's DC Counsel, who is obligated to believe his client's story. The preceding scenario is merely a hypothetical method by which events may have transpired and there may be multiple other means by which AA attempts to assert its claim that Mr. Robertson and Ms. Norris weren't served with process. But it's too late. The sheer methodology by which AA chooses to receive its mail, for which someone signed a receipt on behalf of Mr. Robertson and Ms. Norris means that they have constructively been served with process. Regarding Counsel for AA repetitively asserting that neither party has been served, Plaintiffs can only respond paraphrasing *Hamlet* "methinks Counsel protesteth too much."

[4] While the issue of how one utilizes their education is totally irrelevant to this case, since AA Counsel wishes to put it into play, Ficken holds an abiding belief that an attorney's first and foremost obligation, as an officer of the Court, is to work to bring about an improved state of social justice in the world, and only *after* that has been achieved, might attorneys seek to personally enrich their purse through charging fees for their services to others. (Some might think that the term "social justice" is too subjective, but, e.g. Plaintiffs believe that a broad consensus concerning that could be built around the notion that any child deserves an equal opportunity to maximize their life's potential, an elementary concept which the world falls so short of as to be appalling. Ficken's adoption of Ivanof in 1990 simply applies those

principles, where, now, Ivanof is in the Honors program of a major mid-western university, while his older brother by birth, and perhaps equally intelligent, but due to extreme poverty and lack of parental oversight in the Romanian village in which he grew up, he has only a third grade education, and a relatively bleak future for himself, his wife and son. For all Plaintiffs know, AA Counsel may likewise be supporting some destitute family(s) somewhere in the world, but where, in AA's Motion to Dismiss, AA Counsel claims that he [more accurately "Moving Defendant"] has never even heard of a plaintiff's complaint being given the date at which it was originally filed with the Court in requesting *IFP* status, which was a reasonable expectation here on Plaintiffs' part, given that their cases 04-0350 and 04-1132 had received *IFP* status, it should not be the Plaintiffs who should suffer due to statute of limitations issues, when the Court held their request for reconsideration of the *IFP* status under advisement for 19 months, which tends to indicate that AA Counsel has never even filed a set of Federal pleadings on behalf of a *pro bono* client who couldn't afford to pay the filing fee, which is a far less financially onerous burden than providing long term financial support to a destitute family living overseas). In the meantime, anyone intelligent enough to get through law school and pass a bar should also be intelligent enough to develop an outside source of income to finance their social justice endeavors, without becoming corrupted in the process, and regardless, the heightened knowledge, trust and right to assert an attorney-client privilege placed in such an office should more than offset any diminished standard of living that an attorney would experience as a result of not selling his legal knowledge for financial gain. Unfortunately, too many attorneys in practice hold opposite views toward both issues, arguing whatever side someone pays them to advocate, and expecting a radically higher standard of living than the rest of the populace can afford. This does not auger against most criminal defendants deserving the best counsel they can get, in concert with Judge Reggie Walton's notice to the Constitutional law experts rushing to "Scooter" Libby's defense in June, 2007 in immediately filing a comprehensive *amicus* brief in Libby's post sentencing defense to which Walton rightly admonished—

> "It is an impressive show of public service when twelve prominent and distinguished current and former law professors of well-respected schools are able to amass their collective wisdom in the course of only several days to provide their legal expertise to the Court on behalf of a criminal defendant. The Court trusts that this is a reflection of these eminent academics' willingness in the future to step up to the plate and provide like assistance in cases involving any of the numerous litigants, both in this Court and throughout the courts of our nation, who lack the financial means to fully and properly articulate the merits of their legal positions even in instances where failure to do so could result in monetary penalties, incarceration or worse."

With a probable majority of criminal defendants severely lacking in both education and intelligence, it is not surprising that they might succumb to the drumbeat of American ad agency consumerism telling them that they deserve the best, but lacking any hope or means of achieving that, criminality appears as their only route to respect and success within their grasp. These defendants need all the legal help they can get. But when well educated, highly paid, securely employed and community well respected defendants such as Kenneth Lay, Bernie Ebbers, Dennis Kozlowski or Scooter Libby as well as the AA individuals involved in stealing or destroying the primary financial asset of a kid, who not too many years prior, was a destitute youngster languishing in a Romanian orphanage, and whose primary asset is one which will enable him to be able to make future return visits to his birth family in Romania to help them survive, and the perpetrators of this theft cannot even claim any personal financial gain from their behavior, but simply indifference, the inertia of not wanting to bother with it, and an inability to muster enough moral courage to tell their supervisors that they refuse to perpetrate this kind of wrong, it is these type of defendants, all of whom should know better and for which there is absolutely no excuse for their behavior to the extent that they don't even deserve mediocre legal counsel, let alone the services of what surely is a many hundreds of dollars per hour litigation firm to represent them. But money talks louder than does justice. As the adage goes—"There are no millionaires on death row" and relatively few are even in prison. The willingness of the nation's highest priced per hour billing lawyers to advocate corrupt positions on behalf of the super-rich who reached that financial position using corrupt tactics and the rarity with which they pay for their crimes acts as an incentive for others in similar positions to try the same, perpetuates the realization in society that there is a double standard of justice between the rich and the poor, and diminishes the entire society's respect for the law, knowing that if you're rich enough you can generally "get away with it." Ficken has never charged anyone for legal advice and never will. While he's held administrative positions that required one to hold bar membership (several stints with the SBA in its Disaster Loan Division making low interest loans available in federal disaster declared areas, and for which one's salary is primarily traceable to the graduated income tax which has a minimal impact upon those least able to pay), and whose last employment over 20 years ago ended due to an office director illegally retaliating against him after Ficken filed a grievance and EEO complaints against the director, which ultimately contributed to the director being terminated but the SBA refused to accept responsibility for the director's actions, what had previously been

4

**RESPONSE TO II. Standard of Review**

Due to the shortage of time and lack of access to comprehensive legal research sources, Plaintiffs neither

confirm nor dispute the quotations which Counsel for AA attribute to the cases cited in this section, and for

which, similar to the inferences made in AA's Introduction, Counsel for AA is attempting to adversely mold

---

Ficken's carefully planned accumulation of capitol from ones income, with the intent of returning to doing commodity futures trading (as a means of financing a strictly *pro bono* law practice aimed at correcting the most severe social injustices), with which Ficken had both sufficient success and sufficient losses in the past to realize that returning to it required adequate capitalization to withstand the financial drought of smaller losses waiting until their recoupment with fewer, but more substantial gains, the unanticipated job loss created a decades long reversal of fortune, where, having to expend more than 12 years litigating the SBA case (case no. CV96-00042[CKK]) it was forced into an extremely adverse settlement posture by DC social workers effectively taking Ficken's adoptive son, Ivanof hostage to forcing the settlement which led to case no. CV04-0350 against the DC social workers responsible, CV04-1132 against the State Department and their school for age discrimination and retaliation in not allowing Ficken to regain employment and not allowing Ivanof to attend an American school, as well as the present case against AA for having stolen or destroyed Plaintiffs' airline mileage. Ficken is not a litigious person and bends over backwards to help people, but when outside forces present in the above cases force one's back against the wall, anyone has the right to protect their and their families interests from severe injustices. While not a precise of overlap of Ficken's position on the relative ethics and morality of an attorney defending an unethical position on behalf of a client (and due to everyone having to live with their own conscience, necessitating rationalizing to oneself doing so, which is just another way of stating how far one's own sense of ethics and morality can become corrupted) Counsel for AA may wish to read *Professional Detachment: The Executioner of Paris*, Harvard Law Review, 104, 2 (Dec. 1995) pg. 458-86 (online in JSTOR), which, in much expanded form, became the book, *Ethics for Adversaries*, Princeton Univ. Press., 1999, both written by Arthur Isak Applbaum, an Associate Professor of Public Policy of Harvard University, John F. Kennedy School of Government and Director of Graduate fellowships in the Harvard University Program in Ethics and the Professions, and who is an actively sought visiting lecturer at many law schools across the country. Specifically the focus of the Harvard Law Review article proceeds from the premise, in the case of the hereditary regal appointment given by King Louis XVI (who, as Applbaum quaintly adds "would come to observe his appointee's handiwork up close") to Charles-Henri Sanson as France's pre-eminent practitioner of the art and science of torture, dismemberment and death, Applbaum introduces his topic—

   At the risk of causing squeamishness, I invite you to explore with me one extraordinary professional career and the arguments from the morality of roles that can be offered in its defense. The uneasiness this will cause is not merely an affront to delicate feelings, for the claims that can be made on Sanson's behalf strikingly resemble the claims about role morality that have been offered for the less sanguinary professions. If these arguments are perverse when offered by Sanson, why are they not perverse when offered by lawyers, politicians, bureaucrats, journalists, and business executives in defense of actions that, if performed outside of their roles, would be morally wrong? The point of this article is to unsettle.
From one of the editorial reviews of Applbaum's book—

   The adversary professions—law, business, and government, among others—typically claim a moral permission to violate persons in ways that, if not for the professional role, would be morally wrong. Lawyers advance bad ends and deceive, business managers exploit and despoil, public officials enforce unjust laws, and doctors keep confidences that, if disclosed, would prevent harm. *Ethics for Adversaries* is a philosophical inquiry into arguments that are offered to defend seemingly wrongful actions performed by those who occupy what Montaigne called "necessary offices." Applbaum concludes that these arguments are weaker than supposed.
In summary of this extended footnote, to the degree that Counsel for AA attempts to pervert Plaintiffs' pleadings with an inference that Ficken is inappropriately utilizing his legal education in the filing of this Cause of Action, it is Counsel for AA himself who is advocating for AA's corrupt position, and simply because he's being handsomely paid to do so. There are words which describe people who advocate actions such as that. In the interests of maintaining the dignity and decorum of the forum in which this is being filed, they will not be used here.

the Court's opinion at the outset against *any* legal conclusions that Plaintiffs have put forth, through the repetitive inclusion of provisos such as "... the Court is 'not bound to accept as true a legal conclusion ...'" designed solely to instill skepticism or outright prejudice in the Court concerning any legal conclusion which Plaintiffs advocate.

## RESPONSE TO III. Analysis

Counsel for AA spends the bulk of pg. 2 trying to break apart and discredit Plaintiffs' joint claims. One of a number of reasons why Plaintiffs filed this action in the DC Federal District Court where they had two other Federal Causes of Action pending is that with all three cases being "related" and being internally consistent such that all of the facts in each Complaint corroborate and support the facts in the other Complaints, which should give the Court at least some sense of confidence concerning the credence of the various actions committed by the multiple Defendants in the various cases against Plaintiffs, is that the Court already has an established history of Ficken having signed the previous Complaints and any subsequent filings on behalf of his adoptive son, Ciprian Ivanof, and, even after Ivanof attained the age of eighteen, and Plaintiffs carefully dropped the word "minor" under the signature block of Plaintiffs' various filings, neither this Court, nor the U.S. Court of Appeals for the DC Circuit, nor the U.S. Supreme Court of the United States (in both additional Courts Plaintiffs have made original filings since Ivanof has become 18 years of age) has questioned Plaintiffs' practice in doing so, and thus has established at least some continuity in Ficken being able to continue Plaintiffs' filings (where in all of the cases under consideration here, including this case against AA, the elements of damages arose while C. Ivanof was a minor child) in the hope of reaching an ultimate resolution in each of these Causes of Actions, without having the additional time and expense burden of sending each filing to Ivanof for his signature, where, from the distance of being in Wisconsin, it is hard enough trying to stay on top of the obligatory filings in each of these three cases, when mailed notices from the Court are frequently more than a week late after the Court's filing date, in even being mailed by the Clerk's Office, and sometimes not mailed at all.

As a practical matter, Counsel for AA's attempt to dismiss C. Ivanof's and I. Ivanof's claims is nothing more than an attempt to impose either/or both an impossible time or financial constraint upon Plaintiffs to discontinue this Cause of Action.

And while all three of these related cases before this Court are internally consistent, the present case against AA partakes of such an absolute identity of claims, in that each Plaintiff's frequent flyer mileage account was under the exclusive control of Ficken both before, as well as in August, 2001 when AA's representative assured Ficken over the telephone that all of the TWA mileage accounts would be automatically converted into an AA AAdvantage mileage account around November of 2001 and throughout the time period following that as well. Since Ficken was the only one of the Plaintiffs who participated in that long telephone conversation with the AAdvantage representative in which she promised that the TWA accounts would be automatically converted into an AAdvantage account later that year, Ficken would be the only one who could testify on behalf of all the Plaintiffs here. Whatever may be the fact situation of the case which Counsel for AA cites on page 2, it is doubtful that there is the same complete identity of interests and facts, as well as the condition that the parent signing on behalf of his son would be the sole person able to testify, that is present in Plaintiffs' present case.

Whatever may be the Court's perception of this joint filing, it could just as well be, and perhaps should be expanded into a class action (given the similarity of the loss to many other holders of TWA mileage, and particularly all minor children who held TWA mileage against whom the various statutes of limitation in virtually all jurisdictions, either created by statute or by judicial determination wouldn't even *begin* to run until the child reached age 18, in addition to a large number of adults who, *even by now, never* received notice that their TWA mileage, eligible for conversion into AA mileage, was not in fact converted as it was supposed to have been), which would undoubtedly make the case more financially attractive to place with an experienced litigator of class action suits.[5]

---

[5] Noting that Counsel for AA has only one single specialty listed in Martindale-Hubbell, i.e. Class Actions, and that he has represented AA in multiple other Federal Court suits in the past, (citations omitted), e.g. *Knowlton v. AA,* `*Cerqueira v. AA* and *Cruz v. AA* (the latter also involving class action issues), Counsel for AA should comfortably be at

Completely aside from expanding the case into an all encompassing (i.e. encompassing all former TWA mileage holders who were unable to get their TWA mileage converted to AA mileage, or, at a minimum, those who were minor children against whom any statute of limitations has not yet run, as well as those adults who were even unaware of their loss until substantially later) class action, and consistent with the common circumstance of the loss of Plaintiffs' mileage, if it suits the Court's need for precision regarding captioning of the case and to obviate AA's objection to all three Plaintiffs being included here, this Cause of Action might be re-titled something to the effect of Ivan Ficken as Plaintiff, for, and on behalf of all similarly situated Plaintiff holders of TWA frequent flyer mileage, of whom he specifically is aware of only two others—Ciprian Ivanof and Isaia Ivanof, which should cure the captioning or titling issue.

Further addressing the issues or concerns brought up by Counsel for AA, Isaia Ivanof is a Romanian, who is Ciprian Ivanof's birth father, living in the village of Jurilovca, Romania. Isaia Ivanof is not fluent in English and has little knowledge or understanding of the subtleties of the airlines in America having frequent flyer mileage and to what use it can be put, and thus would not be competent to testify on behalf of his own interests concerning that mileage. Consequently, for the purposes of this lawsuit, he could safely be considered an "incompetent" in so far as his knowledge concerning how to pursue any claim on behalf of himself to recover any frequent flyer mileage which he probably wouldn't understand anyway, without a detailed explanation having to go through a translator, and given the size of his TWA mileage account, were he to look at his claim alone, without being combined with that of Ficken's and C. Ivanof's, the value of that mileage would probably not be worth the expense and bother of pursuing it in court, meaning that his claim has real value, only *in combination with* Ficken's and C. Ivanof's claims against AA which are far more substantial. Thus Isaia Ivanof's claim deserves to remain in this Cause of Action due to it's identity of circumstance with Ficken's and C. Ivanof's.

---

home with such an expansion of this Cause of Action, and, indicative of AA's probable guilty mind and fear that this will be expanded into a class action, they perhaps chose their DC Counsel with an eye toward pre-emptorily arming themselves against that eventuality.

While Counsel for AA is correct in saying that "Ficken does not purport to represent either Ciprian or Isaia

Ivanof as an attorney,…" if that's what it takes to retain all Plaintiffs in this Cause of Action, then Ficken is

willing to do so. Ficken has held continual membership in the Nebraska State Bar Association since 1974,

for which membership he currently pays inactive bar association dues (Bar no. 11280), but if the only way

that all three Plaintiffs can remain in this Cause of Action as Plaintiffs is to have a formal representation

relationship, Ficken is prepared, at the Court's insistence, to request that that bar membership be upgraded

to an active membership, which, as no doubt Counsel for AA can conjecture, it will simply cost Ficken

more money in bar association dues, as well as having to take the mandatory CLE courses that accompany

any active bar membership these days. Again, this amounts to nothing short of Counsel for AA simply

engaging in financial harassment of Ficken in an attempt to make things more financially difficult for

Plaintiffs by increasing their costs. By Ficken having learned to live on next to nothing, it will not however

cause Plaintiffs to drop this Cause of Action, and will only end up impacting Ivanof at college, and/or his

birth family in Romania, who Plaintiffs try to help support. Upgrading ones bar membership to an active

status should hardly be necessary in this case (due to the identical overlap of the fact situation and interests

among the three Plaintiffs here) because Ficken does not hold himself out, nor has he ever held himself out,

nor does he intend to hold himself out in the future (absent, as explained in footnote 4 of accumulating

enough wealth, both to return to futures trading, as well as being able to capitalize upon that, to open an

exclusively *pro bono* law practice, which, as the Defendant in the SBA case and the other recent defendants

in 04-350 and 04-1132 seem to be in an ever more remote likelihood of providing) as taking in law clients,

nor does he even informally do so, much less publicly hold oneself out to do so.

And, if none of the above is persuasive toward allowing this Cause of Action to proceed, then the Court is

referred to **Attachment 2**, which is a Power of Attorney signed by Ciprian Ivanof, since reaching the age of

18 in which he specifically authorizes Ficken to sign his name on all Court filings relating to cases

originating with 04-0350, 04-1132 as well as the present Cause of Action against AA.

While after being relentlessly retaliated against by government officials in violation of laws against

retaliation, and having to live in Romania for five years out of fear of further retaliation from DC social

workers after the filing of 04-0350, only for Plaintiffs to find that they were being retaliated by officials of

the U.S. State Dept. for filing 04-1132, Plaintiffs seek accountability in lieu of retaliation. But where

Counsel for AA attacks Ficken simply for having signed his son's name to their Court filings the doctrine of

taking on an issue with clean hands comes into play where, although Wayne Schrader appears to have

signed all documents filed with the Court in this case, all previous communications from his office, both by

phone, return address on the envelopes and emails, have originated from Alexander Robbins, where, at the

bottom of Robbins' email matrix is stated "Only licensed to practice law in California; currently under

supervision of the principals of the firm." I.e. Gibson, Dunn & Crutcher, which presumably means under

Mr. Schrader's supervision. It logically might be presumed that Mr. Robbins did most of the legal research

regarding AA's Motion to Dismiss. In the abstract, Plaintiffs couldn't care less who did the research in

AA's Motion to Dismiss. But to whatever extent that Counsel for AA asks the Court to dismiss C. and I.

Ivanof from this Cause of Action simply because Ficken signed their names on their behalf (which both

Ivanofs surely would approve of), the Court might equally demand of Mr. Schrader whether the closeness of

his direction and supervision of Robbins' work justifies Mr. Schrader signing it, i.e. were all the cited cases

thoroughly read to ensure that they all stand for the propositions which they're claimed to stand for, or is

someone practicing law before this Court without possessing the appropriate bar license, and the "principal"

doing the supervising is merely signing off on someone else's work without having comprehensively

reviewed it.

Regarding Counsel for AA's allegations that AMR Eagle Holding Corp. should be dismissed from this

Complaint simply because no specific charges, outside of the background information, was made against

AMR Eagle Holding Corp., Plaintiffs are not privy to the financially interlocking relationships whereby

AMR Corporation, American Airlines and AMR Eagle Holding Corp. are related. Obviously there are

some financially beneficial relationships which exist among these three entities, otherwise they would

simply not exist in that corporate form, and those relationships may well cover issues of liability for various actions and activities, which possibly may be germane to AA's ultimate liability in this Cause of Action. Plaintiffs recollect seeing other Federal Court filings against the multiple identities of AMR Corporation, American Airlines, and AMR Eagle Holding Corp. which may have been overkill or it may have been essential to include them all. In the absence of evidence that the removal of AMR Eagle Holding would assuredly not compromise Plaintiffs' claims in this Cause of Action, AA's simple desire to remove one of their essential holding companies does not warrant the Court doing so.

**RESPONSE TO A.  RICO CLAIMS**

While acknowledging (top full ¶, pg. 4) that Plaintiffs in their Complaint alleged that all the named Defendants participated in the enterprise within the meaning of the relevant statutes, Counsel for AA goes on to attempt to then claim exactly the opposite, i.e. that Plaintiffs failed to plead the existence of the enterprise, it's operation or management or the pattern of racketeering activity.  What kind of double talk is Counsel for AA alleging here?

The "persons" referred to in §1962 can be either or both an individual or a corporation and here it is obvious that all the named individuals are (or were at the earlier most relevant time) employees of AA, and that AA is, in fact, the vehicle through which Plaintiffs ultimately lost their TWA mileage.  Naming the individuals and/or their relationship vis-à-vis each other and the corporation in some other distinct way than what has already been named, would make sense only in the context where the relevant participants had originally been separated, unassociated with each other, and where they then specifically formed a separate and distinct *other* enterprise solely for the purpose of the racketeering activity.  Bluntly stated, Plaintiffs already named the persons, the existence of the enterprise (which, although purporting to act through AA, was, in fact, in probable violation of AA's agreement with the Bankruptcy Court under which AA agreed to assume the TWA frequent flyer mileage [see evidence of that provided in further discussion, *infra*], meaning there is a divergence between the officially agreed upon policies of AA, as promised to the Bankruptcy Court [to assume all the TWA mileage] and what *some* employees did in refusing to transfer

11

that TWA mileage, thus *separating the "official" policies of AA* [as promised to the Bankruptcy Court and which would be AA's "legitimate" activities] *from the "renegade" activities of some of AA's employees later, who decided that for reasons of not wanting to be further inconvenienced or to bother with it or to deceive and defraud the agreement made with the Bankruptcy Court, they were not going to transfer any more TWA mileage*) and that these persons carried out the management of the racketeering enterprise insofar as refusing to transfer Plaintiffs' TWA mileage (as well as apparently a number of other TWA program members' mileage) and that their participation was the pattern of racketeering activity in denying Plaintiffs' mileage claims stated in their Complaint. If there's any doubt about this, then Plaintiffs ask the Court to be able to amend their pleadings, with the Court telling them where there's any lack of specificity. What Counsel for AA disregards in quoting Judge Posner[6] (fourth line from bottom, pg. 5—assuredly Plaintiffs are not challenging the well settled RICO principle that "one cannot form a conspiracy solely with oneself") that "you cannot associate with yourself" is that, at least from what information which Plaintiffs can find publicly available at this point in time (and for which they need the tools of the discovery process to force AA and the Bankruptcy Court handling AA's assumption of TWA's assets to disclose the terms under which AA's bid for those assets was approved, as well as all subsequent information which AA released internally to their AAdvantage mileage program staff in terms of representations concerning how the TWA mileage was going to be assumed by AA) AA's bid for TWA's assets included automatically integrating TWA's Aviators miles into AA's AAdvantage program. (See **Attachment 3** which copies an Internet based information service entitled "Frequentflier.com" in which the following posting was made in

---

[6] By the use of Posner's name, Counsel for AA obviously seems to be wanting to confer greater authority than might otherwise exist without so naming him. Look, everybody reading this knows who Richard Posner is and should know that, at least as of the year 2000, as evidenced by the following article: *The Most-Cited Legal Scholars,* Journal of Legal Studies: Vol. 29, No. 1, Jan. 2000, pg. 409, Judge Posner was *the* most quoted legal scholar in American history (by virtue of numbers of citations to his writings, which totaled 7981, outdoing even Justice Oliver Wendell Holmes, Jr. who only placed third with 3665 citations), having pioneered the concept of using economic analysis (via the University of Chicago approach to economic analysis) in his legal analysis, which, without curtailing his own writing, has now "passed the torch" as a "hereditary mantle of authority" of such economic analysis in law to his son, Eric Posner, who is a Professor of Law at the Univ. of Chicago School of Law, and, as of July, 2007, has 2020 legal citations to his own credit in the field of Law & Economics (Source: *Brian Leiter Most Cited Law Professors by Specialty,* 2000-20007, http://www.leiterrankings.com/faculty/2007faculty_impact_areas.shtml#LawandEconomics).

their March 1, 2001 edition, under two separate headings:  One:  "AA Clarifies TWA Mileage Policies,

Procedures"):

> As part of its official bid for TWA's assets, submitted on Wed. to a bankruptcy court, American
> disclosed details of its plan for integrating Aviators miles into the AAdvantage program.  If
> American is the successful bidder (as seems increasingly likely), "It is anticipated that TWA would
> give Aviators members six months notice before ending the Aviators program.  Aviators members
> would then receive full credit for unused mileage balances in their Aviators portfolio when the
> Aviators program ends."  "During that transition period, Aviators members would be able
> tocontinue earning and redeeming miles as they do today.  At the end of the notification period,
> Aviators members would receive a bonus mileage posting in their new or existing AAdvantage
> account equal to the unused ending mileage balance in their Aviators portfolio."

(And Two:  The TWA Saga [Continued])

> …
> The bidders were, as expected:  American (whose plan has been summarized in past issues of The
> Crier, and includes wholesale conversion of Aviators miles into AAdvantage miles); …

To whatever extent one believes that independent Internet Websites such as Frequentflier.com may lack

authority or credibility, the use of quotation marks in the first above posting, immediately following the

statement that it was a disclosure from AA, logically leads one to believe that the information quoted came

directly from AA's proposal submitted to the Bankruptcy Court.

On page 6 of AA's Motion to Dismiss, Counsel for AA attempts to further pin down the RICO "enterprise"

as a duplication of AA's legitimate enterprise, which, at this point in time in the case, without getting the

necessary discovery concerning what proposal AA made to the Bankruptcy Court for TWA's assets, what

were the terms approved by the Bankruptcy Court which allowed AA to assume TWA's assets, and how

was AA's plan of assumption of TWA's mileage implemented, it is impossible for Plaintiffs or this Court to

be able to tell whether AA as an organization implemented a policy of reneging on it's proposal to assume

the TWA miles or whether officially it adhered to it, but as a matter in practice, certain renegade

subordinates simply didn't want to be bothered with transferring the mileage or materially exaggerated the

onerousness of doing so to certain management officials, who may or may not have been aware of the

specifics of what was going on.  In short, not enough information is available to be able to determine with

certainty to what extent the RICO enterprise of failing to live up to AA's commitment to assume all of

TWA's frequent flyer mileage wholly, partially or not all overlapped AA's legitimate enterprise of flying

airplanes and which persons at what level of authority were involved in it. A blanket statement such as

Counsel for AA makes that "(b)ecause AMR Corporation and American Airlines are necessary to any RICO

enterprise, they are therefore ineligible to be RICO Defendants" is staggeringly overreaching and simply

cannot be made at this time. In short, there are strong indications that, for favorable public relations

purposes, AA "officially" (and as AA's legitimate enterprise) represented to both the Bankruptcy Court and

to the flying public at large, that AA was magnanimously converting all of the TWA mileage into AA

mileage, whereas, in fact, certain rogue elements within AA's organization (and at this point it is unclear to

what extent upper management, the Bankruptcy Court, AA's stockholders, or other "legitimate" elements of

AA's legitimate enterprise, knew that this was going, and which is why the Court needs to at least allow

Plaintiffs the opportunity to initiate discovery to find out the answers to this question), out of laziness, not

caring, a misplaced sense of wanting to improve AA's overall bottom line through engaging in fraudulent

behavior that diminished AA's expenses, or specifically a misplaced sense of wanting to improve their

department's bottom line or lessen it's expenses and work through fraudulent behavior, or other corrupt

reasons, independently formed a *different* enterprise, which is the RICO enterprise, composed of a separate

and distinct group (still, obviously, consisting wholly of AA employees, but not *all* AA employees who

would normally have authority over these issues of frequent flyer mileage) that is not the same group as

comprises AA's legitimate enterprise.

In the following paragraph, Counsel for AA's statement that "*nothing* in the allegations suggests that any of

the three individuals Defendants even knew each other,..." is blatantly untrue, given that the series of e-

mails which Plaintiffs sent to AA's AAdvantage program asking about the status of their TWA miles

(which precipitated AA's initial shocking response that all of Plaintiffs' miles had been lost or canceled)

were requested to be sent up the chain of command (see ¶29 of Complaint), which, if it was, then the named

individuals occupy a direct supervisor-subordinate relationship vis-à-vis each other, or, at least a joint

consultancy relationship with each other, so surely they knew each other, and had mutual conversations

concerning what to do about Plaintiffs' emails concerning the TWA mileage that AA had destroyed, as

14

Plaintiffs' subsequent emails were forwarded up the chain of command. (As proof of this, Lisa Norris'

initial email to Ficken came approximately 13 days after Ficken sent the lengthy email and montage of

photographs to Mr. Robertson and contained the following verbiage:

> Thank you for your additional reply. Please be assured that we have received your email and are
> currently reviewing. We will reply soon and appreciate your patience.

This was followed by her final reply in which she again declined to transfer the mileage. In other words,

Ficken's lengthy email [along with the photo montages] addressed to Mr. Robertson, had made it's way to

Ms. Norris who indicated that it was being "reviewed", which must mean that the various people involved,

i.e. Mr. Robertson, Ms. Norris, and probably other unknown persons whose names have not yet been

disclosed, were talking it over amongst themselves).

Thus, Counsel for AA is outrightly lying to the Court in making the false claim that "*nothing* in the

allegations suggests that any of the three individuals Defendants even knew each other," when in ¶29 of

Plaintiffs' Complaint it was explained that this request was forwarded up the chain of command where

surely the people knew who their own supervisors were. This is exactly what Prof. Applbaum is referring to

in his book *Ethics for Adversaries* (see, *supra,* footnote no. 4) in stating that "lawyers advance bad ends and

deceive" which is not Mr. Schrader's only instance of lying in AA's Motion to Dismiss.

**Top, page 7:** While Plaintiffs hold no personal ill will to any of the three named individuals, who Counsel

for AA now marks as "At most, (it) leaves only Kurt Stache, Barry Robertson and Lisa Norris as potential

RICO defendants", AA as their corporate employer, is not going to force these three individuals to take a

personal financial hit in being held liable under RICO, as any liability would be reimbursed by AA anyway

(unless AA is an even worse corporate player than they've already proven themselves to be), and it would

prove to be an important lesson for AA's corporate culture and employee staff, that each individual

employee has to have sufficient moral courage to stand up for some of the most simple and basic ethical

beliefs like you're not going to rob a formerly orphanage bound child of hundreds of thousands of airline

miles that he's depending upon to be able to see and help out his destitute birth family in Romania over the

coming years and if you have to sacrifice your job for your ethical beliefs then that's simply the price of

moral courage, and to the extent which sound ethical principles are imbued in a corporate culture, the

people at the top would learn not to offend sound ethical sensibilities or all your staff would walk out.[7] (cf.

the references made to Applbaum's law review article and book in footnote 4, *supra*). Furthermore, by

allowing this Cause of Action to proceed, by surviving AA's Motion to Dismiss relatively intact, it would

shows AA's employees that having a strong enough sense of personal ethics that you're not going to

participate in robbing a kid of his major financial asset, actually saves the corporation AA money in the

long run, because, since airline mileage holds tremendous and measurably financial value to members of the

flying public (e.g. Plaintiffs here) who can redeem it, the restrictive redemption terms of most airline

mileage means that from the airlines' viewpoint, it costs very little or nothing, because mileage award

tickets are primarily restricted to otherwise empty seats that have not been sold anyway. But instead of

being willing to grant Plaintiffs the mileage which they were due under the terms of AA's purchase of

TWA's assets (which would have cost AA very little and was in fulfillment of the commitment which AA

had publicly stated that it had [meaning that Plaintiffs were only asking for what was legitimately due them

and certainly were not attempting to "extort" AA into giving it to them]), AA has now probably already

spent (or been billed) something in the nature of five figures by Mr. Schrader's law firm (judging from the

complex and lengthy Motion to Dismiss for which Counsel for AA needed to request an extension of time

from that normally allowed under the Court's rules to produce, meaning that Mr. Schrader and/or Mr.

Robbins invested considerable billable hours producing it), and this case is only getting underway. The

critical public policy, corporate policy and personal ethical policy of each of AA's employees, that AA

should have followed, was corrupted by someone, or some renegade group at AA, who thought that they

---

[7] Plaintiffs note here that during Ivanof's time of growing up between 1992 and 1996, they made at least annual and sometimes twice yearly visits to Ivanof's birth family in Romania to bring them food, clothing and tools, as well as clothing and toys to the orphanage which previously cared for Ivanof and both TWA and Northwest Airlines allowed Plaintiffs multiple free additional baggage allowances (beyond the usual two free checked bag limit) of maximum weight due to the humanitarian relief nature of their trips. In 2000, Northwest Airlines even allowed Plaintiffs to transport for free a medium sized refrigerator to Ivanof's birth family who had never had a fridge before. In contrast to

could get away with this, simply because few or none of TWA's other mileage holders did anything about their loss, which is the all too frequent story in America of the rich abusing the legitimate rights of the poor, simply because they think they can get away with it, and which leads to the perception (as discussed in footnote 4) that there is a double standard of justice in America, one for the rich (who enforce their rights) and another for the poor (who cannot afford to).

**Pg 8-9:**  Counsel for AA falsely claims that Plaintiffs do not allege any predicate acts, and then, while acknowledging that robbery (call it what you will—theft, embezzlement or intentional destruction of another person's property of substantial value, etc.) as well as mail and wire fraud are alleged, attempts to exclude its effect, claiming that one needed to be physically harmed or threatened with such in order for a robbery or theft to have occurred.  The core essence of civil RICO is that one was harmed in a manner which can be financially measured.  RICO, (at least these days in what civil RICO suits are filed) by its very nature, seldom lends itself to being physically beaten up (albeit, the Mafia, which, as one of the pre-eminent organized crime organizations in the U.S., was one of the original specific targets of RICO, tends to "enforce" their rules with violence and the threats thereof, the past success of RICO in prosecuting Mafia officials has substantially diminished their overall significance in the totality of RICO actions that are filed). Regarding Counsel for AA's allegation (pg. 9) that Plaintiffs cannot allege a violation of RICO using robbery, how much value, in terms of money has to be wrongfully taken from a person before he would accept that a crime has been committed?  The value of the TWA mileage lost here is worth well into the five figures.  (The mental anguish inflicted upon Plaintiffs over this is substantially more than five figures). RICO cases have been successfully prosecuted with as little as a few hundred dollars being lost.

**Pg. 9 (Mail and Wire Fraud Issues):**  Plaintiffs explained in their Complaint that during an extended phone conversation with an AAdvantage representative in August, 2001, in which Ficken repetitively asked and got the assurance that AA would automatically transfer Plaintiffs' TWA mileage into a present or new AAdvantage account later that year (anticipated to be in November, 2001) Ficken was told that he could

---

this, AA steals or destroys hundreds of thousands of airlines miles which Ivanof had with TWA and which AA promised

transfer all the mileage right then and there if he wanted to, but that unless there was some "activity" in the account, it would only remain there dormant for three years before expiring. Since Plaintiffs knew that they were going to be gone in Romania for probably five years, every extension of time counted, where, "activity" in one's account during any three year period could not only be accomplished by taking a flight or redeeming miles for a flight, but a whole host of other means like even buying a few boxes of certain brands of breakfast cereal which had coupons that could be sent in to add mileage to one's account. In any event, it seemed most prudent to push ahead the running of that three year time period as far into the future as possible, which is why Ficken didn't tell the AAdvantage representative to transfer the mileage from Plaintiffs' accounts right then and there. This fits precisely into what Counsel for AA quotes as what was "retained or given up as a consequence of the fraud", because, in exchange for delaying the point in time of entry of the TWA miles into Plaintiffs' anticipated new AA account, Plaintiffs were promised that extra few months of their mileage validity into the future three years in advance.

**Pg. 10:** Counsel for AA in the first paragraph of pg. 10 again lies concerning his charge that it's not identified what statements were made (Plaintiffs comprehensively explained both the content of the phone conversation with the AAdvantage representative in Aug., 2001, as well as the subsequent email responses), where to the best of Ficken's recollection, the AAdvantage representative didn't identify herself by name in the Aug. 2001 phone conversation, while the email transmissions a couple years later were predominantly with Barry Robertson and Lisa Norris. It just isn't true that the mail and wire fraud allegations are not pleaded with the requisite specificity.

Additionally, there's nothing unclear about ¶¶28 & 29 that causes it to fail a particularity test. Counsel for AA's completely distorts the meaning of the quote he gives for *United States v. DeFries,* 129 F.3d 1293 (D.C. Cir. 1997) which deals with depriving a person of a significant benefit, but Counsel for AA tries to infer some deficiency by the inability to infer that Mr. Robertson or Ms. Norris obtained any property from Ficken as a result of their misrepresentations. (These are two completely different things. Destroying

---

to deposit in a new AAdvantage mileage account for him, but never did.

hundreds of thousands of miles of frequent flyer mileage only hurts the person who loses it. It doesn't *benefit* anyone, except presumably AA assumes that Plaintiffs would spend money to buy their airline tickets in the future instead of redeeming mileage for them. The fact that no one received a benefit from the loss does nothing to diminish the significance of the loss to Plaintiffs. In many respects, it makes it even worse, because anyone who engages in actions to hurt another, without anyone receiving any benefit from it, can only be called sadistic, otherwise they would care too much about human feelings to do it.) Furthermore, Counsel for AA's double talk in the bottom six lines of page 10 that nothing in the Complaint supports an inference that AA's misrepresentation of whether they could vs. their not wanting to recover the mileage caused a property deprivation, is totally untrue, because AA tries to throw an irrelevant smoke screen over the whole offense of AA refusing to transfer the TWA mileage, and whether Ficken believes or suspects that AA employees are lying concerning their willingness or inability to transfer the mileage has nothing to do with the fact of their refusal to transfer the mileage, and the equally valid fact that just like a bank book that shows what one's cash deposit is in a bank, given enough time to search their records, Plaintiffs could prove that they had a substantial mileage account balance with TWA and AA could just credit the miles based on those statements. (Whatever twisted logic Counsel for AA thinks he can pull over on the Court, Plaintiffs are confident that both the Court and a jury can see that AA's repetitive misrepresentations deserve recompense to Plaintiffs.) AA's continued refusal to credit the mileage, whether denominated as robbery, theft, conversion, embezzlement or whatever, amounts to a wrongful taking or destruction of another person's valuable property, which bizarrely, Counsel for AA seems to think is alright. Would he think the same if vandals destroyed or stole some valuable property from his house or office?

**Pg. 11**: Regarding Counsel for AA's interpretation of "predicate acts" and his claim that Ficken does not allege that either of them committed more than a single predicate act of losing his TWA mileage more than once, first of all, there are three named Plaintiffs here. That's at least three predicate acts of failing to transfer the mileage which was promised to be transferred. All three of their TWA mileage accounts were not transferred to AA in spite of the fact that for many years Ficken had a mileage account with both

19

airlines.[8]. Furthermore, all the predicate acts don't have to be the same identical act, where one predicate

act was the failure to transfer the TWA mileage like AA promised that they would. Subsequent predicate

acts, in furtherance of that fraud, were committed by Mr. Robertson and Ms. Norris in their failing to live

up to the agreements which one of their predecessors at AA had promised Ficken that AA would do. All of

these various acts are "related" to one another and partake of the"continuity" of continuing to fail to credit

Plaintiffs' TWA mileage into an AA account.

**Pgs 12-14  DC Law Claims:** Counsel for AA argues that all of Ficken's claims are time barred by DC's

three year statute of limitation. While Defendants' footnote 5 notes receipt of Plaintiffs' Motion that the

Court Set the Filing Date to January 19, 2006 when this Complaint was actually filed with the Court and

while Plaintiffs were still in Romania, Plaintiffs carefully inserted a copy of the original front page of that

filed set of pleadings, which shows the Clerk of Court's date stamp into each copy of their pleadings, that

they re-filed with the Court in November, 2007 as well as in each of the sets of pleadings sent to the various

Defendants, in addition to the change of address notification for this case which Plaintiffs filed with the

Court in September, 2006.. Furthermore, even though Plaintiffs' original Jan. 19, 2006 filing of this Cause

of Action (where the Clerk of Courts filing date stamp on the front page confirms that it was Jan. 19, 2006)

didn't make it into the Court's records, because the filing was held in limbo pending the determination of

Plaintiffs' *In Forma Pauperis* filing request, Plaintiffs' subsequent request for reconsideration of that initial

denial of *IFP did* make it into the Court's records, as case no. mc06-00083, filed February 27, 2006, so

there should be absolutely no doubt concerning Plaintiffs' earlier filing of this Cause of Action in January,

2006. With the exception of changing Plaintiffs' mailing address on the front page of the Complaint (done

simply to prevent confusion concerning where Plaintiffs were presently living), absolutely *nothing* of the

content of the Complaint was changed between when it was originally filed on January 19, 2006 and when

---

[8] The significance of this is that in reviewing some comments submitted to frequent flyer websites recently to try to
glean what history occurred here, some people believed that it was only if you had a pre-existing AAdvantage mileage
account under the same name that AA would transfer your TWA miles into it, but obviously that isn't true because
Ficken received none of his TWA miles in his AAdvantage mileage account. Furthermore, Ficken was specifically

it was filed as a paid case in November, 2007. Specifically *because* Plaintiffs' other two cases, CV04-350 and CV04-1132 had been approved for *In Forma Pauperis* filing status, by any objective standard that Plaintiffs were aware of, they held a reasonable expectation that the present case against AA would receive *IFP* status also, given that their financial condition had not materially changed between last filing case no. CV04-1132 (which had received an initial denial of *IFP* but it was approved on reconsideration). Thus, Plaintiffs were also not being unrealistic in requesting reconsideration of their application for *IFP* status in the present case against AA. While Plaintiffs were somewhat surprised that the Court held this case under advisement for 19 months making the decision for reconsideration of Plaintiffs' *IFP* status, they did not complain about it to the Court, feeling it was inappropriate to do so.

When the Court turned down the reconsideration request for *IFP* status in late September, 2007, Ficken tried to get it re-filed as a paid case as soon as possible, but with a crisis in Plaintiffs' life taking up most of the month of October, plus not knowing how to get the summons issued and served, it was November, 2007 before Plaintiffs were able to get it filed with the DC District Court Clerks Office, and that even after the Clerks Office sent the whole package of two sets of filings back to Plaintiffs earlier in November, simply because the entire sets of documents for filing were not contained in a PDF file on a floppy disc, for which no one, and no instructions had told Plaintiffs that it needed to be. Ms. Higgins finally agreed to take it back "as is" due to the difficulty of getting everything on a PDF file which Ficken was unsure that he would be capable of doing so. In discussing the 19 month hiatus (while the pleadings were held by the Court for reconsideration of *IFP*) with Ms. Higgins, she also advised that Plaintiffs should file a motion asking that the Court treat the original filing date of January 19, 2006 as the true filing date because, in fact, that's when it actually was filed in the Clerks Office. Punishing a litigant by *not* referencing the filing date back to it's true original filing date would impose too serious a chilling effect on any litigant even *trying* to apply for *IFP* filing status, out of fear that if *IFP* were not approved, a Plaintiff would run the serious risk of having one or all of his causes of action voided by an intervening statute of limitations that had run between

---

assured by the AA representative by phone in August, 2001 that you didn't need a pre-existing AA mileage account to

the period of time that he actually first filed the case, asking for *IFP* and when the case ultimately became

filed. Plaintiffs have already experienced a personal precedent for allowing such back dating of their filed

petition, where, in their CV04-1132 case, there also was a month or two's time lag before the case was

approved for *IFP* on reconsideration. The Court has confirmed that the applicable filing date for case no.

CV04-1132 should be moved back to when it originally was actually filed, so as not to discourage litigants

asking for *IFP* status. Under the discovery rule, it was only upon contacting AA by email in late 2003

(extending into 2004 with the multiple emails appealing that being sent back and forth), that Ficken learned

that AA had not transferred Plaintiffs' TWA mileage as they had promised that they would.

Finally, Counsel for AA's footnote 5 appears to carefully use the term of art that "the Moving Defendants"

variously "have no knowledge of" or "are unaware of any provision in the Federal Rules..." which, no

doubt, Counsel for AA would try to claim that he's not misrepresenting anything, because, after all, the

"Moving Defendants" are all located down in Dallas, TX. and are not attorneys themselves, so, of course

they wouldn't know these things. The issue is whether Mr. Schrader knows about these things, which he

pretty obviously does or ought to, but he doesn't want to admit it, so he passes off a cryptically stated literal

truth for a substantive lie of putting on a pretense that such things as dating a complaint the date when it

was first filed with the Court must actually be unheard of, in an attempt to encourage the Court to deny

Plaintiffs' Motion to set the date on Jan. 19, 2006.

**Pg. 15:** Counsel for AA's logic is inherently unsound regarding his treatment of Plaintiffs' claims,

alternatively pled as conversion, trover, detinue or replevin. In the broadest distinction of real versus

personal property, Counsel for AA attempts an illogical extreme of expecting this Court to be capable of

offering no relief to someone who has had personal, and, apparently, worse yet, intangible denominated

property wrongfully taken from them. Counsel for AA's citation of *Equity Group v. Painewebber Inc.,* 839

F. Supp 930,933 (D.D.C 1993) where apparently the Court was dealing with an intangible interest in

business relationships should have no applicability here, where, for all practical purposes, except the format

---

receive your TWA miles into it.

of the paper upon which the numbers are printed is slightly different, airline frequent flying mileage is tantamount to, and valued almost exclusively as airline tickets. Is the Court seriously going to claim that there exists no civil right to reclaim stolen or destroyed airline tickets that could be used by someone else? Or cash? How would Counsel for AA feel if someone entered his office without authorization and burned up or chemically destroyed tens of thousands of dollars in cash? Is he claiming that he has no right of recompense against the perpetrator?

**Pg. 16:** Counsel for AA's claim in the first sentence that Plaintiffs' Complaint doesn't allege that any Defendant ever took any frequent flyer mileage away from anyone is ridiculous. That's what this whole Cause of Action is about. AA, through buying TWA's assets assumed control over TWA's frequent flyer mileage program. It is indisputable that AA transferred some TWA mileage accounts to some new and existing AA mileage accounts. What AA's criteria was for that transfer remains elusive and subject to so many conflicting reports that it's anybody's guess at this point. That's what discovery is for: to find out what happened here. Counsel for AA's analogy of money being deposited in a bank, and that having an account in Bank A with Bank B refusing to accept the transfer of that account, and then Bank B going out of business, fails for the reason that, as explained in Plaintiffs' Complaint, during the August, 2001 phone conversation between Ficken and the AAdvantage representative, if Ficken had wanted to transfer all three TWA accounts into an AAdvantage account right then, the AA representative on the phone said that she would do so. Consequently, there never was a failure of "Bank B to accept the transfer of that account" (as Counsel for AA claims). To the contrary, there was a promise on Bank B's part that they would automatically transfer the funds or the TWA frequent flyer mileage, and, in fact, AA made a commitment to every TWA mileage holder that AA would transfer the mileage into an AA account. Why, eventually, AA failed to do this, when AA had publicly made the commitment to do that transfer is the enigma here, and that's an entirely different scenario than the one which Counsel for AA tries to paint in AA's Motion to Dismiss. The sheer fact of the offer, in August 2001, made by the AAdvantage representative that she could transfer the TWA mileage into a AA account right then and there, completely contradicts Counsel for AA's

lie made as the second to the last sentence on the page, that "...the facts alleged in the Complaint prevent any inference that American Airlines or any other defendant ever 'exercised ownership, dominion or control' over any of the TWA frequent flier miles allegedly belonging to the Plaintiffs." **This lie, so obviously and blatantly false, and in combination with the plethora of other lies which Counsel for AA is placing in AA's Motion to Dismiss is so outrageous, that Plaintiffs ask the Court to refer AA's Counsel to the DC Bar Association for disciplinary action to stop him from being either rewarded with getting pleadings dismissed unethically, or even the sheer fact of getting away with it encourages him to try again with some other judge, even where, as here, the Court surely sees through the falseness of it.**

**PG. 17**   Given the high crime rate in DC (which Plaintiffs find it hard to believe is due to any absence of a DC statute giving a private right of action analogous to conversion) what Counsel for AA is saying here is that if somebody steals something from you, and regardless of whether he's prosecuted criminally or not, he can just keep the stolen merchandise, cash, property, or whatever because there's no means in civil court of getting your property back, so if a thief thinks that the value of the property is worth "doing the time" in prison to be able to keep it, that that's a fair trade off? And Mr. Schrader is making this argument to a Federal Judge? Is this why Mr. Schrader lapses back into using the term of art "the Moving Defendants" are unaware... (of course they're unaware of DC statutes, they're all down at the DFW Airport).

## EMOTIONAL DISTRESS CLAIMS

Counsel for AA attempts to set a standard of outrageous conduct which he feels that Plaintiffs cannot meet. The sheer fact that dealings between Ficken and Defendants were at arms length (more specifically, close to a third the distance around the world) does nothing in terms of moderating the sense of outrage at what AA did to Plaintiffs.   Mr. Schrader can try to allege all he wants that "Defendants' conduct was *not* outrageous"—but it simply isn't true. As expressed in Plaintiffs' final email back to AA, in which the two montage of photographs were included, Mr. Robertson's inclusion of the sure to be a corporate obligatory sign-off that American Airlines "must earn the respect and loyalty of [its] customers by providing them with

24

outstanding service" was a completely inappropriate phrase under the circumstances which just poured the equivalent of hydrochloric acid into an open wound, that proves beyond any doubt that AA's email response edicts require such an obviously phony prescribed verbiage to be placed in *everything* in the same manner (coupled with AA's unwillingness to transfer Plaintiffs' TWA mileage, in spite of the obvious financial and emotional hardship that it was inflicting upon Plaintiffs, simply for the sake of "obedience" to AA's rules), is reminiscent of as the famed experimental psychologist, Stanley Milgram's psychological experiments on obedience, where, test subjects, feigning being shocked into torturous pain, were subjected to ever increasing doses of electrical voltage (or so the other test subjects in charge of the voltage switches thought so) as they revved the voltage up to as high as 450 volts, causing Milgram to soberingly conclude that one could easily find enough workers to staff an entire Nazi concentration camp with sadistic guards in any average American city. Summarizing his experiment in an article written in 1974, entitled "The Perils of Obedience", Milgram wrote:

> Stark authority was pitted against the subjects' (participants') strongest moral imperatives against hurting others, and, with the subjects' (participants') ears ringing with the screams of the victims, authority won more often than not. The extreme willingness of adults to go to almost any lengths on the command of an authority constitutes the chief finding of the study and the fact most urgently demanding explanation. Ordinary people, simply doing their jobs, and without any particular hostility on their part, can become agents in a terrible destructive process. Moreover, even when the destructive effects of their work become patently clear, and they are asked to carry out actions incompatible with fundamental standards of morality, relatively few people have the resources needed to resist authority.

Referencing Milgram's observation about being able to find enough people in any American city to staff a Nazi concentration camp, it is reminiscent of the phrase coined by Hannah Arendt in her book "Eichmann in Jerusalem: A Report on the Banality of Evil" in which the phrase "banality of evil" was used to describe Eichmann's deportment at his trial in Israel, where he claimed that he was not responsible for his actions because he was only "doing his job" and lacked the ability to think for himself.

Completely beyond the equities of Plaintiffs' claims in this Cause of Action, an important reason for this Cause of Action to proceed is the public policy aspects of helping to instill a sense of moral responsibility among employees in any organizational or corporate culture to be able to resist simply "following orders"

25

and "doing one's job" when those orders and job cross the line of ethical and moral reprehensibility, as they do here.

Had Ficken been working for AA and was the recipient of Plaintiffs email, complete with the photo montages, he would have sooner walked off the job, and resigned rather than send the email back to Plaintiffs' that AA's employees did send, again, just reiterating the "party line" that AA would no longer transfer the TWA miles.

Is Mr. Schrader out of touch with reality or has he lived an unduly sheltered life to think that using such terms as "shocking, rude, and economically ruinous conduct" that some court may not have felt was outrageous enough, is supposed to sway Plaintiffs' belief that their own damages from AA are minimal? There were three specific reasons why Ficken sent the final, relatively long email to AA, complete with the photo montages:

1. He genuinely wanted to reach someone at AA who had a conscience and could realize the gravity of impact which AA's actions were having on Plaintiffs, and wanted to show them the visual proof of it in the hopes of reversing AA's mind concerning restoring the TWA mileage  (Assuredly Plaintiffs dislike drafting this response to AA's Motion to Dismiss far more than Mr. Schrader can impassively draw down many hundreds of dollars per hour thinking up whatever other situation he can thrust the "Moving Defendants" into so as to appear absolutely ignorant of obvious things himself, even though he's not, but arguably the people at AA at DFW Airport are.)

2. He wanted to be able to prove, beyond any doubt to any judge or jury that he had tried everything conceivable, while remaining honest (which is more than Mr. Schrader seems capable of doing) to effectively communicate Plaintiffs' situation to AA, and they AA's representatives still refused.

3. Particularly in light of sending the montage of photographs, of which Plaintiffs have many more of their early trips to Ivanof's birth family which Plaintiffs want to show to a jury, when twelve jurors realize that people at AA's corporate headquarters received three successive pleas, topped with visual proof of the difficult and strained financial circumstances which not only Plaintiffs had, (and their having to

leave the U.S. for five years between 2001 and 2006 to be assured that they could safely avoid retaliation from the DC social workers who had placed Plaintiffs in such difficult economic straits, during which time the DC social workers actually confiscated Ivanof's passports so that Plaintiffs could no longer make any humanitarian relief trips to help out Ivanof's birth family, and during which time Ivanof's mother in Romania even died and Plaintiffs didn't find out about it until many months after she was even dead, and *still* the DC social workers (even with the knowledge of the unforgivable atrocity which they had perpetrated against Ivanof in not letting him even see his own mother again before she was dead, which is a burden that he will carry with him for the rest of his life), wanted to continue harassing Plaintiffs and didn't want to end their case against Plaintiffs, but that Ivanof's birth family had during that time period as well as many years earlier when three of Ivanof's siblings even died in infancy, no doubt due to the harsh living conditions into which they were born, for a jury to realize that here is America's largest airline, who had adamantly promised Plaintiffs that AA would automatically transfer their hundreds of thousands of airline miles that they had in their TWA accounts into an AA account, so that Plaintiffs would have enough airline mileage to be able to make many more trips in the future to help out Ivanof's birth family, and then, completely without warning, AA steals or destroys that mileage, even in the face of knowing what a serious impact that loss worth tens of thousands of dollars has on Plaintiffs, and which, at the time, and perhaps still, represented Ivanof's largest financial asset, it isn't going to matter that Ivanof is no longer a "baby." The parallel of "stealing candy from a baby" still fits, hand in glove, and any jury is going to find that action by a multibillion dollar corporation of stealing a kid's right to make trips to his birth family for years in the future to be "outrageous." Of that, Plaintiffs have no doubt. Counsel for AA knows this too, which is why he is "pushing the envelope" beyond the breaking point of ethics in so aggressively attacking Plaintiffs' Complaint in AA's Motion to Dismiss.

Further to the issue of how "outrageous" does something have to be before it becomes truly "outrageous" as applied to these circumstances, Ficken wishes to remind Mr. Schrader that in tort law, while one uses an

*objective* standard to determine whether someone was, say, negligent or acting intentionally, maliciously, or whatever, ones damages are measured *subjectively*. Thus, while under ordinary circumstances, one might somewhat carelessly run through a crowd, fully realizing that one is behaving somewhat negligently, but confident that most anyone who you accidentally hit will be both forgiving enough, as well as a robust enough, that no one is going to pay much attention to your relatively minor negligent behavior, . . . that is, until you accidentally bump against someone with *osteogenesis imperfecta* (the condition often referred to as having "glass bones") and he falls onto the concrete with shards of bone sticking out of his arms and legs. Plaintiffs are not going to begin to describe to Mr. Schrader (or the Court, who has already read too much of) Plaintiffs' problems surviving over the past nine years since the intervention of the DC social workers, but a few points are critical to keep in mind, which are that Plaintiffs' entire five years in Romania were relentlessly dogged with problems in finding a decent and affordable place to live (e.g Bucharest is to Romania as New York is to the U.S. in terms of relative affordability, though Bucharest still being cheaper than New York), a decent and affordable school for Ivanof to attend, and, at the time Ficken learned of Plaintiffs' TWA mileage being destroyed, being in the throes in worrying about and needing to draft Plaintiffs' other Causes of Action in this Court, CV04-350 and CV04-1132, as well as still suffering from the PTSD aftereffects of two and half years of torture from the DC social workers, leaving Plaintiffs in a far more emotionally susceptible condition of not being able to either absorb or easily shake off the devastating shock of the loss of their TWA mileage, in comparison with AA's perception of the "average" TWA mileage holder, who they obviously perceived as perhaps being a bit irritated, but, likely to forget about it within a few weeks. As the question was posed in Ficken's email to Mr. Robertson, how would he feel if he came home one night to find that his most valuable major asset (perhaps for most people their house) has been stolen or destroyed? Well, that's the effect on Plaintiffs. And while even the loss of one's house to a hurricane, flood or tornado usually leaves you with a few neighbors or friends who can commiserate with you, and you obtain some comfort from the fact that it was a natural disaster that was unavoidable, absolutely *everything* about AA's destruction of Plaintiffs' TWA mileage was avoidable because it was

caused by inflexible human decision making, meaning that those people who refuse to change their minds are nothing short of sadistic, otherwise they *would* change their minds, particularly upon being confronted with Plaintiffs' last email with the photo montages. And to reinforce the sadism involved here, Defendants were fully knowledgeable about the hardship which AA's action was bringing upon Plaintiffs, and still they did nothing. And to make things worse, it really wouldn't have "cost" AA much of anything, since the use of the mileage is restricted to otherwise empty airline seats which hadn't sold anyway, so there's really minimal cost involved. Juries can understand this, and recognize sadistic behavior when they see (learn about) it, and by any standard, this is outrageous corporate behavior. Even just the filing of this Motion to Dismiss, which is riddled with lies and innuendo intended to prejudice the Court against Plaintiffs, AA has now crossed another line of choosing the most hardball representation having no ethical barriers to lying that they can find, which is designed to devastate Plaintiffs hardest. Even the lies and hardball misrepresentation tactics in AA's Motion to Dismiss should be capable of being brought to the attention of a jury as AA appears intent upon digging themselves into an ever deeper hole of liability.

**PG. 19, BREACH OF CONTRACT/PROMISSORY ESTOPPEL**

Counsel for AA's claim that any breach of contract claim would fail for lack of consideration, ignores the essential "carrot" which AA dangled in front of Ficken during the August, 2001 telephone conversation, which was to forgo immediately transferring the TWA miles into an AA mileage account (which, in retrospect, obviously Plaintiffs should have done at that very instant, but that assessment is made with the benefit of hindsight) in exchange for being guaranteed that the three year expiration date of those miles would be pushed several months further into the future, and given Plaintiffs' realization that they'd probably be over in Romania at that period of time, almost *any* additional time before those miles expired, which would enable Plaintiffs to just do *something, anything,* which caused some "activity" in their accounts, and which would again give them another additional three year time window within which all of their hundreds of thousands of airline miles would remain valid. That fact that Mr. Schrader can't see or overlooked that extension of time of validity of the airline miles as being "valuable consideration" is

probably indicative of the radically different economic status between Plaintiffs and Mr. Schrader (giving

Mr. Schrader the most generous benefit of the doubt that he isn't just intentionally lying and

misrepresenting things to the Court again), where his wealth would probably blind him to the realization of

the value of the extra period of time.

## PG. 20, BREACH OF CONTRACT

The same consideration that was overwhelmingly relevant in the discussion, immediately *infra,* i.e. Ficken

agreed to forgo having all three accounts' TWA mileage transferred immediately to an AA account in

August, 2001, while having the extended phone conversation with the AA representative, who said that she

could do it right now, but the prospect of those few extra months of validity of three years worth of validity

of the airline miles convinced Ficken that there was no risk on the downside (after all, he had been

repeatedly assured by the AA representative over the phone that the conversion of the TWA miles to AA

miles would happen automatically, and he was trusting, naïve, foolish [whatever trait of misfortune one

wishes to insert here] enough to believe what he had been told by the AA representative, specifically

because, in that long phone conversation, he confirmed that same scenario with her repeatedly) and

potentially some benefit on the upside (pushing the running of the three year expiration cycle further into

the future) to just letting things remain as they were, since AA had assured him that the miles would transfer

automatically.  Plaintiffs have no idea, and need the discovery process to find out whether the AA

representative that Ficken was talking to in August, 2001, really didn't know what she was talking about (in

which case AA should still be bound by her representations, which, to most people, sounded reasonable and

the best, correct way of handling the situation), or whether AA had some sinister plot up their sleeve of

discouraging people from transferring their TWA miles early, in the hopes that they would eventually forget

about it, or whether AA simply changed the rules and made up new ones as they went along, in which case

whatever representations that they made to the Bankruptcy Judge also need to be investigated during the

discovery process.

Ficken wishes to be very clear that to the best of his recollection, it was *after* the initial bad news received via email that AA had not transferred Plaintiffs' TWA miles, that he created the additional AA mileage accounts for C. Ivanof and I. Ivanof, simply because he thought that by doing so, if things were somewhat "hanging on the edge" of AA transferring the mileage or not (given that Ficken had already sent in the first "appeal" to AA's sense of decency), and already having an AA account in both of those individuals' names might make the process easier for AA.

Counsel for AA in the bottom partial paragraph of page 20 (top couple lines of page 21) asserts that AA never assumed any obligation regarding the TWA miles, further claiming some "contractual agreement" between TWA and AA naming Plaintiff as an intended beneficiary (that's complete baloney to imagine that AA and TWA would have executed some contractual agreement naming *anyone* as an intended beneficiary). Without the benefit of having discovery access to the Bankruptcy Court documents and internal AA memoranda concerning this, one has to look elsewhere for what other people were experiencing. Although at the time in 2001 when Plaintiffs went to Romania, they were completely unaware of any Internet Frequent Flyer forums which received input from frequent flyer program members (why should they either be aware of it or search for one, since they had just received the most reliable assurance possible directly from the presumed most reliable source, AA's own phone representatives right before leaving the U.S.) upon doing a search of such airline mileage forums at this late date of drafting Plaintiffs opposition to AA's Motion to Dismiss, everything available corroborates AA's expressed commitment to welcome and absorb the mileage from the TWA program, with many people reporting the process of getting their TWA mileage posted to their AA mileage account going very smoothly, balanced against a probable equal number who received no notice or mileage transfer at all. If all that Counsel for AA and the Court need is something on paper demonstrating AA's expressed commitment to freely absorb the TWA mileage, then they might review **Attachment 4,** which shows a letter sent by one of the frequent flyer forum posters to AA chairman Don Carty concerning not only getting their TWA mileage transferred to AA's program, which was a given (and which AA acknowledges in its letter response), but that they

wanted to also have their lifetime total TWA mileage accumulation count toward reaching a one or two million mile mark where certain other perks kicked in. AA's AAdvantage program president at the time, Bruce Chemel, sent a reply to the inquirer, which, while attempting to disavow any "legal" obligation in contacting for the TWA miles (whether that's true of not, i.e. given the previous news reports that AA's bid in the Bankruptcy Court included transferring TWA miles to AA's mileage program, there is strong reason to believe that it is not, and that Mr. Chemel's response is intended to just burnish AA's public image as being extraordinarily beneficent, over and beyond their legal obligations), made the commitment that "…in the spirit of good customer service for TWA's loyal customers, American is offering AAdvantage miles to Aviators members", thereby solidifying AA's commitment, on public relations grounds, to transfer all members' TWA miles, AND ADDITIONALLY, in that letter, AA also agrees to credit the TOTAL TWA mileage *ever* accumulated by TWA flyers (even if it had long ago been redeemed for travel awards) toward AA's "Lifetime Elite Status" of having flown a total of over one or two million miles, and whatever benefits flow from that. When the chairman of the entire AA company and the head of their frequent flyer program makes that commitment, it renders Mr. Schrader's use of lies and attempts to wiggle out from under any obligation to transfer the TWA miles a moot issue, because the company has already publicly made the commitment to not only transfer all outstanding TWA miles, but also give lifetime status credit for TWA miles previously accumulated and even redeemed that isn't even outstanding for use anymore. But the question still remains of why were Plaintiffs given either erroneous information or misled concerning AA's commitment to transfer that mileage automatically.

**PG. 21-22, PROMISSORY ESTOPPEL**

Counsel for AA attempts to dispose of the promissory estoppel argument by alleging that "(i)njury to a plaintiff's reliance interest is defined by comparing the plaintiff's actual situation not to what he could have expected had the promise been performed, but rather to his situation *had the promise never been made in the first place.*" Well, OK, if the promise (i.e. the promise that AA would automatically convert the TWA miles to AA miles around Nov. 1, 2001) had never been made in the first place, given AA's publicized

commitment to absorb TWA's miles, then obviously when Ficken had been talking with the AA

representative on the phone during August, 2001, and she said that she could transfer all the miles in

Plaintiffs' TWA mileage account to a present or new AA mileage account right now, then Ficken would

have taken her up on that proposition, Plaintiffs would have all their TWA miles converted to AA miles,

and this lawsuit would have no reason to exist. Because without that critical promise made by the AA

representative over the phone in August, 2001, that the later automatic transfer date of Nov. 1, 2001 for

converting TWA miles to AA miles would extend the validity of Plaintiffs' three year mileage lifetime by

several months, there would have been no "carrot" or "added value" to attract Plaintiffs to hold off on

converting their TWA miles to AA miles immediately. So, in effect, Counsel for AA's discourse on how

injury should be defined in a promissory estoppel situation merely reinforces the validity of Plaintiffs' claim

for their TWA miles to be converted to AA miles.

Additionally, this whole section of breach of contract and promissory estoppel, ignores the thousands of

dollars paid out of Plaintiffs' pockets in previous years to TWA, which accrues to the benefit of AA by

virtue of buying TWA's assets, which include at least a somewhat richer balance sheet, due simply to the

money which Plaintiffs paid to TWA solely for the mileage accumulation, and which funds were expended

solely to, in effect, "buy" their airline miles, through Plaintiffs having taken numerous TWA flights for no

other purpose than getting the mileage accumulated in their TWA mileage accounts, and not needing to go,

nor even *wanting* to go on the flights they took to get that mileage, but which were necessary to take, simply

to get mileage credit for having taken the flights. I.e. Ultimately, AA got Plaintiffs' money (previous paid

to TWA for unnecessary flights), which was sufficient valuable consideration that required AA to live up to

their (previously TWA's commitment) mileage commitment for which the funds were expended.

**PG. 23  MIDDLE PARAGRAPH**

The logic of Counsel for AA's middle paragraph is wildly erroneous right from the start where Mr.

Schrader claims that without that critical promise made in August, 2001, "Plaintiffs' TWA frequent flier

miles *would have been lost anyway.*" This is patently fallacious. Given the AA representative's

explanation over the phone in August, 2001 that Plaintiffs' could convert their TWA miles to AA miles immediately, and right over the phone while the parties were talking, if she hadn't made the promise to convert Plaintiffs' TWA miles automatically later, then Plaintiffs would have converted their TWA miles to AA miles immediately, and they just would have had to have been more mindful at an earlier point in time to ensure that there was some "activity" in each of Plaintiffs' AA mileage accounts before the running of the three year deadline before their expiration. That would have been no problem for Ficken, since the Mastercard credit card which he had and still has, accumulates one mile of AA mileage for each dollar spent, so it's easy to create mileage "activity" in his AA mileage account, and most such credit card accounts have interchangeability of the frequent flyer number such that at some other point in time before the running the three year expiration date for the miles, Ficken could easily have switched to C. Ivanof's and/or I. Ivanof's frequent flyer number to create some "activity" in their account also. The rest of Counsel for AA's sentences in this paragraph are equally illogical and false where Ficken had no need to state any intent to "use" the mileage; all he had to do was create some "activity" of either additions or subtractions in the mileage accounts at least once every three years, easily enough to hold that mileage without using any of it. What Plaintiffs "gave up" was, as has been explained in their Complaint, about half a million airline miles that AA stole or destroyed by failing to follow through with their promise that they would convert the miles to AA miles. It is totally false for Mr. Schrader to say in his last two sentences before his conclusion that "Plaintiffs are no worse off than if American Airlines had never allowed conversion of those miles in the first place" because AA *did* allow conversion of those miles in the first place, and maintaining consistency in public confidence and trust in the long term stability of the airline industry in America, AA's commitment to convert the TWA miles into AA miles (at least for some of the TWA mileage holders who converted them early and didn't rely upon AA's misrepresentations about their being automatically converted later) maintained the long standing industry standard of not abandoning and rendering worthless any of the frequent flyer mileage that people had accumulated, when major airlines merge and buyout each other. Lastly, Plaintiffs clearly *did* experience detrimental reliance, because had Plaintiffs not relied on the

34

promises of the AA phone representative that Plaintiffs' TWA mileage would convert to AA mileage automatically if they did nothing and waited until November, 2001, then the only other alternative by which Plaintiffs could have saved their TWA mileage, which they surely would have done, would have been to have immediately converted the TWA mileage to AA mileage during the time of the August, 2001 phone call, when that opportunity was presented to them.

### CONCLUSION

Counsel for AA's Motion to Dismiss contains a disturbing number of intentional misrepresentation interspersed with crude and heavy handed attempts to mold the Court's opinion with adverse innuendo in an unfavorable way to Plaintiffs' Cause of Action. Plaintiffs don't mind defending their position against a civilly written motion to dismiss. A complete misrepresentation of Plaintiffs' position, the facts and the law is an entirely different matter. Many of AA's Counsel's misrepresentation are serious enough that, as recommended in the text, the Court should consider filing an ethics violation complaint with the DC Bar Association against Counsel for AA. If the Court or Counsel for AA feels that the immediately forgoing statement is even more blunt concerning criticism of opposing Counsel than what he has sent toward Plaintiffs' way in his Motion to Dismiss (made with the intent of obliquely trying to prejudice the Court against Plaintiffs in a subtle enough way that it had been intended that the Court wouldn't realize that it's attitude is being manipulated), Plaintiffs can only say that they're more forthright in their assessment of the opposition than stooping to play on emotional subtleties behind someone's back. Under other circumstances, Plaintiffs might give a wider berth to Counsel for AA's apparent ignorance of how airline industry frequent flyer programs work, but the misstatements and false allegations are simply too fundamental and profound to be attributable to that. In the environment of Counsel for AA's lengthy and complex Motion, Plaintiffs haven't had the time nor the legal research resources to have checked the accuracy of nearly all of the numerous cases cited, some of them for reasons that obviously do not logically fit the proposition which Counsel for AA claims that they do. Summarizing the above, Plaintiffs only caution the Court to be wary of relying upon the validity of any of the cases cited concerning the

applicability of what's being claimed that they stand for[9].  Plaintiffs' Cause of Action is sound enough to

remain essentially intact.

_____

Plaintiff Ivan Ficken, Individually

_____

Plaintiff Ivan Ficken, for and on behalf of his adoptive son,
Plaintiff Ciprian Ivanof, and C. Ivanof's birth father, Plaintiff Isaia Ivanof

---

[9] Shortly before Ficken had his SBA employment retaliatorily terminated in 1987, another attorney working in the same office had simply resigned out of disgust with SBA's management and went into private law practice in Dallas. (As between the two approaches, Ficken has always believed that you don't cure problems by running away from them. While Ficken stayed on at SBA until his termination, his efforts also helped lead to the termination of the office's director, with Ficken paying the price of not only job termination but 12+ years of subsequent litigation attempting to hold SBA responsible for the transgressing official's improprieties).  Not long afterward, the attorney work colleague was commenting to Ficken that the general state of ethics among private practitioners in Dallas was so bad that attorneys were citing cases in their court filed briefs for propositions which the cases being cited didn't stand for at all.  Texas has long had a reputation for questionable ethical standards for lawyers, where, at least at the time (mid-1980s) Texas was reported to be the only state that permitted attorneys to bill a client simply for a referral to another attorney, without the referring attorney doing any work on the case at all.  Given the extraordinarily large number of caselaw citations contained in Counsel for AA's Motion to Dismiss that exceeds even most Supreme Court briefs and where at least some of the propositions that Counsel for AA claims from that caselaw, just aren't applicable to or support the propositions that Counsel claims for them, one cannot help but question  whether Counsel for AA believes that sheer numbers of case citations are presumed to be persuasive to the Court (which may lack the time to check them all out), or persuasive to AA in house corporate counsel who is being sent Mr. Schrader's billable hours that they are getting their money's worth of research.  The fact that AA is headquartered in Texas should not give *carte blanch* permission for Counsel to use Texas style ethical practices in a DC Federal Court.

## CERTIFICATE OF SERVICE

I hereby certify that prior to the 12th day of March, 2008, **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** in case no. CV 07-2166 was served by first-class mail postage prepaid upon Defendants at their Counsels' following address:

Alexander P. Robbins
Gibson, Dunn and Crutcher, LLP
1050 Connecticut Ave., NW
Washington, DC. 20036-5309

(Mr. Robbins being the associate at Gibson, Dunn who has been in phone, email and written communication with Plaintiffs since the inception of this case, and whose email communications ends with the disclosure that Mr. Robbins is "Only licensed to practice law in California; currently under supervision of the principals of the firm.", apparently meaning under Mr. Schrader's supervision, who appears as counsel of record for American Airlines and the other Defendants in this Cause of Action. Mr. Robbins had directed Plaintiffs to address correspondence to him).

**EXPLANATORY ADDENDUM:**
This Certificate of Service is being filed concomitantly with the re-filing of Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, which, as shown by the Xeroxed first page of both copies of this re-filed document, was received by the DC Federal Clerk of Courts Office on the required due date of Feb. 20, 2008, but, for reasons which initially were unfathomable by Plaintiffs, the Court declined to allow the filing, stamping it "Let This Not Be Filed". After Plaintiffs made multiple phone calls to the Clerks Office, the Court's Docketing Clerk and the Court's Pro Se Unit, some parties of whom were willing to explain or conjecture why the filing had been denied, Plaintiffs were led to believe that the reason the filing was denied was due to the fact that it had not been accompanied by a Certificate of Service, which had caused it to be diverted to the Court's Chambers prior to being actually filed.

Since, upon Mr. Robbins' initial phone call to Plaintiffs, Plaintiffs received the clear impression that Mr. Schrader and/or Mr. Robbins at Gibson, Dunn had a DC Federal District Court CM/ECF account through which they received notice of documents filed in this case, and that Plaintiffs' previous experience in two related cases (CV04-350 and CV04-1132) where counsels representing various defendants also had CM/ECF accounts through which they received notice of documents being filed, and for which cases, because of such electronic notification (which even the Clerk of Courts office uses to send notice of documents filings to the defendants in those cases in lieu of sending a paper copy) Plaintiffs had not been sending paper copies to such defendants, Plaintiffs assumed that the electronic notification system of the court would suffice to give notice to Counsel for Defendants in this case no. 07-2166 also.

When it became apparent that Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss was not showing up on the CM/ECF system and that their filing (at least initially) appeared to be lost at the Federal Courthouse, Plaintiffs sent both an emailed copy of their filing to Mr. Robbins at Gibson, Dunn, followed by sending a paper copy via first class mail, which paper copy was receipted for (via an email acknowledgment) by Mr. Robbins on March 12, 2008.

Because the perceived defect in this filing appeared curable through submission of this Certificate of Service, along with re-filing the Opposition to the Motion to Dismiss, during one of the phone calls to the various DC Federal District Court offices (referenced, *supra*) Plaintiffs were informed that the Court's law clerks had been advised to not do anything further with respect to this case until Plaintiffs re-filed their Opposition with this Certificate of Service.

Plaintiff Ivan Ficken, individually

Plaintiff Ivan Ficken, for and on behalf of
his adoptive son, Plaintiff Ciprian Ivanof

# ATTACHMENT 1

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

O F F I C I A L   U S E

Postage $ 6.20
Certified Fee 2.65
Return Receipt Fee (Endorsement Required) 2.15
Restricted Delivery Fee (Endorsement Required)
Total Postage & Fees $ 11.00

Postmark Here — EAU CLAIRE WI 54701 STATION 0978·USPS — DEC 11 2007

Sent To AMR CORPORATION
Street, Apt. No.; or PO Box No. 4333 AMON CARTER BLVD.
City, State, ZIP+4 FT. WORTH, TX. 76155

PS Form 3800, May 2000          See Reverse for Instructions

7000 1670 0005 4448 1746

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

O F F I C I A L   U S E

Postage $ 6.20
Certified Fee 2.65
Return Receipt Fee (Endorsement Required) 2.15
Restricted Delivery Fee (Endorsement Required)
Total Postage & Fees $ 11.00

Postmark Here — EAU CLAIRE WI 54701 STATION 0978·USPS — DEC 11 2007

Sent To AMERICAN AIRLINES, INC.
Street, Apt. No.; or PO Box No. 4333 AMON CARTER BLVD.
City, State, ZIP+4 FT. WORTH, TX 76155

PS Form 3800, May 2000          See Reverse for Instructions

7000 1670 0005 4448 1784

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

FORT WORTH TX 761__     O F F I C I A L   U S E     0079

Postage $ $6.20
Certified Fee $2.65
Return Receipt Fee (Endorsement Required) $2.15
Restricted Delivery Fee (Endorsement Required) $0.00
Total Postage & Fees $ $11.00

Postmark Here — EAU CLAIRE WI 54703 — DEC 12 2007 — 12/12/2007 — USPS

Sent To AMR EAGLE HOLDING CORPORATION
Street, Apt. No.; or PO Box No. 4333 AMON CARTER BLVD.
City, State, ZIP+4 FT. WORTH, TX. 76155

PS Form 3800, May 2000          See Reverse for Instructions

7000 1670 0005 4448 1722

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

FORT WORTH TX 761__     O F F I C I A L   U S E     0079

Postage $ $6.20
Certified Fee $2.65
Return Receipt Fee (Endorsement Required) $2.15
Restricted Delivery Fee (Endorsement Required) $0.00
Total Postage & Fees $ $11.00

Postmark Here — EAU CLAIRE WI 54703 — DEC 12 2007 — 12/12/2007 — USPS

Sent To KURT STACHE, PRES. OF AA MARKETING
Street, Apt. No.; or PO Box No. AMERICAN AIRLINES, INC 4333 AMON CARTER BLVD
City, State, ZIP+4 FT. WORTH, TX. 76155

PS Form 3800, May 2000          See Reverse for Instructions

7000 1670 0005 4448 1708

---



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

FORT WORTH TX 761__     O F F I C I A L   U S E     0079

Postage $
Certified Fee $2.65
Return Receipt Fee (Endorsement Required) $2.15
Restricted Delivery Fee (Endorsement Required) $0.00
Total Postage & Fees $ $11.00

Postmark Here — EAU CLAIRE WI 54703 — DEC 12 2007 — 12/12/2007 — USPS

Sent To BARRY ROBERTSON, C/O AMERICAN AIRLINES Inc.
Street, Apt. No.; or PO Box No. 4333 AMON CARTER BLVD.
City, State, ZIP+4 FT. WORTH, TX. 76155

PS Form 3800, May 2000          See Reverse for Instructions

7000 1670 0005 4448 1739

---



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

FORT WORTH TX 761__     O F F I C I A L   U S E     0079

Postage $ $6.20
Certified Fee $2.65
Return Receipt Fee (Endorsement Required) $2.15
Restricted Delivery Fee (Endorsement Required) $0.00
Total Postage & Fees $ $11.00

Postmark Here — EAU CLAIRE WI 54703 — DEC 12 2007 — 12/12/2007 — USPS

Sent To LISA NORRIS, C/O AMERICAN AIRLINES, INC.
Street, Apt. No.; or PO Box No. 4333 AMON CARTER BLVD.
City, State, ZIP+4 FT. WORTH, TX. 76155

PS Form 3800, May 2000          See Reverse for Instructions

7000 1670 0005 4448 1715

# ATTACHMENT 2

## LIMITED POWER OF ATTORNEY

I, Ciprian Ivanof, holding citizenship in the United States of America, appoint my adoptive father Ivan Ficken as my agent to act for me in any lawful way with respect to any legal actions, which shall include, but are not limited to: the initiation of, filing any subsequent documents for, appealing of, or handling in any way he deems prudent or necessary the Causes of Action which have been filed or potentially will be filed in the future in the United States Federal District Court for the District of Columbia, the United States Federal Court of Appeals for the District of Columbia Circuit and/or the United States Supreme Court or any other court. I authorize my agent to appear for me in all actions and proceedings to which I may be a party; commence actions and proceedings in my name; sign in my name all documents or pleadings of every description; and to retain attorneys on my behalf. I further authorize my agent to take any and all legal steps necessary to collect any amount or debt owed to me, or to settle any claim, whether made against me or asserted on my behalf against any other person or entity.

Being mindful of certain Causes of Action in the above cited courts having already been initiated during the years of my minority, I hereby both retrospectively ratify all signatures of my name signed on all legal documents on my behalf by my agent, both during my minority and subsequent to my attaining the age of majority as well as I prospectively assert this authorization in favor of continuing to authorize my agent to sign all future legal documents on my behalf, both time periods applied as well to all other powers enumerated above, since my having attained the age of majority.

This limited power of attorney is not dependent upon my agent holding bar membership, whether active or inactive, in any bar association, but rather is prompted by the familial father-son relationship existing between myself and my agent and the relatively common set of factual circumstances which befell both myself and my agent which gives rise to any of the Causes of Action already filed or to be filed in the future in any court.

Similarly, due to the need for this power of attorney arising out of the relatively common set of factual circumstances which befell both myself and my agent, and the familial love and

_____*CI*_____ (Ciprian Ivanof initial)

1

sense of responsibility shared between my agent and myself, my agent agrees to assume these powers and responsibility without any expectation of personal compensation for assuming this agency.

This power of attorney, including both its retrospective ratification and prospective validity, shall become effective immediately and shall not be affected by any future disability or lack of mental competence, and shall continue effective until it is revoked by me. Subject to the extent which any state or federal statute has applicability to this issue, in the absence of my revocation of this power of attorney, it shall remain effective up to and beyond my death with regard to the survivability of any pending Causes of Action which would accrue to my estate, heirs and/or assigns. This document consists of two pages.


_____
            Ciprian Ivanof  (signature)

By signing as a witness, I acknowledge that Ciprian Ivanof either signed this Power of Attorney in my presence, or that Ciprian Ivanof stated to me that the above signature belongs to him and that he voluntarily executed this document. I am not related to Ciprian Ivanof by blood, marriage or adoption and, to the best of my knowledge, his execution of this Power of Attorney confers no benefit to me whatsoever.


_____
            Witness' Signature

Miriam    Chun
_____
            Witness' Printed Full Legal Name


_____
            Witness' Signature

Elizabeth Ferderbar
_____
            Witness' Printed Full Legal Name


2

# ATTACHMENT 3



**=Frequent =Flier.com**
may your miles never expire

Welcome to FrequentFlier.com | Friday, February 29, 2008
The Internet's premier site for frequent flyer program information and advice.

 imagine... your own
**Round-the-World journey** 

| Home | News & Analysis | Strategies & Tactics | FrequentFlier Forum | Programs | Airport Links | About the Site |

Quick Links...

▶ **Archived Issues**

2008 Issues of The Crier
2007 Issues of The Crier
2006 Issues of The Crier
2005 Issues of The Crier
2004 Issues of The Crier
2003 Issues of The Crier
2002 Issues of The Crier
2001 Issues of The Crier
2000 Issues of The Crier
1999 Issues of The Crier
1998 Issues of The Crier

## The FrequentFlier CRIER A weekly summary of travel news & opinion

### Issue #136 -- Mar. 1, 2001

#### CONTENTS

▷ Take a Survey, Change the World << O N S I T E >
▷ FrequentFlier Forum Topics
▷ AA Clarifies TWA Mileage Policies, Procedures
▷ Greenpoints Delists Delta from Partner Roster
▷ SkyMiles Adds "New" Miles-for-Loans Partner
▷ AAdvantage Lowers Mile Requirement for Upgrades
▷ Hertz Doubles Miles, Points
▷ CO Discounts Award Travel, Drops Czech Airline
▷ idwest Express Has Take-a-Friend Sale
▷ At Safeway, Buy 5 to Earn 50
▷ The TWA Saga (Continued)
▷ Can You Say 'Disintermediation'?
▷ Chase Travel Rewards

## U P F R O N T

### Take a Survey, Change the World
================================

Juline is back, and she needs more data for her Purdue PhD research on inflight dining (oxymoron?). The survey is online at http://courses.unt.edu/jclay/ and it only takes a minute to complete.

Why bother? Consider the following scenario...

Our intrepid PhD candidate gets her doctorate (on the strength of the research completed with YOUR help) and joins the Department of Transportation. There her talent is obvious to all. She quickly rises through the gray ranks to become Airline Food Czar, and mandates that all U.S. airlines must serve Prime beef and Alaska salmon, prepared to order, complemented by premium liquors, fine wines and fresh-squeezed juices. We all eat happily ever after.

It COULD happen!!!

## O N S I T E

### FrequentFlier Forum Topics
===========================

As always, there's plenty of activity on the Forum...

Crystal started a thread on the effect of appearance (dress, accessories, gender, race) on one's chances of getting an upgrade. Aaron wants to convert Mypoints into airline miles. Jonathon is looking for access to Star Alliance airport lounges. Jean thinks the Qualiflyer grouping is a goner. And Ronald has more mileage and points suggestions than there are hours in the day.

Do you have questions? Do you have answers? Post them to the Forum!

>> More - The FrequentFlier Forum

## M I L E S & P O I N T S



imagine...
your own
**Round-
the-World
journey**



### AA Clarifies TWA Mileage Policies, Procedures
========================================================

As part of its official bid for TWA's assets, submitted on Wed. to a bankruptcy court, American disclosed details of its plan for integrating Aviators miles into the AAdvantage program.

If American is the successful bidder (as seems increasingly likely), "It is anticipated that TWA would give Aviators members six months notice before ending the Aviators program. Aviators members would then receive full credit for unused mileage balances in their Aviators portfolio when the Aviators program ends."

"During that transition period, Aviators members would be able to continue earning and redeeming miles as they do today. At the end of the notification period, Aviators members would receive a bonus mileage posting in their new or existing AAdvantage account equal to the unused ending mileage balance in their Aviators portfolio."

### Greenpoints Delists Delta from Partner Roster
===========================

Those with a yen for airline miles will be disappointed with the latest move by one of the higher profile rewards programs, Greenpoints. In the company's own words:

"Our records indicate that your S&H greenpoints Wish List includes Delta Airlines Frequent Flyer Mileage Certificate (Item #S5023). Because you are a valued member of S&H greenpoints, we wanted to make sure you know that, effective March 5th, 2001 our Delta Airlines Frequent Flyer Mileage Certificate will be discontinued."

For context, Greenpoints originally gave members 3 mileage options when it came time to redeem their points--Alaska, American or Delta. American miles were taken off the awards list last year, leaving Alaska and Delta. And as of March 5, only Alaska miles will remain. While a Greenpoints representative promised that there are no plans to drop Alaska, I was unable to find any reference to Alaska miles on the Greenpoints.com website. In any case, miles clearly no longer play an important part in the Greenpoints scheme.

In place of miles, Greenpoints is promoting its new (as of Jan. 15) Travel Rewards option, which allows members to redeem points and cash for travel.

While I have heard cries of anguish from some readers, it's worth bearing in mind that not all loyalty programs are frequent-travel programs. According to the folks at Greenpoints, their average member is 34 years of age, female, with 2 kids. That's more likely to be the profile of a frequent buyer than a frequent flyer. And there's a place in an intelligent shopper's strategy for an effective rebate of 1 - 3%.

If you have a Greenpoints account and were planning to redeem for SkyMiles, do keep that Mar. 5 deadline in mind.

### SkyMiles Adds "New" Miles-for-Loans Partner
=====================================

What SkyMiles members loseth with Greenpoints, they gaineth with LendingTree. Here's the story...

Online realty services company and SkyMiles partner Homespace.com was recently acquired by LendingTree. LendingTree has elected to continue the relationship, and even to expand it. And to promote the fact, LendingTree is sponsoring a 1-million-mile sweepstakes drawing.

Earning miles the old-fashioned way with LendingTree works as follows--

- Mortgage - Earn 1,250 SkyMiles for every $10,000 borrowed
- Real Estate - Earn 3,300 SkyMiles for every $10,000 in home sale and/or purchase amount
- Home Equity - Earn 1,250 SkyMiles for every $10,000 borrowed
- Auto Loan - Earn 1,250 SkyMiles for every $10,000 borrowed

To enter the sweepstakes, go to http://www.lendingtree.com/delta/ and complete the online entry form. There's no purchase necessary, but YOU MUST HAVE BEEN AN ENROLLED SKYMILES MEMBER AS OF FEB. 1, 2001, to participate. Only U.S. residents at least 18 years of age are eligible. Last date to enter: May 30, 2001.

### AAdvantage Lowers Mile Requirement for Upgrades

**At Safeway, Buy 5 to Earn 50**
======================================

Mileage Plus members who have signed up with the GroceryMiles program will earn 50 bonus miles for every 5 Safeway SELECT items purchased at participating stores. The bonus offer is in effect until Mar. 27, 2001.

If you're not a GroceryMiles member, there's an enrollment bonus in place until Mar. 27. Sign up (by calling 1-800-645-4502 or at participating markets) and purchase $250 worth of goods before Mar. 27 to earn 250 Mileage Plus miles -- double the normal 125 miles for $250 in eligible purchases.

## S T E A L S & D E A L S

**Deal Alert from SmarterLiving.com**
======================================

This week's hot deals from SmarterLiving.com...

Spring Savings on Domestic and International Travel
--------------------------------

American Airlines has announced a sale on domestic and international travel to destinations in North, Central, and South America and Europe for departures through May 19.

For more details, go here.

Three Airlines Offer Mexico Deals
--------------------------------

American has released sale fares to Mexico, with round-trip fares starting at $179. Also, America West has extended its sale to/from 10 cities in Mexico, and Delta is offering two different sales to a total of seven cities.

For more details, go here.

## I N D U S T R Y N E W S B I T E S

**The TWA Saga (Continued)**
======================================

On Wed., interested parties submitted bids to the bankruptcy court for TWA's assets. The only surprise... there were no surprises.

The bidders were, as expected: American (whose plan has been summarized in past issues of The Crier, and includes wholesale conversion of Aviators miles into AAdvantage miles); Jet Acquisitions (a group whose members and plan remain publicly undeclared even at this late date); and Galileo (the computer reservation system owned jointly by TWA, Northwest and Delta whose $220 million bid is solely for TWA's 26% stake in Worldspan). After all the legal saber-rattling, Continental declined to bid.

In reviewing the offers, the court will apply a "best for the most" criterion, evaluating the competing plans' effects on employees, consumers, stockholders and creditors. The consensus is that American will prevail over Jet Acquisitions, and that Galileo's bid for Worldspan will also succeed. The judge will rule on Mar. 9.

**Can You Say 'Disintermediation'?**
======================================

You won't find 'disintermediation' in your office copy of Webster's. But it's a very real commercial and economic force even if lexicographers haven't noticed the trend or come across the term. It's the process of squeezing out, eliminating, as much of the distribution network as possible while still delivering the product or service to the consumer.

In the travel industry, disintermediation (DM for short) is what the airlines are doing to the travel agents. While agents effectively extend the airlines' own sales and ticketing operations, the commissions they charge to sell and issue tickets represent a huge cost to the airlines.

No matter what they say publicly, all airlines really want one thing: All customers buying all tickets on the airlines' own websites. That results in reduced customer service costs, ticketing costs, and postage costs. And no travel agency commissions (another cost). Costs are minimized, profits maximized.

It's a dangerous game, for at least 2 reasons. First, airlines must work with travel agencies at the same

# ATTACHMENT 4



| Home | Forums | Members | Extras | Store | Help |
|---|---|---|---|---|---|
| Jump to Forums: | Miles & Points | Travel & Dining | | Community | OMNI |

# Forums



London's new airport shuttle    Book now >    national express dot2dot



| | | User Name | User Name | Remember Me? |
|---|---|---|---|---|
FlyerTalk Forums > Miles&Points > Airline Programs > American AAdvantage
**American to honor TWA lifetime miles ???**    Password [    ]  Log in

| Register | FAQ | Calendars | Search |
|---|---|---|---|

**Post Reply**    Page 1 of 4  **1** 2 3 4 > 

Thread Tools    #1

☐ Jun 30, 01, 12:32 am

**freakflyer**

Join Date: Jan 2000
Location: Northern California
Programs: Inf Elite CO, lifetime AA Platinum
Posts: 1,683

**American to honor TWA lifetime miles ???**

From planebusiness.com. Incredible if true. Maybe we can get them to write a letter to Mr. Carty about the lifetime Platinum cards.

Recently I sent a letter to AA Chairman Don Carty, signed by myself and five other TWA Frequent Flyers from this board. Between us we represent several million earned frequent flyer miles. We are all Elite One, Platinum or Lifetime Platinum Aviators members.

**Looking for a real travel deal?**

$83 & up Cheap domestic fares
$261+ Quick US ski trips w/air & hotel
$179+ Last-min sailings to sun spots
$479+ 7-night Barbados trips w/flight
$99 & up Easter weekend US flights
$140/night+ Deluxe Bahamas resorts
$200 & up Spring flights to Europe
more deals                Sherman's Top 25

We had a concern about American's planned integration of Aviators members into the AAdvantage program. Under American's AAdvantage rules, members can qualify for "Million Miler" Lifetime elite status (one million miles for Gold, two million for Platinum) by accumulating one million or two million miles in the AAdvantage program since their date of enrollment, from all sources, including bonuses, car rentals, hotels, etc. These miles do not need to remain in your account, they can be used. Once the cumulative total has reached the one or two million threshold, you become "vested", meaning you have achieved "Lifetime" Gold or Platinum status, with no requirement to re-qualify each year.

American has told the TWA Aviators members that when their accounts are transferred over to AAdvantage accounts, they will be given credit for their current TWA mileage balance in their new or existing AA account. Of course, to do otherwise would be to lose these customers and create a great deal of hostility in the process. So this was a prudent business decision.

However, when we inquired as to whether all the miles we had accumulated at TWA would count towards the "Lifetime" levels in the AAdvantage program, we were told that they would not. Only the existing mileage balance in our TWA accounts at the time of transfer (November 30, 2001) would be applied toward AA Lifetime status.

In my case for example, I have a current Aviators mileage balance of 228,000 miles. But I have accumulated 944,000 miles since my enrollment. So I would lose over 715,000 miles toward my AA Lifetime qualification--and that assumes I don't use any more TWA miles between now and the transfer date, which would further erode my standing!

The letter to Mr. Carty carefully pointed these facts out and illustrated that Aviators members were in effect, being "stapled" below AAdvantage members, whose cumulative total from date of enrollment was counted, while only our remaining unused balance at the date of transfer would be counted. We feel that one of the "assets" which AA acquired when they bought TWA's assets, was us, TWA's best customers. But unlike employees, we have a choice of where to do our business, and this AA decision was a substantial motivating factor to go elsewhere, where our loyal TWA patronage and expected future business would be recognized.

Mr. Carty asked Mr. Bruce Chemel, President of the American AAdvantage Program, to respond to us. Here is Mr. Chemels response as taken from his letter to me:

Dear Mr.(Marky):

We appreciate your enthusiasm about American's recent acquisition of TWA. We are excited about this addition to our network, and we are looking forward to building relationships with TWA's loyal Aviators members. We are committed to making this the most successful transition ever.

In response to the concerns expressed in your letter, let me begin by giving you some background on the acquisition of the TWA assets. American acquired certain assets of TWA through a court approved bidding process after TWA filed for bankruptcy. Under our agreement with TWA, and as approved by the court, American did not assume, and is not responsible for, any contracts that TWA had with its Aviators members.

Nonetheless, in the spirit of good customer service for TWA's loyal customers, American is offering AAdvantage miles to Aviators members. Those miles, however, will be governed solely by the AAdvantage program. I am happy to report that as a further gesture of our desire to retain the loyalty of TWA's Aviators members, we have decided to allow previously earned Aviators miles to count towards the members' status in the AAdvantage program. The combined mileage earned in the Aviators and AAdvantage programs will be used in recognizing Million Miler status in the AAdvantage program.

Mr. (Marky), it is our goal to provide all of our customers a wider network of destinations, the safest and most comfortable fleet, the services of top notch employees and a frequent traveler program that is second to none. We are confident we can provide you with top quality service and will always work hard to earn your business.

Sincerely, Bruce Chemel

Despite the skepticism of many, who believed that a huge company like AA, the world's largest airline, would not reconsider their policy, they have in fact agreed to our request. This change in American's policy will benefit many thousands of TWA Aviators members other than ourselves. In addition to counting all TWA miles from all sources, since our enrollment in TWA's program, American will also count any miles members may have earned seperately in an AAdvantage account. I have earned about 22,000 miles in my AAdvantage account. Combined with my 944,000 TWA total, I am now only 34,000 miles away from Lifetime status with American!

Folks, American Airlines has stated that their goal is excellence in customer service, second to none. They are to be commended for this example of responsiveness to new customers. They have put their